# EXHIBIT 17

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION
CASE NO.:

KONSTANTINOS GIANNITSOPOULOS and
FATIMA BAGHAT GIANNITSOPOULOS, as
Co-Personal Representatives of the Estate of Andreas
Konstantinos Giannitsopoulos;

      Plaintiffs,

v.

CHAMPLAIN TOWERS SOUTH CONDOMINIUM
ASSOCIATION, INC., a Florida not-for-profit
corporation; SCOTT STEWART, individually;
MORABITO CONSULTANTS, INC., a foreign for-
profit corporation; CONCRETE PROTECTION AND
RESTORATION, INC., a foreign for-profit corporation;
WILLCOTT ENGINEERING, INC., a Florida for-profit
corporation; 8701 COLLINS DEVELOPMENT, LLC, a
Florida limited liability company; TERRA GROUP,
LLC, a Florida Limited Liability Company; TERRA
WORLD INVESTMENTS, LLC, a Florida limited
liability company; JOHN MORIARTY & ASSOCIATES
OF FLORIDA, INC., a foreign for-profit corporation;
NV5, INC., a foreign-for profit corporation; NV5
GLOBAL INC., a foreign-for profit corporation;
DESIMONE CONSULTING ENGINEERS, LLC, a
Florida limited liability company; BIZZI & PARTNERS
DEVELOPMENT, LLC, a foreign limited liability
company; BECKER & POLIAKOFF, P.A., a Florida
limited liability corporation; and H. VIDAL &
ASSOCIATES, Inc., a Florida for-profit corporation,

      Defendants.

_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, by and through the undersigned counsel, hereby sue Defendants, CHAMPLAIN TOWERS SOUTH CONDOMINUM ASSOCIATION, INC. (hereinafter "the Association") a Florida not-for-profit corporation; SCOTT STEWART, individually; MORABITO CONSULTANTS, INC. (hereinafter "MORABITO CONSULTANTS") a foreign for-profit corporation; CONCRETE PROTECTION AND RESTORATION, INC. a foreign for-profit corporation; WILLCOTT ENGINEERING, INC., a Florida for-profit corporation; 8701 COLLINS DEVELOPMENT, LLC; a Florida limited liability company; TERRA GROUP, LLC, a Florida Limited Liability Company; TERRA WORLD INVESTMENTS, LLC, a Florida limited liability company; JOHN MORIARTY & ASSOCIATES OF FLORIDA, INC., a foreign for-profit corporation; NV5, INC., a foreign for-profit corporation; NV5 GLOBAL, INC., a foreign for-profit corporation; DESIMONE CONSULTING ENGINEERS, LLC, a Florida limited liability company; BIZZI & PARTNERS DEVELOPMENT, LLC, a foreign limited liability company; BECKER & POLIAKOFF, P.A., a Florida limited liability corporation; and H. VIDAL & ASSOCIATES, Inc., a Florida for-profit corporation and as grounds therefore allege the following:

## **INTRODUCTION**

This is a wrongful death action brought against Defendants who were either involved in the ownership, maintenance, restoration, management, inspection and/or oversight of the property known as "CHAMPLAIN TOWERS SOUTH", located at 8777 Collins Ave, Surfside, FL 33154 (hereinafter "the Building") or with the neighboring property whose representatives, employees and/or agent's conduct interfered with and damaged the Building.

On June 24, 2021, the unthinkable occurred in the town of Surfside, Florida. A residential building was reduced to rubble. In one of the most catastrophic building collapses in United States

history, Andreas Konstantinos Giannitsopoulos ("ANDREAS"), along with ninety-eight (98) other residents and visitors, lost his life. ANDREAS was an overnight visitor when the Building collapsed. The collapse was preventable and a result of the direct negligence of the Defendants. The conduct of these Defendants was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, and rights of persons, including ANDREAS, who lost his life as a result of the Defendants' actions or omissions.

## JURISDICTION, VENUE AND THE PARTIES

1.      This is a wrongful death action brought pursuant to section 768.16, Florida Statutes, seeking damages in excess of $30,000.00, exclusive of interest, costs and attorney's fees. Accordingly, this Court has subject matter jurisdiction over this cause.

2.      Venue is proper in this circuit because the actions and omissions of the Association and other Defendants, forming the basis of this Complaint all occurred in this circuit, and because the incident occurred in Miami-Dade County.

3.      At all times material, Plaintiffs, were and are *sui juris* and residents of Fort Bend County, Texas.

4.      At all times material, ANDREAS was an overnight guest in unit no. 801 located at the Building.

5.      Plaintiff, KONSTANTINOS GIANNITSOPOULOS, is ANDREAS' biological father, and has been or will be the duly appointed Co-Personal Representative of the Estate of Andreas Konstantinos Giannitsopoulos. He brings this claim on behalf of the ANDREAS' Estate and survivors.

6.      Plaintiff, FATIMA BAGHAT GIANNITSOPOULOS, is ANDREAS' biological mother, and has been or will be the duly appointed Co-Personal Representative of the Estate of

Andreas Konstantinos Giannitsopoulos. She brings this claim on behalf of the ANDREAS' Estate and survivors.

7.    At all times material, the Association was and is a Florida not-for-profit corporation licensed to and doing business in Miami-Dade County, Florida, and was and is the owner, operator and/or manager of The Association.

8.    At all times material to this action, Defendant, SCOTT STEWART, was and is a legal resident of Miami-Dade County, Florida, is over the age of 18 and is otherwise *sui juris*. Said Defendant was engaged in providing property management services at the Building.

9.    At all times material, Defendant, MORABITO CONSULTANTS, INC., was and is a foreign for-profit corporation, licensed to and doing business in Florida, and was engaged in providing engineering consulting services at the Building.

10.    At all times material, Defendant, CONCRETE PROTECTION AND RESTORATION, INC., (hereinafter "CPR") was and is a foreign for-profit corporation, licensed to and doing business in Florida, and was engaged in assessing, inspecting and/or performing concrete structural restoration to the Building.

11.    At all times material, Defendant, WILLCOTT ENGINEERING, INC, was and is a Florida for-profit corporation, licensed to and doing business in Florida, and provided engineering consulting services at the Building. Said Defendant conducted an engineering inspection of the Building in January 2020.

12.    Defendant 8701 Collins Development, LLC, was and is a Delaware limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida and was and is doing business in Florida. Defendant 8701 Collins Development, LLC, by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or

alter egos, owned, operated, constructed, managed, supervised, and/or developed a construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida.

13.     Defendant Terra Group, LLC, was and is a Florida limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida and was and is doing business in Florida. Defendant Terra Group, LLC, by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos owned, operated, constructed, managed, supervised, and/or developed a construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida.

14.     Defendant Terra World Investments, LLC, was and is a Florida limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida and was and is doing business in Florida. Said Defendant, by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos owned, operated, constructed, managed, supervised, and/or developed a construction project known as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida. Together, Defendants 8701 Collins Development, LLC; Terra Group, LLC; and Terra World Investments, LLC, are collectively referred to herein as the "Terra Defendants."

15.     Defendant 8701 Collins Development, LLC was a shell company established by Defendants Terra Group, LLC, and/or TerraWorld Investments, LLC through which Terra Group, LLC, and/or Terra World Investments, LLC carried out its development of Eighty-Seven Park. However, the conduct, actions, and inactions giving rise to this action and Defendants' liability were committed by agents, servants, employees, ostensible agents, and/or alter egos of Terra Group, LLC and/or Terra World Investments, LLC.

16.     At all times material, Defendant, JOHN MORIARTY & ASSOCIATES OF FLORIDA, INC., was and is a foreign for-profit corporation, licensed to and doing business in

Page | 5

Miami-Dade County, and was engaged in providing general contracting services for the construction project at "Eighty-Seven Park."

17.     At all times material, Defendant, NV5, INC., was and is a foreign for-profit corporation, licensed to and doing business in Miami-Dade County, and was engaged in providing geotechnical engineering services for the construction project at 8701 Collins Avenue Miami Beach, Florida (hereinafter referred to as "Eighty-Seven Park Construction.")

18.     At all times material, Defendant, NV5 GLOBAL, INC., was and is a Foreign Profit Corporation, licensed to and doing business in Miami-Dade County, and was engaged in providing geotechnical engineering services for the construction project at "Eighty-Seven Park." Collectively NV5, Inc. and NV5 Global, Inc. will be referred to as the "NV5 Defendants."

19.     At all times material, Defendant, Desimone Consulting Engineers, LLC, was and is a Delaware limited liability company with its principal place of business at 140 Broadway, 25th Floor, New York, New York and was and is doing business in Florida. Desimone, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired, retained, or otherwise acting as the structural engineer on the construction project knowns as "Eighty-Seven Park," located at 8701 Collins Avenue, Miami Beach, Florida.

20.     At all times material, Defendant, BIZZI & PARTNERS DEVELOPMENT, LLC, was and is a foreign limited liability company, doing business in Florida, and operated, managed, supervised and/or developed a construction project known as "Eighty-Seven Park" and located at 8701 Collins Ave, Miami Fl, 33154.

21.     Defendant Becker & Poliakoff, P.A. (hereinafter referred to as "Becker"), was and is a Florida processional association with a principal place of business at 1 East Broward Boulevard, Suite 1800, Fort Lauderdale, Florida and was and is doing business in Florida. Becker, by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or

alter egos provided continuous legal services and counsel to the Association since at least February 25, 1993, until after the Building collapsed.

22.     Defendant H. VIDAL & ASSOCIATES, INC. (hereinafter referred to as "VIDAL"), was and is a Florida for profit corporation, doing business in Florida. VIDAL provided remediation estimates during the 40-Year Recertification and assessed the condition of the Building prior to the collapse.

23.     Local governments, including Town of Surfside, have been placed on legal notice of this claim.

24.     All conditions precedent to the bringing of this action and Plaintiff's rights to the relief sought herein have occurred, have been performed or have been waived.

## **BACKGROUND**

25.     At all times material, prior to its collapse, the Building was a 12-story beachside residential building with 136 units, located at 8777 Collins Avenue, Surfside, Florida.

26.     In the decades leading up to this catastrophe, the Association was placed on actual notice of the deplorable conditions that existed. Concerns about the structural integrity of the Building were repeatedly brought to their attention by the residents, the maintenance manager and in various building inspections.

27.     In fact, William Espinosa, who oversaw maintenance of the Building from 1995-2000, recounted that he personally witnessed concerning amounts of sea water accumulating in the garage during high ocean tides.[1] He recalled that sometimes one to two feet of sea water would sit

---

[1] "Condo Collapse: Former Maintenance Manager William Espinosa Was Concerned About Saltwater Intrusion" AP. Available at: https://miami.cbslocal.com/2021/06/20/condo-collapse-former-maintenance-manager-william-espinosa-was-concerned-about-saltwater-intrusion/

in the garage for extended periods of time. Despite warning the Building's managers and owners on numerous occasions, nothing was done to resolve this serious ongoing problem.

28.     Indeed, Donna DiMaggio Berger, an attorney for The Association, acknowledged that it is common knowledge that sea water corrosion is a serious issue for beach front properties when she said in a recent interview: "Concrete spalling, rebar deterioration—these are not unusual events when you have buildings exposed to corrosive conditions."[2] She added, "This building was buffeted by water." She was right. These are not unusual events. In fact, her statements make clear that any reasonable person would have known that the structure of the Building was in peril and bound to fail without proper repair. The Association knew of the dangerous condition that existed within the Building's structure and elected to ignore it.

29.     Contrary to recent assertions by Ms. DiMaggio Berger, the residents of the Building did not believe the structure was properly maintained and resorted to taking matters into their own hands when the Association failed to act on their behalf.

30.     In 2001, a building resident filed a lawsuit against the Association alleging property damage caused by water entering her unit through "cracks in the outside wall of the building." The complaint alleged that the Association "failed to repair or negligently repaired" the "common elements of the outside walls of the building."[3] No action was taken.

31.     Still faced with dangers at the Building that were unaddressed, a second lawsuit was filed in 2015 alleging additional property damage caused by the Association, which concerned the structural integrity of the Building.

---

[2] "*Miami-Area Condo Failure: Years of Warnings, but Mixed Signals*" A.P. Available at: https://www.wsj.com/articles/miami-area-condo-failure-years-of-warnings-but-mixed-signals-11624994509
[3] Zaidenweber, Matilde v. Champlain Towers South Condo Assn Inc., Case No.: 01-26634 CA 22; and Matilde Fainstein v. Champlain Towers South Condominium Association Inc., Case No.: 13 2015 CA 022299000001

32.     It was not until 2018 that the Association elected to take any action to address the safety concerns that existed at the Building. Even then, the Association's sole motivating factor for taking action was to pass the county's 40-year recertification process.

33.     Toward that end, MORABITO CONSULTANTS, INC., was hired by the Association to perform the work and prepare the necessary paperwork to obtain the recertification of the condo building, as required by Miami-Dade County and the Town of Surfside.

34.     MORABITO CONSULTANTS, INC. inspected the Building and provided their Structural Field Survey Report to the Association on October 8, 2018 assessing the overall condition of the building and explaining what repairs were necessary to provide a safe and functional infrastructure for the future.

35.     The report confirmed the Building had significant cracks and breaks in the concrete. These compromised the structural integrity of the Building.

36.     Specifically, the report identified evidence of "major structural damage" below the pool deck and warned that waterproofing below the pool deck and entrance drive was failing and that "[f]ailure to replace the waterproofing in the near future will cause the extent of the concrete deterioration to expand exponentially." The report further explained that "[a]bundant cracking and spalling of varying degrees was observed in the concrete columns, beams, and walls …" and recommended that "most of the concrete deterioration needs to be repaired in a timely fashion." No action was taken to resolve these conditions.

37.     Notwithstanding the comprehensive inspection, documented in photographs, and the severe structural issues with the Building, foundation, and other areas, at no time did MORABITO CONSULTANTS, INC. advise the Association that there was any urgency to performing repairs or any need to evacuate residents immediately or during repairs.

38.     On April 9, 2021, the president of the Association's Board, Jean Wodnicki, wrote a letter to the residents which was referred to as "State of the Building." In the letter, Wodnicki attempted to address concerns voiced by residents as to whether the repairs were necessary due to the cost, amounting to more than $15 million.

39.     Three months prior to the Building's collapse, Wodnicki acknowledged that "indeed the observable damage such as in the garage has gotten significantly worse since the initial inspection. When you visually see the concrete spalling (cracking), that means that the rebar holding it together is rusting and deteriorating beneath the surface."[4]

40.     To further justify the need for over $15 million, Wodnicki wrote "[p]lease note that the original scope of work in the 2018 report has expanded. The concrete deterioration is accelerating."

41.     She then admitted that "[a] lot of this work could have been done or planned for in years gone by, but this is where we are now."

42.     Wodnicki concluded the letter by providing residents with a status of the Association's current finances and the loan that was acquired from a financial institution to fund the repairs. When addressing the Association's limited reserves, she stated that the Board would not utilize its reserves to fund the repairs. "[T]his Board feels it would be inappropriate to spend our Reserves for these projects. We need to conserve some cash in the event of an emergency."

43.     Three months later, the Building would collapse.

## THE CATASTROPHE

44.     On June 24, 2021, at approximately 1:30 a.m., the Building suffered a catastrophic failure and collapsed, resulting in the deaths of ninety-eight (98) people, including ANDREAS.

---

[4] https://s.wsj.net/public/resources/documents/miamiletter0628.pdf

45.     Surfside Mayor Charles Burkett eloquently stated the obvious when he announced the Town of Surfside's plan to relocate the remaining residents and begin a forensic investigation of the collapse. He said, "the building collapsed for inexplicable reason[s], buildings in the United States do not fall down, and something very wrong was going on."[5]

## ANDREAS KONSTANTINOS GIANNITSOPOULOS

46.     This world lost a bright, caring, and loving young man that had so much to give. Andreas was only twenty-two (22) years old and completing his studies at Vanderbilt University when he was killed in the Building collapse. He had his whole life ahead of him. Majoring in Economics, he would have graduated from Vanderbilt in May of 2022. Unfortunately, as a result of the negligence and complete disregard for human life exhibited by the Defendants, Andreas will not be able to fulfil that dream and his parents' have suffered extreme mental pain and suffering as a result of losing their son.

## COUNT I: NEGLIGENCE AGAINST THE ASSOCIATION

47.     Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

48.     The Association owed Plaintiffs a non-delegable duty under its governing documents, the Miami-Dade County Code of Ordinances, and the common law to maintain the Building in a safe condition and to warn of unreasonable risks of harm.

49.     This non-delegable duty included inspecting and maintaining the Building so that conditions on the premises did not create a danger to the public, including ANDREAS.

---

[5] Mayor: 'Something very wrong' at building collapse, AP. Available at:
https://www.usatoday.com/videos/news/nation/2021/06/26/mayor-something-very-wrong-building-collapse/5359108001/

50.     At the time of the accident described above, the Building was in a defective, weakened, and dangerous condition. Specifically, the Building's concrete, structural integrity, rebar, and other foundational materials were in deplorable condition and required remediation.

51.     Defendant had actual knowledge and notice of the defective and dangerous condition of the Building, or, in the exercise of reasonable care, should and would have had known of the unsafe condition of the premises. Specifically, Defendant was on notice as of October 2018, if not earlier, that the Building had major structural damage. In addition, the parking lot was noted to have extensive cracking, crumbling of concrete in columns, beams, and walls, among other areas.

52.     Notwithstanding such knowledge, Defendant failed to act and continued to negligently and carelessly maintain the Building. Defendant's failures allowed the Building to remain in a dangerous and defective condition.

53.     On the above-mentioned date and place, Defendant through its agents and/or employees, breached its duty to exercise reasonable care and acted in a negligent manner through the following acts and/or omissions:

   a. Failing to appreciate the significance of the cracking, fractures, and defects in the Building brought to their attention by their residents, agents and/or employees;

   b. Permitting the water from the pool deck and other water in existence under the structure to seep and leak into the structure of the subject building causing damage to the structural integrity of the Building;

   c. Placing ANDREAS in the zone of danger of imminent risk of death or serious bodily injury;

   d. Failing to properly analyze, review, communicate, prevent and/or eliminate the risks associated with the fractures, cracks, and defects in the Building;

   e. Failing to disclose to ANDREAS, that the structure was weak, deficient and/or defective rendering the Building unsafe;

f.  Failing to disclose to ANDREAS, that the cracks and defects observed on the Building created a dangerous condition and were likely to cause a collapse;

g.  Failing to disclose to ANDREAS, that the cracks observed in the Building before its collapse were a safety concern;

h.  Failing to perform, manage, supervise, oversee, and/or inspect any repair and/or restoration of the Building;

i.  Failing to properly train, instruct, and supervise personnel who participated in   maintenance, inspection, repair or restoration of the Building;

j.  Failing to warn ANDREAS that the Building was unsafe;

k.  Failing to notify the ANDREAS to timely evacuate the Building;

l.  Using improper equipment and/or improperly using equipment during any repair and/or restoration of the Building;

m.  Recklessly and carelessly not requesting the evacuation of the Building before attempting to perform repairs and/or restoration; and

n.  Otherwise negligently failing to disclose any dangerous condition relative to the Building in the circumstances.

54.  As a foreseeable and proximate result of the Association's negligence and reckless disregard for human life and safety in this matter, ANDREAS sustained injuries resulting in his death.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against Defendant the Association for damages, costs and such further relief as the Court deems just and proper.   KONSTANTINOS   GIANNITSOPOULOS   and   FATIMA   BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

## COUNT II: NEGLIGENCE AGAINST
## SCOTT STEWART

55.     Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

56.     At all times material, SCOTT STEWART was the manager of the Building, and had duty to maintain it in a reasonably safe condition.

57.     This duty included inspecting and maintaining the Building so that conditions on the premises did not create a danger to the public, including ANDREAS.

58.     At the time of the accident described above, the Building was in a defective, weakened, and in an otherwise dangerous condition. Specifically, the Building's concrete, structural integrity, rebar, and other foundational materials were in deplorable condition and required remediation.

59.     At all times material, Defendant had actual knowledge and notice of the defective and dangerous condition of the Building, or, in the exercise of reasonable care, should and would have had known of the unsafe condition of the premises.

60.     Notwithstanding such knowledge, Defendant failed to take action and continued to negligently and carelessly maintain the Building. Defendant's failures allowed the Building to remain in a dangerous and defective condition.

61.     On the above-mentioned date and place, Defendant breached his duty to exercise reasonable care and acted in a negligent manner through the following acts and/or omissions:

    a.  Failing to appreciate the significance of the cracking, fractures, and defects in the Building brought  to their attention by their residents, agents and/or employees;

    b.  Permitting the water from the pool deck and other water in existence under the structure to seep and leak into the structure of the subject building causing damage to the structural integrity of the Building;

c. Placing ANDREAS in the zone of danger of imminent risk of death or serious bodily injury;

d. Failing to properly analyze, review, communicate, prevent and/or eliminate the risks associated with the fractures, cracks, and defects in the Building;

e. Failing to disclose to ANDREAS, that the structure was weak, deficient and/or defective rendering the Building unsafe;

f. Failing to disclose to ANDREAS, that the cracks and defects observed on the Building created a dangerous condition and were likely to cause a collapse;

g. Failing to disclose to ANDREAS, that the cracks observed in the Building before its collapse were a safety concern;

h. Failing to perform, manage, supervise, oversee, and/or inspect any repair and/or restoration of the Building;

i. Failing to properly train, instruct, and supervise personnel who participated in  maintenance, inspection, repair or restoration of the Building;

j. Failing to warn ANDREAS that the Building was unsafe;

k. Failing to notify the ANDREAS to timely evacuate the Building;

l. Using improper equipment and/or improperly using equipment during any repair and/or restoration of the Building;

m. Recklessly and carelessly not requesting the evacuation of the Building before attempting to perform repairs and/or restoration; and

n. Otherwise negligently failing to disclose any dangerous condition relative to the Building in the circumstances.

62.    As a result, the Building was unsafe, unstable and collapsed.

63.    As a foreseeable and proximate result of SCOTT STEWART'S negligence and reckless disregard for human life and safety in this matter, ANDREAS sustained injuries resulting in his death.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against Defendant SCOTT STEWART for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

## COUNT III: NEGLIGENCE AGAINST
## MORABITO CONSULTANTS, INC.

64.     Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

65.     At all relevant times, Defendant was retained for purposes related to the Building's 40-year recertification process. Accordingly, Defendant undertook to inspect, evaluate, and advise the Association on certain repairs and to assess the Building's structural condition.

66.     Defendant had a duty to incorporate therein nationally recognized safety standards and practices; to follow and incorporate therein the terms and provisions of the applicable building codes; to make a design, plan and specification which would not produce harm, injury or death to the public including the ANDREAS, and to perform their services in a safe manner.

67.     This duty included providing accurate information as to the condition of the Building and potential safety risks and recommending timely evacuation of the Building so that conditions on the premises did not create a danger to the public, including ANDREAS.

68.     The need for a thorough structural inspection and examination, including a quantitative analysis performed through sampling and testing, is especially necessary in the marine climate in which the Building was located, where highly aggressive conditions exist year-round.

69.     In 2018, the Association retained Defendant to perform a structural engineering analysis of the Building and submit a report in anticipation of the 40-year recertification requirement. Defendant completed and rendered the report on October 8, 2018.

70.     The goal of the analysis undertaken by the Defendant "was to understand and document the extent of structural issues that require repair and/or remediation in the immediate and near future" in order to "provide a safe and functional infrastructure for the future."

71.     The conclusions reached and recommendations given in Defendant's 2018 report were alarming, required immediate remediation, and raised multiple red flags which Defendant ignored.

72.     The 2018 inspection and Filed Survey, detected "abundant cracking and spalling of varying degrees … in the concrete columns, beams, and walls," among other discoveries.

73.     Defendant's observations and findings during its 2018 inspection should have spurred Defendant to examine the structural stability of the Building further by inspecting the sub-surface foundation.

74.     Defendant's findings rendered the Building an unsafe structure pursuant to section 8-5(b)(2)(ii) of the Miami-Dade County Building Code.

75.     At all times material, Defendant knew, or in the exercise of reasonable care should have known that the subject building was in a defective, weakened, and dangerous condition.

76.     Specifically, due to the nature of the dangers potentially associated with this type of work, the Defendant and its workers, servants, agents, and employees knew or should have known that the subject building where they were performing their services was occupied by residents and invitees.

77.     Nevertheless, the Defendant negligently, carelessly, and intentionally failed or refused to take the appropriate or reasonable precautions generally recognized to protect the public in general, and the ANDREAS, from the defective condition of the building.

78.     On the above-mentioned date and place, Defendant through its agents and/or employees, breached its duty to exercise reasonable care and acted in a negligent manner by allowing a hazardous and dangerous condition to exist in the subject building and failing to accurately disclose the inherent dangers associated with major structural damage, among others. Defendant failed to warn the public and among others, the Andreas, of the dangers outlined above.

79.     Defendant further failed to appreciate the hazardous and dangerous condition of the Building, communicate the urgency of its condition and the danger of its impending collapse, and recommend appropriate measures including immediate repair and evacuation.

80.     As a foreseeable and proximate result of MORABITO CONSULTANTS, INC.'s negligence and reckless disregard for human life and safety in this matter, ANDREAS sustained injuries resulting in his death.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against Defendant MORABITO CONSULTANTS, INC. for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

**COUNT IV: NEGLIGENCE AGAINST
CONCRETE PROTECTION AND RESTORATION, INC.**

81.     Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

82.     CPR was retained to conduct core sampling of the concrete at the Building and engage in repairs. CPR worked on the structural columns that provided critical support to the Building as well as in the pool area.

83.     CPR represents itself to have "superior technical experience." What's more, CPR provides its clients with a false sense of security by representing that its work will make buildings safer. "A properly maintained concrete structure should provide a lifetime of beneficial service. Partial or full depth removal of damages or deteriorating concrete "**can restore the structure to long term service life.**"[6]

84.     The work performed at the Building by CPR did not restore the structure to long term service life.

85.     CPR was retained to remove and repair any and all loose, cracked, spalled, deteriorated, and delaminated concrete at or around the pool pump room. CPR failed to property address the deteriorated condition of the concrete in this area which further contributed to the collapse of the Building.

86.     CPR was retained to conduct exploratory demolition throughout the Building. Specifically, CPR conducted exploratory demolition at or near the pool deck. CPR had firsthand knowledge of the concrete's condition at one of the critical points as it pertains to the collapse.

87.     Prior to the collapse of the Building, at least one critical support column and sections of the pool deck had already collapsed. CPR tested, examined, and repaired these sections.

88.     Lacking these key support members, the Building proceeded to collapse in a progressive fashion. In fact, minutes prior to the collapse, video footage confirmed that one of columns in the parking garage had collapsed. The collapse of this structural column, along with the

---

[6] https://concretecpr.com/about-us/

pool deck, left the Building without lateral support resulting in tremendous stress on the columns supporting the center portion of the tower.

89.     The failure of the foundational structure in the parking garage helped trigger the collapse sequence.

90.     At all times material, Defendant, its agents, servants or employees, were engaged in inspecting, assessing and making restorations to the concrete of the Building and had a duty to its residents and invitees to not endanger them and to maintain the Building in a reasonably safe condition for use by the public, including ANDREAS, and to perform its services and construction work in a safe manner.

91.     At all times material, Defendant employed a number of workers, servants, agents, and employees to perform the work incidental to the concrete restoration process. These workers, servants, agents, and employees were working within the nature, course, and scope of their employment, and were repairing the concrete foundation of the Building, the roof, and other structural components of the Building.

92.     Specifically, Defendant was negligent for failing to follow industry standards and mandatory health and safety guidelines while working on the structural aspects of the building, including the concrete, roof, and other areas.

93.     Furthermore, Defendant failed to secure the foundation of the Building.

94.     Due to the nature of the dangers potentially associated with this type of work, the Defendant and its workers, servants, agents, and employees knew or should have known that the subject building where they were performing the restoration was being occupied by residents and invitees. Nevertheless, the Defendant negligently, carelessly, and intentionally failed or refused to take the appropriate or reasonable precautions generally recognized to protect the public in general, including ANDREAS, from the hazards of the Building.

95.     The Defendant knew its activities did, in fact, constitute a known and dangerous condition to ANDREAS, and as a result of the Defendant's conduct, the Building collapsed.

96.     On the above-mentioned date and place, Defendant through its agents and/or employees, breached its duty to exercise reasonable care and acted in a negligent manner by creating and allowing a hazardous and dangerous condition to exist in the Building; failing to repair the defective condition; in failing to recommend evacuation of the Building; and in failing to warn the public and ANDREAS of the imminent collapse.

97.     Defendant further failed to appreciate the hazardous and dangerous condition of the Building, communicate the urgency of its condition and the danger of its impending collapse, and recommend appropriate measures including immediate repair and evacuation.

98.     The Defendant was also negligent, in that a contractor engaged in work of this nature, scope, and type is at all times required to institute and maintain safety precautions of a type and nature sufficient and necessary to safeguard all persons and property affected by the contractor's operations.

99.     As a foreseeable and proximate result of CPR's negligence and reckless disregard for human life and safety in this matter, the ANDREAS sustained injuries resulting his death.

        **WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against Defendant CONCRETE PROTECTION AND RESTORATION, INC. for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

## COUNT V: NEGLIGENCE AGAINST
## WILLCOTT ENGINEERING, INC.

100.    Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

101.    At all relevant times, Defendant, its agents, servants, or employees, were engaged in providing engineering consulting services for the Building.

102.    In early 2020, Defendants inspected the Building and provided their "Engineering Services Proposal" to the Association. The Building, its appurtenances, and particularly the pool deck and parking garage, were all inspected and evaluated for safety under Defendant's supervision. At its inspection, Defendant identified several defects in the Building.

103.    Defendant had a duty to incorporate therein nationally recognized safety standards and practices; to follow and incorporate therein the terms and provisions of the applicable building codes; to make a design, plan and specification which would not produce harm, injury or death to the public, including the ANDREAS, and to perform its services in a safe manner.

104.    This duty included providing accurate information as to the condition of the Building and potential safety risks ensuring timely evacuation of the Building so that conditions on the premises did not create a danger to the public, including ANDREAS.

105.    At all times material, Defendant knew, or in the exercise of reasonable care should have known that the Building was in a defective, weakened, and dangerous condition.

106.    Specifically, due to the nature of the dangers potentially associated with this type of work, the Defendant and its workers, servants, agents, and employees knew or should have known that the Building was occupied by its residents and invitees.

107.    Nevertheless, the Defendant negligently, carelessly, and intentionally failed or refused to take the appropriate or reasonable precautions generally recognized to protect the public in general, and the ANDREAS, from the defective condition of the Building.

108.    On the above-mentioned date and place, Defendant through its agents and/or employees, breached its duty to exercise reasonable care and acted in a negligent manner by allowing a hazardous and dangerous condition to exist in the subject building and not accurately disclosing the inherent dangers associated with major structural damage, among others. Defendant failed to warn the public and among others, the ANDREAS of the dangers of the Building.

109.    Defendant further failed to appreciate the hazardous and dangerous condition of the Building, communicate the urgency of its condition and the danger of its impending collapse, and recommend appropriate measures including immediate repair and evacuation.

110.    As a foreseeable and proximate result of WILLCOTT ENGINEERING, INC.'s negligence and reckless disregard for human life and safety in this matter, ANDREAS sustained injuries resulting in his death.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against Defendant WILLCOTT ENGINEERING, INC. for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

### COUNT VI: NEGLIGENCE AGAINST
### TERRA DEFENDANTS

111.    Plaintiff re-incorporates paragraphs one (1) through forty-six (46) as set forth herein.

112.    The Terra Defendants were the owners, developers, and managers of the Eighty-Seven Park construction/development project and had supervisory authority over all decision-making related to the project.

113.    The Terra Defendants owed a duty to persons present in and occupying adjacent structures, including ANDREAS, to ensure that its development and construction activities on the Eighty-Seven Park project did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including the Building.

114.    The Terra Defendants' aforementioned duty was heightened by the fact that the Terra Defendants were warned, explicitly notified, and made aware that certain activities on the Eighty-Seven Park project, including site compaction activities, pile driving, dewatering, and excavation activities had the potential to negatively impact the structural stability of adjacent structures, including the Building.

115.    Given the Terra Defendants' knowledge of the risks that certain construction activities posed to the Building and its residents, the Defendants had a duty and responsibility to vigilantly monitor and control those risks and ensure that their construction activities did not negatively impact the structural stability of the Building. They failed to do so.

116.    Further, because of the inherently dangerous nature of the street demolition and construction activities on the Eighty-Seven Park project, the Terra Defendants were under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities they undertook. Given that this duty was nondelegable, the Terra Defendants are accountable and responsible for the negligent actions of their sub-contractors, employees and/or agents in the performance of these dangerous activities.

117.   Prior to commencing construction, the Terra Defendants obtained various studies and opinions as to how the construction for this project should proceed.

118.   One such report was prepared by Defendant NV5. The NV5 Report presented the Terra Defendants with several available and appropriate options for basement excavation support methods. Only one of those options would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive.

119.   The Defendants had a duty to consider the impact on adjacent properties, including the Building, when choosing basement excavation support methods. The Terra Defendants had an additional duty to ensure that a reasonably safe method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

120.   The Terra Defendants failed to abide by their duties when they elected to proceed with the only basement excavation that produced damaging vibrations. The Terra Defendants elected to prioritize profits over safety.

121.   In addition to warning the Terra Defendants that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact the Building, the Terra Defendants were told to monitor and control these activities and cease if the Building was negatively impacted.

122.   As discussed, despite the risks about which NV5 warned the Terra Defendants, the Terra Defendants failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures. The Terra Defendants also failed to

25

undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting the Building.

123.    The Terra Defendants, acting by and through their agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respect, breached the duties owed to ANDREAS by:

a)    Placing the residents and occupants of the Building at grave and immediate risk of harm;

b)    Damaging the Building by impacting its structural condition and stability through construction and street excavation site activities at the Eighty-Seven Park  Construction site;

c)    Conducting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including the Building;

d)    Choosing to utilize a vibratory hammer to drive sheet piles on the project site, despite knowing that said pile driving activities would emit dangerous and destructive vibrations that would foreseeably penetrate and damage the Building;

e)    Choosing to utilize driven sheet piles for basement excavation support, despite knowing that pile driving activities would cause damaging vibrations to impact the Building and despite knowing that available and suitable  alternatives existed that were vibration free;

f)    Prioritizing corporate profits over the safety of the residents and occupants  of the Building and trying to save money by choosing to use driven sheet piles rather  than available alternative methods that were vibration free;

g)    Performing pile driving without monitoring vibration levels;

h)    Performing pile driving along and/or immediately adjacent to the Building south foundation wall;

i)    Performing pile driving along and/or immediately adjacent to the Building south foundation wall without monitoring vibration levels;

j)    Selectively or insufficiently monitoring vibration levels during pile driving activities;

k)    Continuing to use a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

l)    Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m)   Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

n)   Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including the Building;

o)   Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including the Building, and despite knowing that allowing the emission of the vibrations at dangerous levels would expose the residents and occupants of the Building to an unreasonable and  unacceptable risk of severe injury and/or death;

p)   Failing to warn the Association and any residents and/or occupants of the Building that vibrations in excess of safe and allowable limits were being emitted  from the Eighty-Seven Park project site;

q)   Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities  at Eighty-Seven Park caused to the Building;

r)   Failing to inspect and analyze the structural condition and stability of the Building after Defendant knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving  activities;

s)   Failing to inspect and analyze the structural condition and stability of the Building  after Defendant knew or should have known the construction activates emitted vibrations in excess of the safe and allowable limit during pile driving  activities and after receiving a complaint from residents at the Building regarding  tremors felt and structural damage done to their property as a result of the  Eighty-Seven Park construction activities;

t)   Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u)   Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v)   Performing numerous vibration-emitting construction activities without monitoring or controlling vibrations;

w)   Performing site compaction work without monitoring vibrations;

x)   Failing to appropriately control vibrations during site compaction  procedures;

y)   Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z)   Failing to appropriately monitor and control vibrations emitted during site

27

compaction procedures, despite knowing that such vibrations could and foreseeably would damage the Building and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa)   Excavating dangerously close to the Building south foundation wall;

bb)   Damaging the Building's south foundation wall during excavation work;

cc)   Damaging the Building's south foundation wall during construction of the beach access walkway;

dd)   Failing to take proper and necessary precautions for excavations performed immediately adjacent to the Building's south foundation wall;

ee)   Failing to properly perform dewatering work at the Eighty-Seven Park site;

ff)   Performing dewatering work at the Eighty-Seven Park site in a manner that negatively impacted the structural stability of the Building;

gg)   Dangerously drawing down the water table underlying the Building through dewatering procedures at the Eighty-Seven Park site;

hh)   Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on the Building, including its structural stability;

ii)   Failing to appropriately monitor and analyze the impact of drawing down the water table underlying the Building;

jj)   Drawing down the water table underlying the Building asymmetrically;

kk)   Failing to recharge the water table underlying the Building;

ll)   Impacting the structural stability and condition of the Building through dewatering activities undertaken at Eighty-Seven Park;

mm)   Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of the Building, despite knowing that such a failure would expose the residents and occupants of the Building to an unreasonable and unacceptable risk of severe injury and/or death;

nn)   Causing and allowing water to infiltrate the Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

oo)   Causing and allowing water to infiltrate the Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that the water infiltration would damage the Building and impact its structural stability;

pp)    Failing to warn the Association and the Building residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of the Building;

qq)    Excavating and constructing the beach access walkway immediately adjacent to the Building's south foundation wall in such a way that caused water to infiltrate the Building foundation wall and seep into the basement parking garage;

rr)    Excavating and constructing the beach access walkway immediately adjacent to the Building's south foundation wall in such a way that caused water to infiltrate the Building's foundation and damage its structural foundation;

ss)    Constructing the beach access walkway so that it was pitched and angled toward the Building's south foundation wall;

tt)    Causing water runoff to infiltrate the Building's south foundation wall and cause damage to the Building's foundation;

uu)    Damaging the Building's south foundation wall such that water runoff was able to infiltrate the Building's foundation;

vv)    Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww)    Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations; and

xx)    Prioritizing corporate profits over the safety of the Building's residents and occupants, among other negligence.

124.    The Terra Defendants' conduct and failures, as described herein, demonstrated disregard for the safety and health of the Building's residents and occupants, including ANDREAS.

125.    The Terra Defendants' negligence caused one of the most devastating and deadly building collapses in United States history, and the Plaintiffs suffered the damages set forth herein.

126.    By conducting themselves as set forth herein, the Terra Defendants' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to Plaintiffs.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against the Terra Defendants for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

**COUNT VII STRICT LIABILITY**
**(AGAINST THE TERRA DEFENDANTS)**

127.   Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

128.   As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the direction of and under the supervision of the Terra Defendants.

129.   The following factors are pertinent to determine whether an activity is abnormally dangerous under Florida law: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging & Dock Co. v. Sea Gull Operating Corp.*, 460 So. 2d 510, 512–13 (Fla. 3d DCA 1984).

130.   Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*. Pile driving, including sheet pile driving necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care. Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

30

131. The ultrahazardous and abnormally dangerous construction activity of sheet pile driving poses a physical danger to persons and property in the area and adjacent to the sheet pile driving that is of a significant magnitude and nature.

132. Pile driving on the Eighty-Seven Park project, carried out at the direction and under the supervision of the Terra Defendants, was inappropriate given the warnings and the project's proximity to the Building, a highly populated condominium building.

133. Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized—the only "value" provided by pile driving was to the Terra Defendants' wallets.

134. The April 2015 NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including the Building and its residents, occupants, and guests. The April 2015 NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including the Building, if not properly monitored and controlled.

135. The pile driving that the Eighty-Seven Park project performed damaged the Building and negatively impacted its structural stability.

136. Damage to the Building's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk pile driving presents.

137. The ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project caused significant structural damage to the Building and are a substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to ANDREAS

and the structural damage to the Building, which ultimately led to the third deadliest building collapse in United States history.

138.    As a result of the Terra Defendants' ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to the Building's structure, Defendants are strictly liable for the decedent's injuries and damages Plaintiffs suffered, as alleged herein.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against the TERRA Defendants for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

### COUNT VIII: NEGLIGENCE AGAINST
### JOHN MORIARTY & ASSOCIATES OF FLORIDA, INC

139.    Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

140.    At all relevant times, Defendant, its agents, servants, or employees, were engaged in providing general contracting services for the construction of Eighty-Seven Park located next door to the Building.

141.    Defendant had a duty to incorporate therein nationally recognized safety standards and practices; to follow and incorporate therein the terms and provisions of the applicable building codes; to make a design, plan and specification which would not produce harm, injury or death to the public, including the ANDREAS, and to perform its services in a safe manner.

142.    This duty included providing accurate information regarding the dangerous conditions and potential safety risks that existed at the Building as a result of the Eighty-Seven Park construction, including recommending safety measures and timely evacuation of the Building

so that conditions created by the construction of Eighty-Seven Park did not create a danger to the Building's residents and invitees, including ANDREAS.

143.    At all times material, Defendant knew, or in the exercise of reasonable care should have known that Eighty-Seven Park construction would damage the Building's structure and foundation.

144.    At all times material, Defendant knew, or in the exercise of reasonable care should have known that that as a result of the Eighty-Seven Park construction, the Building was in a defective, weakened, and dangerous condition.

145.    Specifically, due to the nature of the dangers associated with this type of work, the Defendant and its workers, servants, agents, and employees knew or should have known that the Building next to where they were performing their services was being occupied by residents and invitees.

146.    Nevertheless, the Defendant negligently, carelessly, and intentionally failed or refused to take the appropriate or reasonable precautions generally recognized to protect the public in general, and the ANDREAS, from the dangers they created.

147.    On the above-mentioned date and place, Defendant through its agents and/or employees, breached its duty to exercise reasonable care and acted in a negligent manner by creating and allowing a hazardous and dangerous condition to exist at the Building that resulted from Defendant's conduct on the Eighty-Seven Park property; in failing to repair the defective condition created by Defendants conduct on the Eighty-Seven Park property; and in failing to warn the public and ANDREAS of the need to  evacuate the Building and or of its imminent collapse.

148.    Defendant further failed to appreciate the hazardous and dangerous conditions the Eighty-Seven Park construction created at the Building, failed to communicate the urgency of such

conditions and the danger of its impending collapse, and to recommend appropriate measures including immediate repair and evacuation of the Building.

149.     As a foreseeable and proximate result of JOHN MORIARTY & ASSOCIATES OF FLORIDA, INC.'s negligence and reckless disregard for human life and safety in this matter, ANDREAS sustained injuries resulting in his death.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against Defendant JOHN MORIARTY & ASSOCIATES OF FLORIDA, INC. for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

**COUNT IX: NEGLIGENCE AGAINST**
**NV5 DEFENDANTS**

150.     Plaintiffs re-incorporates paragraph one (1) through forty-six (46) as set forth herein.

151.     The NV5 Defendants were the geotechnical engineers and construction inspectors Terra Defendants hired to work on the Eight-Seven Park Project. Thus NV5 had extensive knowledge of all construction activities primarily discussed herein, including but not limited to pile driving, dewatering, excavation, and site compaction procedures.

152.     Indeed, NV5 issued many of the warnings to other Defendants regarding the danger that pile driving, site compaction, dewatering, and excavation work on the Eighty-Seven Park project posed to the Building. Unfortunately, NV5 ignored its own warnings and allowed dangerous work to proceed on the Eighty-Seven Park project, despite the harm it was inflicting on the Building.

153.    NV5 owed a duty to persons present in and occupying adjacent structures, including ANDREAS, to ensure that the development and construction activities on the Eighty-Seven Park project did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including the Building.

154.    Defendant NV5's aforementioned duty was heightened by the fact that NV5 itself issued warnings regarding the danger that certain construction activities posed to the Building if performed improperly or were not appropriately monitored and controlled. These construction activities included site compaction activities, pile driving, dewatering, and excavation activities that NV5 explicitly warned had the potential to negatively impact the structural stability of adjacent structures, including the Building.

155.    Defendant NV5 was responsible for ensuring both that all of its warnings regarding construction activities on the Eighty-Seven Park project were heeded and that the work not be permitted to negatively impact or damage the Building in the very ways NV5 warned against.

156.    Given NV5's knowledge of the risks that certain construction activities posed to the Building and its residents, NV5 had a duty and responsibility to vigilantly monitor and control those risks and ensure that the identified risky and dangerous construction activities did not negatively impact the structural stability of the Building.

157.    NV5 had a duty to ensure that all work on the Eighty-Seven Park project, including all pile driving, dewatering, site compaction, and excavation work, was carried out safely and in a manner that did not damage or otherwise negatively impact adjacent properties, namely the Building.

158.    Defendant NV5's April 2015 Report presented several available and appropriate options for basement excavation support methods. Only one of those options would produce

35

damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive. NV5 had a duty to ensure that the Terra Defendants, JMA, and Desimone appropriately considered the potentially devastating impact on adjacent properties, including the building, when choosing basement excavation support methods. NV5 had a further duty to ensure that the safest method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

159.    NV5 should have recommended only the safest methods of basement excavation support that were practically vibration free and that would not have had a negative structural impact on the Building.

160.    Further, because of the inherently dangerous nature of the construction activities on the Eighty-Seven Park project, NV5 was under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities it undertook. Given that this duty was nondelegable, NV5 is accountable and responsible for the negligent actions of its sub-contractors, employees and/or agents in the performance of these dangerous activities.

161.    NV5 failed its duties when it initially proposed pile driving as a viable option for basement excavation support. NV5 further failed its duties when it permitted the most dangerous method of basement excavation support—driven sheet piles—to be chosen and implemented on the project, despite the known and foreseeable risks to the Building.

162.    Even after proposing and allowing the use of driven sheet piles on the project, NV5 had a duty to ensure that vibrations emitted through the vibratory sheet pile driving activities were vigilantly monitored and that the work would not be permitted to continue if vibration levels exceeded safe and allowable limits.

163.   NV5 was also unquestionably aware that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact the Building if those activities were not vigilantly monitored and controlled and absent specific measures to ensure that the Building was not being negatively impacted.

164.   As discussed, despite the risks about which Defendant NV5 was aware and warned others, NV5 failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures. NV5 also failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting the Building.

165.   The National Society of Professional Engineers Code of Ethics for Engineers establishes the fundamental canon and rule of practice that professional engineers must "Hold paramount the safety, health, and welfare of the public."

166.   NV5 failed to abide by the fundamental canon of the Code of Ethics for Engineers to hold the safety, health, and welfare of the public, specifically the residents and occupants of the Building, of paramount importance by engaging in the acts and omissions discussed herein.

167.   NV5, acting by and through their agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to Plaintiffs by:

   a.   Placing the residents and occupants of the Building at grave and immediate risk of harm;

   b.   Permitting construction site activities at the Eighty-Seven Park project to impact the Building by damaging its structural condition and stability;

   c.   Permitting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including the Building;

d.      Allowing a vibratory hammer to be used to drive sheet piles on the project
        site, despite knowing that the pile driving activities would emit dangerous
        and destructive vibrations that would foreseeably damage the Building;

e.      Proposing driven sheet piles as a viable option for basement excavation
        support for the Eighty-Seven Park project, despite the known risks;

f.      Permitting driven sheet piles to be utilized for basement excavation support,
        despite knowing that pile driving activities would cause damaging
        vibrations to impact the Building and despite knowing that available and
        suitable  alternatives existed that were vibration free;

g.      Failing to appropriately and vigilantly monitor vibration levels for all pile
        driving performed on the project;

h.      Permitting pile driving to be performed along and/or immediately adjacent
        to the Building's south foundation wall;

i.      Permitting pile driving to be performed along and/or immediately adjacent
        to the Building's south foundation wall without monitoring vibration
        levels;

j.      Selectively or insufficiently monitoring vibration levels during pile driving
        activities;

k.      Continuing to allow the use of a vibratory hammer to drive sheet piles after
        learning that vibrations were exceeding safe and allowable limits;

l.      Failing to take appropriate corrective action after learning that vibrations
        caused by sheet pile driving were exceeding safe and allowable limits;

m.      Failing to stop pile driving work after learning that vibrations were
        exceeding safe and allowable limits;

n.      Failing to stop the pile driving work or take appropriate corrective action
        after learning that vibrations were exceeding safe and allowable limits
        despite knowing that vibrations from pile driving could and would
        foreseeably damage adjacent structures, including the Building;

o.      Failing to stop the pile driving work or take appropriate corrective action
        after learning that vibrations were exceeding safe and allowable limits,
        despite knowing that vibrations from pile driving could and would
        foreseeably damage adjacent structures, including the Building, and
        despite knowing that allowing the emission of the vibrations at
        dangerous levels would expose the Building's residents and occupants to
        an unreasonable and unacceptable risk of severe injury and/or death;

p.      Failing to warn the Association and the Building's residents and/or
        occupants that the Eighty-Seven Park project site was emitting vibrations in
        excess of safe and allowable limits;

q.      Failing to conduct a proper and adequate post-construction survey to
        determine the existence and extent of damage the construction site activities

38

at Eighty-Seven Park caused the Building;

r.     Failing to inspect and analyze the structural condition and stability of the Building after Defendant knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s.     Failing to inspect and analyze the structural condition and stability of the Building after Defendant knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities and after receiving a complaint from the Building's residents regarding tremors they felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t.     Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u.     Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v.     Permitting numerous vibration-emitting construction activities to be performed without monitoring or controlling vibrations;

w.     Allowing site compaction work to be performed without monitoring vibrations;

x.     Failing to appropriately control vibrations during site compaction procedures;

y.     Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z.     Failing to appropriately monitor and control vibrations emitted during site compaction procedures, despite knowing that such vibrations both could and foreseeably would damage the Building and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa.     Permitting and not appropriately monitoring and controlling excavation activities in proximity to the Building's south foundation wall;

bb.     Failing to take proper and necessary precautions for excavations performed immediately adjacent to the Building's south foundation wall;

cc.     Failing to ensure that dewatering work was properly performed at the Eighty-Seven Park site;

dd.     Permitting dewatering work at the Eighty-Seven Park site to be performed in a manner that negatively impacted the structural stability of the Building;

ee.     Failing to recognize and prevent the dangerous draw down of the water table underlying the Building through dewatering procedures at the Eighty-Seven Park site;

ff.   Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on the Building and its structural stability;

gg.   Failing to appropriately monitor and analyze the impact of drawing down the water table underlying the Building;

hh.   Drawing down the water table underlying the Building asymmetrically.

ii.   Failing to prevent the water table underlying the Building from being drawn down asymmetrically;

jj.   Failing to recharge the water table underlying the Building and/or otherwise failing to ensure that the water table underlying the Building was appropriately recharged;

kk.   Permitting and/or failing to recognize that the structural stability and condition of the Building was negatively impacted through dewatering activities undertaken at Eighty-Seven Park;

ll.   Failing to monitor and analyze the impact of the Eighty-Seven Park project site dewatering activities on the structural stability and condition of the Building, despite knowing that such a failure would expose the Building's residents and occupants of to an unreasonable and unacceptable risk of severe injury and/or death;

mm.   Causing and allowing water to infiltrate the Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

nn.   Causing and allowing water to infiltrate the Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that the water infiltration would damage the Building and impact its structural stability;

oo.   Failing to warn the Association and the Building's residents and occupants that dewatering activities at the Eighty-Seven Park site were impacting the structural stability of the Building;

pp.   Failing to recognize that the beach access walkway immediately adjacent to the Building's south foundation wall was excavated and constructed in a manner that caused water to infiltrate the Building's foundation wall and seep into the basement parking garage;

qq.   Failing to insist that corrective measures be taken to address the improperly excavated and constructed beach access walkway, which was causing water to infiltrate the Building's foundation wall and seep into the basement parking garage;

rr.   Failing to recognize and/or prevent the beach access walkway immediately adjacent to the Building's south foundation wall from being excavated and constructed in a manner that caused water to infiltrate the Building's foundation and damage its structural foundation;

40

ss.   Failing to recognize and correct the beach access walkway which was excavated and constructed in such that it was pitched and angled toward the Building's south foundation wall;

tt.   Failing to recognize and permitting water runoff to infiltrate the Building's south foundation wall and to damage the Building's foundation;

uu.   Damaging the the Building's south foundation wall such that water runoff was able to infiltrate the the Building's foundation;

vv.   Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww.   Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

xx.   Violating the Code of Ethics for Engineers;

yy.   Knowing or having had reason to know Defendant's conduct violated the Code of Ethics for Engineers;

zz.   Prioritizing corporate profits over the safety of the Building's residents and occupants.

168.   The NV5 Defendants' conduct and failures, as described herein, demonstrated a disregard for the safety and health of the Building's residents and occupants, including ANDREAS.

169.   The NV5 Defendants' negligence caused one of the most devastating and deadly building collapses in United States history, and the Plaintiffs suffered the damages set forth herein.

170.   By conducting itself as set forth herein, the NV5 Defendants' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to Plaintiffs.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against the NV5 Defendants for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as

Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate and survivors under Florida Statute Section 768.21.

**COUNT X STRICT LIABILITY**
**(AGAINST NV5)**

171.    Plaintiffs incorporate paragraphs  one (1) through forty-six (46) as set forth herein.

172.    As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the suggestion of and under the supervision of the NV5 Defendants.

173.    The NV5 Defendants were intimately involved in the performance and progress of the pile driving activities on the project and was responsible for closely monitoring the vibration levels during portions of the pile driving work.

174.    The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *See Great Lakes Dredging*, supra, 460 So. 2d at 512–13.

175.    Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*. Pile driving, including sheet pile driving necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care. Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

176.   The ultrahazardous and abnormally dangerous construction activity of sheet pile driving poses a physical danger to persons and property in the area and adjacent to the sheet pile driving that is of a significant magnitude and nature.

177.   Pile driving on the Eighty-Seven Park project, carried out under the supervision of the NV5 Defendants, was inappropriate given the project's proximity to the Building, a highly populated condominium building.

178.   Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized.

179.   A report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including the Building and its residents and occupants. The NV5 Defendants report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including the Building, if not properly monitored and controlled.

180.   The pile driving that the Eighty-Seven Park project performed damaged the Building and negatively impacted its structural stability.

181.   Damage to the Building's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk that pile driving presents.

182.   The ultrahazardous and abnormally dangerous pile driving activities carried out by the NV5 Defendants on the Eighty-Seven Park Construction site caused significant structural damage to the Building and are a substantial factor in, a factual cause of, and/or resulted in an

increased risk of harm to ANDREAS and the structural damage to the Building, which ultimately led to one of the deadliest building collapse in United States history.

183.    As a result of Defendant's ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to the Building's structure, the NV5 Defendants are strictly liable for the injuries and damages Plaintiffs suffered, as alleged herein.


**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against the NV5 Defendants for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate under Florida Statute Section 768.21.

**COUNT XI: NEGLIGENCE AGAINST**
**BIZZI & PARTNERS DEVELOPMENT, LLC**

184.    Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

185.    BIZZI & PARTNERS DEVELOPMENT, LLC (hereinafter "Bizzi & Partners) is a real estate development company that focuses on projects in the United States, Italy, Europe and the Americas.

186.    Bizzi & Partners has extensive experience in in the fields of acquisitions, real estate finance, zoning, master-planning, design, construction management, sales, and marketing.

187.    In 2013, Bizzi & Partners identified an opportunity in a dilapidated hotel located at 8701 Collins Avenue in Miami Beach, Florida. From 2015 through 2020, Bizzi & Partners along with the Terra Defendants, and others, purchased the land located at 8701 Collins Avenue Miami Beach, FL.



188.    After purchasing the land, Bizzi & Partners, along with other Defendants, demolished the existing hotel structure and began developing an 18-story luxury condominium adjacent to the Building (hereinafter referred to as the Eighty-Seven Park Construction).



189.     From the onset of the construction, Bizzi & Partners was involved in the planning, direction, and overall construction of the Eighty-Seven Park development project.

190.     Upon information and belief, Bizzi & Partners were involved and/or knew or should have known about the aforementioned excavation at the Eighty-Seven Park property. As a result, Bizzi & Partners knew or should have known that the excavation would negatively impact the Building. Specifically, the excavation weakened the foundation of the Building, among other things, and created a hazard to the public, including the ANDREAS.

191.     Upon information and belief, on various occasions during 2016, 2017, 2018, 2019 and thereafter, the Defendant was made aware, through various reports including the NV5 Defendants report mentioned above, that construction activities were a danger to the structures surrounding the project, including the Building.

192.     Upon information and belief, the Bizzi & Partners failed to properly underpin or otherwise brace the Building during the Project and failed to comply with the applicable rules, codes and regulations governing underpinning and bracing of adjacent properties.

193.     At all material times, Bizzi & Partners knew, or should have known, that the construction activities that took place during the Eighty-Seven Park Construction were done in such a manner as to likely cause damage to the structural foundation of the Building.

194.     Further, Bizzi & Partners knew or should have known that had it followed the applicable rules, codes, regulations and industry standards it would have reduced the likelihood of causing damage the structural foundation of the Building.

195.     Nevertheless, the construction activities conducted during the Eighty-Seven Park Construction were performed in a negligent and hazardous manner without regard for the safety and protection of the public, including the ANDREAS.

196.    Due to the nature of the dangers potentially associated with this type of work, Bizzi & Partners and its workers, servants, agents, and employees knew or should have known that the Building was being occupied by residents and invitees. Nevertheless, the Bizzi & Partners negligently, carelessly, and intentionally failed or refused to take the appropriate or reasonable precautions generally recognized to protect the public in general, including ANDREAS, from the hazards of such work.

197.    Bizzi & Partners knew its activities did, in fact, constitute a known and dangerous condition to the Building, by creating severe and significant instability in the foundation and structure of the Building, and as a result, the Building collapsed.

198.    On the above-mentioned date and place, Bizzi & Partners through its agents and/or employees, breached its duty to exercise reasonable care and acted in a negligent manner by creating and allowing a hazardous and dangerous condition to exist at the Building that resulted from Bizzi & Partners' conduct during the Eighty-Seven Park Construction; in failing to repair the defective condition created by Bizzi & Partners' conduct during the Eighty-Seven Park Construction; and in failing to warn the public and ANDREAS of the need to evacuate the Building and or of its imminent collapse.

199.    Bizzi & Partners was also negligent, in that a developer engaged in work of this nature, scope, and type is at all times required to institute and maintain safety precautions of a type and nature sufficient and necessary to safeguard all persons affected by the developer's operations.

200.    As a foreseeable and proximate result of BIZZI & PARTNERS DEVELOPMENT, LLC's negligence and reckless disregard for human life and safety in this matter, the Building collapsed, causing the ANDREAS to sustain injuries resulting his death.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against Defendant BIZZI & PARTNERS DEVELOPMENT, LLC for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate survivors under Florida Statute Section 768.21.

### COUNT XII: NEGLIGENCE AGAINST
### H. VIDAL & ASSOCIATES, INC.

201.    Plaintiffs re-incorporate paragraphs one (1) through forty-six (46) as set forth herein.

202.    At all relevant times, VIDAL, their agents, servants, or employees, were engaged in providing remediation estimates for the Building in anticipation of the 40-year recertification.

203.    VIDAL had a duty to incorporate therein nationally recognized safety standards and practices; to follow and incorporate therein the terms and provisions of the applicable building codes; to make a design, plan and specification which would not produce harm, injury or death to the public including the ANDREAS, and to perform their services in a safe manner.

204.    This duty included providing accurate information regarding the dangerous conditions and potential safety risks that existed at the Building as a result of the Eighty-Seven Park Construction, including recommending safety measures and timely evacuation of the Building so that conditions created by the Eighty-Seven Park Construction did not create a danger to the Building's residents and invitees, including ANDREAS.

205.    At all times material, Defendants knew, or in the exercise of reasonable care should have known that Eighty-Seven Park Construction would damage the Building's foundation.

48

206.    At all times material, Defendants knew, or in the exercise of reasonable care should have known that that as a result of the Eighty-Seven Park Construction, the Building was in a defective, weakened, and dangerous condition.

207.    Specifically, due to the nature of the dangers potentially associated with this type of work, the Defendants and their workers, servants, agents, and employees knew or should have known that the Building next to where they were performing their services was being occupied by residents and invitees.

208.    Nevertheless, the Defendants negligently, carelessly, and intentionally failed or refused to take the appropriate or reasonable precautions generally recognized to protect the public in general, and the ANDREAS, from the dangers they created.

209.    On the above-mentioned date and place, Defendants through their agents and/or employees, breached its duty to exercise reasonable care and acted in a negligent manner by creating and allowing a hazardous and dangerous condition to exist at the Building that resulted from Defendant's conduct during the Eighty-Seven Park Construction; in failing to repair the defective condition created by Defendant during the Eighty-Seven Park Construction; and in failing to warn the public and the ANDREAS of the need to  evacuate the Building and or of its imminent collapse.

210.    Defendant further failed to appreciate the hazardous and dangerous conditions during the Eighty-Seven Park Construction that were created at the Building, communicate the urgency of such conditions and the danger of its impending collapse, and recommend appropriate measures including immediate repair and evacuation of the Building.

211.   As a foreseeable and proximate result of VIDAL's negligence and reckless disregard for human life and safety in this matter, ANDREAS sustained injuries resulting in his death.

**WHEREFORE**, for the foregoing reasons, the Plaintiffs demand judgment against Defendant VIDAL for damages, costs and such further relief as the Court deems just and proper. KONSTANTINOS GIANNITSOPOULOS and FATIMA BAGHAT GIANNITSOPOULOS, as Co-Personal Representatives of the Estate of Andreas Konstantinos Giannitsopoulos, seek all compensable damages for the estate under Florida Statute Section 768.21.


## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury on all issues so triable.

DATED: February 17, 2022.

SILVA & SILVA, P.A.
*Attorneys for Plaintiff*
236 Valencia Avenue
Coral Gables, Florida 33134
Telephone: (305) 445-0011
Facsimile: (305) 445-1181

By: /s/Jorge E. Silva
JORGE E. SILVA, ESQ.
Florida Bar No.: 964476
JSilva@silvasilva.com
CARLOS E. SILVA, ESQ.
Florida Bar No.: 999032
CSilva@silvasilva.com
PAUL JON LAYNE, ESQ.
Florida Bar No. 23558
PLayne@silvasilva.com
BENJAMIN FERNANDEZ IV, ESQ.
Florida Bar No. 638811
BFernandez@silvasilva.com