# EXHIBIT 18

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL**
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2021-015089-CA-01
SECTION: CA43
JUDGE: Michael Hanzman

**In re:**

**Champlain Towers South Collapse Litigation.**

_____/

### DEFENDANT CHAMPLAIN TOWERS SOUTH CONDOMINIUM ASSOCIATION, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT AND CROSSCLAIMS

Defendant Champlain Towers South Condominium Association, Inc., through its Court-appointed Receiver Michael I. Goldberg (the "Association"), files its Answer and Affirmative Defenses to Plaintiffs' Consolidated Third Amended Class Action Complaint against the Association and Defendants 8701 Collins Development, LLC; Terra Group, LLC; Terra World Investments, LLC; John Moriarty & Associates of Florida, Inc.; NV5, Inc.; DeSimone Consulting Engineers, LLC; Morabito Consultants, Inc.; Becker & Poliakoff, P.A.; Stantec Architecture Inc.; Geosonics, Inc.; Florida Civil, Inc.; and 8701 Collins Avenue Condominium Association, Inc. (all collectively, underline excluding underline the Association, "Defendants"), and Crossclaims against Defendants Morabito Consultants, Inc. ("Morabito"); 8701 Collins Development, LLC, Terra Group, LLC, and Terra World Investments, LLC (collectively, the "Terra Defendants"); John Moriarty & Associates of Florida, Inc. ("JMA"); NV5, Inc. ("NV5"); and DeSimone Consulting Engineers, LLC ("DeSimone"). [1]

---

[1] Through separate counsel and in a separate pleading, the Association also has a crossclaim pending against Defendant Becker & Poliakoff, PA.

62820710;1

## INTRODUCTION

1.      The Association admits the allegations in Paragraph 1.

2.      The Association admits that residents and occupants lost their lives, homes, and belongings in the collapse of Champlain Towers South ("CTS"). The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 2.

3.      The Association admits that CTS was an older building in need of routine repairs and maintenance. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 3.

4.      The Association is without knowledge sufficient to respond to the allegations in Paragraph 4.

5.      The Association admits that the engineer hired by the Association to investigate the structure failed to report adequately on the dire situation, and the experienced law firm hired to represent the Association, upon whom the Board of Directors relied for advice and counsel, ignored red flags and was indifferent to the obvious danger facing residents. The Association is without knowledge sufficient to respond to the allegations that the collapse was entirely preventable, and that the negligence and gross negligence of the Defendants caused this devastating tragedy, for which the responsible Defendants must be held liable. The Association denies the remaining allegations in Paragraph 5.

## PARTIES

6.      The Association admits the allegations in Paragraph 6.

7.      The Association is without knowledge sufficient to respond to the allegations in Paragraph 7.

### *Plaintiffs*

8.      The Association is without knowledge sufficient to respond to the allegations in Paragraph 8.

9.      The Association is without knowledge sufficient to respond to the allegations in Paragraph 9.

10.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 10.

11.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 11.

12.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 12.

### ***Defendants***

13.     The Association admits Defendant 8701 Collins Development, LLC was and is a Delaware limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida, and was and is doing business in Florida. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 13.

14.     The Association admits Defendant Terra Group, LLC was and is a Florida limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida, and was and is doing business in Florida. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 14.

15.     The Association admits Defendant Terra World Investments, LLC was and is a Florida limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida and was and is doing business in Florida. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 15.

16.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 16.

17.     The Association admits the allegations in Paragraph 17.

18.     The Association admits the allegations in Paragraph 18.

19.     The Association admits the allegations in Paragraph 19.

20.     The Association admits the allegations in Paragraph 20.

21.     The Association admits that Defendant Morabito was and is authorized to do and/or doing business in Florida, duly organized, created and existing under and by virtue of the laws of the State of Maryland with its principal place of business located at 952 Ridgebrook Road, Suite 1700, Sparks, Maryland, and that Morabito was hired as a professional engineer to inspect CTS. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 21.

22.     The Association admits that Defendant Becker & Poliakoff, P.A. was and is a Florida professional association with a principal place of business at 1 East Broward Boulevard, Suite 1800, Fort Lauderdale, Florida and that Becker & Poliakoff, P.A. ("Becker") provided legal services and counsel to the Association in Miami-Dade County. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 22.

23.     The Association admits that Defendant Stantec Architecture Inc. was and is a North Carolina corporation with its principal place of business at 224 South Michigan Avenue, Suite 1400, Chicago, Illinois and was and is authorized to do and is doing business in Florida. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 23.

24. The Association admits that Defendant Geosonics, Inc. was and is authorized to do and/or doing business in Florida, duly organized, created, and existing under and by virtue of the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 359 Northgate Drive, Warrendale, Pennsylvania 15086. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 24.

25. The Association admits that Defendant Florida Civil, Inc. was and is authorized to do and is doing business in Florida, duly organized, created, and existing under and by virtue of the laws of the State of Florida, with its principal place of business located at 4491 NE 6th Terrace, Oakland Park, Florida 33334. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 25.

26. The Association admits that Defendant 8701 Collins Avenue Condominium Association, Inc. is a Florida not-for-profit corporation with its principal place of business at 8701 Collins Avenue, Miami Beach, Florida 33154, and was and is doing business in Florida. The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 26.

## JURISDICTION AND VENUE

27. The Association admits that this is an action seeking damages in excess of $30,000, which falls within this Court's jurisdiction, but denies any liability therefore.

28. The Association admits that jurisdiction properly lies in this Court but denies the commission of any tort.

29. The Association admits the allegations in Paragraph 29.

## GENERAL ALLEGATIONS

30. The Association admits the allegations in Paragraph 30.

31. The Association admits the allegations in Paragraph 31.

62820710;1

32.     The Association admits the allegations in Paragraph 32.

33.     The Association admits the allegations in Paragraph 33.

### *The Mechanics of the CTS Catastrophe*

34.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 34.

35.     The Association admits the allegations in Paragraph 35.

36.     The Association admits the allegations in Paragraph 36.

37.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 37.

38.     The Association admits the allegations in Paragraph 38.

39.     The Association admits the allegations in Paragraph 39.

40.     The Association admits the allegations in Paragraph 40.

41.     The Association admits the allegations in Paragraph 41.

42.     The Association admits the allegations in Paragraph 42.

43.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 43.

44.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 44.

45.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 45.

46.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 46.

47.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 47.

62820710;1

48.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 48.

49.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 49.

50.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 50.

### *The Terra Defendants' Dangerous Expansion of the 8701 Collins Avenue Property*

51.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 51.

52.     The Association is without knowledge sufficient to respond to the allegations in Paragraph 52.

53.     The Association admits the allegations of Paragraph 53.

54.     The Association admits the allegations of Paragraph 54.

55.     The Association admits the allegations in Paragraph 55.

56.     The Association admits the allegations in Paragraph 56.

57.     The Association admits the allegations in Paragraph 57.

58.     The Association admits the allegations in Paragraph 58.

59.     The Association admits the allegations in Paragraph 59.

60.     The Association admits the allegations in Paragraph 60.

61.     The Association admits the allegations in Paragraph 61.

62.     The Association admits the allegations in Paragraph 62.

63.     The Association admits the allegations in Paragraph 63.

64.     The Association admits the allegations in Paragraph 64.

65.     The Association admits the allegations in Paragraph 65.

66.     The Association admits the allegations in Paragraph 66.

67.     The Association admits the allegations in Paragraph 67.

68.     The Association admits the allegations in Paragraph 68.

69.     The Association admits the allegations in Paragraph 69.

70.     The Association admits the allegations in Paragraph 70.

71.     The Association admits the allegations in Paragraph 71.

72.     The Association admits the allegations in Paragraph 72.

### *Defendants Ignored Warnings About the Risk of Construction to CTS*

73.     The Association admits the allegations in Paragraph 73.

74.     The Association admits the allegations of Paragraph 74.

75.     The Association admits the allegations of Paragraph 75.

76.     The Association admits the allegations in Paragraph 76.

77.     The Association admits the allegations in Paragraph 77.

78.     The Association admits the allegations in Paragraph 78.

79.     The Association admits the allegations in Paragraph 79.

80.     The Association admits the allegations in Paragraph 80.

81.     The Association admits the allegations in Paragraph 81.

82.     The Association admits the allegations in Paragraph 82.

83.     The Association admits the allegations in Paragraph 83.

84.     The Association admits the allegations of Paragraph 84.

85.     The Association admits the allegations of Paragraph 85.

86.     The Association admits the allegations of Paragraph 86.

87.     The Association admits the allegations of Paragraph 87.

88.     The Association admits the allegations of Paragraph 88.

89.     The Association admits the allegations in Paragraph 89.

90.     The Association admits the allegations in Paragraph 90.

### *Ultrahazardous Sheet Pile Driving at Eighty-Seven Park Damaged CTS*

### Defendants Ignored NV5 Warnings and Used Sheet Pile Driving

91.     The Association admits the allegations in Paragraph 91.

92.     The Association admits the allegations in Paragraph 92.

93.     The Association admits the allegations in Paragraph 93.

94.     The Association admits the allegations in Paragraph 94.

95.     The Association admits the allegations in Paragraph 95.

96.     The Association admits the allegations in Paragraph 96.

97.     The Association admits the allegations in Paragraph 97.

98.     The Association admits the allegations in Paragraph 98.

99.     The Association admits the allegations in Paragraph 99.

100.    The Association admits the allegations in Paragraph 100.

101.    The Association admits the allegations in Paragraph 101.

102.    The Association admits the allegations in Paragraph 102.

103.    The Association admits the allegations in Paragraph 103.

104.    The Association admits the allegations in Paragraph 104.

105.    The Association admits the allegations in Paragraph 105.

### Defendants Failed to Adequately Monitor Sheet Pile Driving

106.    The Association admits the allegations in Paragraph 106.

107.    The Association admits the allegations in Paragraph 107.

108.    The Association admits the allegations in Paragraph 108.

109.    The Association admits the allegations in Paragraph 109.

110.    The Association admits the allegations in Paragraph 110.

111.    The Association admits the allegations in Paragraph 111.

112.    The Association admits the allegations in Paragraph 112.

113.    The Association admits the allegations in Paragraph 113.

114.    The Association admits the allegations in Paragraph 114.

115.    The Association admits the allegations in Paragraph 115.

116.    The Association admits the allegations in Paragraph 116.

117.    The Association admits the allegations in Paragraph 117.

118.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 118.

119.    The Association admits the allegations in Paragraph 119.

120.    The Association admits the allegations in Paragraph 120.

121.    The Association admits the allegations in Paragraph 121.

122.    The Association admits the allegations in Paragraph 122.

123.    The Association admits the allegations in Paragraph 123.

124.    The Association admits the allegations in Paragraph 124.

125.    The Association admits the allegations in Paragraph 125.

126.    The Association admits the allegations in Paragraph 126.

127.    The Association admits the allegations in Paragraph 127.

128.    The Association admits the allegations in Paragraph 128.

129.    The Association admits the allegations in Paragraph 129.

130.    The Association admits the allegations in Paragraph 130.

131.    The Association admits the allegations in Paragraph 131.

132.    The Association admits the allegations in Paragraph 132.

**Defendants Ignored CTS Warnings, Dismissed Residents' Fear for their Lives and Safety, and Continued Using Sheet Pile Driving**

133.    The Association admits the allegations in Paragraph 133.

134.    The Association admits the allegations in Paragraph 134.

135.    The Association admits the allegations in Paragraph 135.

136.    The Association admits the allegations in Paragraph 136.

137.    The Association admits the allegations in Paragraph 137.

138.    The Association admits the allegations in Paragraph 138.

139.    The Association admits the allegations in Paragraph 139.

140.    The Association admits the allegations in Paragraph 140.

141.    The Association admits the allegations in Paragraph 141.

142.    The Association admits the allegations in Paragraph 142.

143.    The Association admits the allegations in Paragraph 143.

144.    The Association admits the allegations in Paragraph 144.

145.    The Association admits the allegations in Paragraph 145.

146.    The Association admits the allegations in paragraph 146.

147.    The Association admits the allegations in Paragraph 147.

148.    The Association admits the allegations in Paragraph 148.

149.    The Association admits the allegations of Paragraph 149.

150.    The Association admits the allegations in Paragraph 150.

151.    The Association admits the allegations in Paragraph 151.

152.    The Association admits the allegations in Paragraph 152.

153.    The Association admits the allegations in Paragraph 153.

154.    The Association admits the allegations in Paragraph 154.

155.    The Association admits the allegations in Paragraph 155.

156.    The Association admits the allegations in Paragraph 156.

**_Soil Compaction Vibrations at Eighty-Seven Park Damaged CTS_**

157.    The Association admits the allegations in Paragraph 157.

158.    The Association admits the allegations in Paragraph 158.

159.    The Association admits the allegations in Paragraph 159.

160.    The Association admits the allegations in Paragraph 160.

161.    The Association admits the allegations in Paragraph 161.

162.    The Association admits the allegations in Paragraph 162.

163.    The Association admits the allegations in Paragraph 163.

164.    The Association admits the allegations in Paragraph 164.

165.    The Association admits the allegations in Paragraph 165.

166.    The Association admits the allegations in Paragraph 166.

167.    The Association admits the allegations in Paragraph 167.

168.    The Association admits the allegations in Paragraph 168.

169.    The Association admits the allegations in Paragraph 169.

**_Dewatering at Eighty-Seven Park Damaged CTS_**

170.    The Association admits the allegations in Paragraph 170.

171.    The Association admits the allegations in Paragraph 171.

172.    The Association admits the allegations in Paragraph 172.

173.    The Association admits the allegations in Paragraph 173.

174.    The Association admits the allegations in Paragraph 174.

175.    The Association admits the allegations in Paragraph 175.

176.    The Association admits the allegations in Paragraph 176.

177.    The Association admits the allegations in Paragraph 177.

178.    The Association admits the allegations in Paragraph 178.

179.    The Association admits the allegations in Paragraph 179.

180.    The Association admits the allegations in Paragraph 180.

181.    The Association admits the allegations in Paragraph 181.

182.    The Association admits the allegations in Paragraph 182.

183.    The Association admits the allegations in Paragraph 183.

184.    The Association admits the allegations in Paragraph 184.

185.    The Association admits the allegations in Paragraph 185.

186.    The Association admits the allegations in Paragraph 186.

187.    The Association admits the allegations in Paragraph 187.

### *Excavation and Water Diversion at 87th Terrace Damaged CTS*

188.    The Association admits the allegations in Paragraph 188.

189.    The Association admits the allegations in Paragraph 189.

190.    The Association admits the allegations in Paragraph 190.

191.    The Association admits the allegations in Paragraph 191.

192.    The Association admits the allegations in Paragraph 192.

193.    The Association admits the allegations in Paragraph 193.

194.    The Association admits the allegations in Paragraph 194.

195.    The Association admits the allegations in Paragraph 195.

196.    The Association admits the allegations in Paragraph 196.

197.    The Association admits the allegations in Paragraph 197.

62820710;1

198.    The Association admits the allegations of Paragraph 198.

199.    The Association admits the allegations in Paragraph 199.

200.    The Association admits the allegations in Paragraph 200.

201.    The Association admits the allegations in Paragraph 201.

202.    The Association admits the allegations in Paragraph 202.

203.    The Association admits the allegations in Paragraph 203.

204.    The Association admits the allegations in Paragraph 204.

***The 2016 Pre-Construction Survey Confirmed That the Eighty-Seven Park Construction Project Damaged CTS***

205.    The Association admits the allegations in Paragraph 205.

206.    The Association admits the allegations in Paragraph 206.

207.    The Association admits the allegations in Paragraph 207.

208.    The Association admits the allegations in Paragraph 208.

209.    The Association admits the allegations in Paragraph 209.

210.    The Association admits of the allegations in Paragraph 210.

211.    The Association admits the allegations in Paragraph 211.

212.    The Association admits the allegations in Paragraph 212.

213.    The Association admits the allegations in Paragraph 213.

214.    The Association admits the allegations in Paragraph 214.

215.    The Association admits the allegations in Paragraph 215.

216.    The Association admits the allegations in Paragraph 216.

217.    The Association admits the allegations in Paragraph 217.

218.    The Association admits the allegations in Paragraph 218.

*<u>The Association's Failure to Repair and the Association and Morabito's Failure to Warn About CTS's Dangerous Structural Problems</u>*

219.    The Association admits the allegations of Paragraph 219.

220.    The Association admits the allegations of Paragraph 220 to the extent that it properly quotes Section 7.1 of the Amended and Restated Declaration of the Condominium of Champlain Towers South Condominium (the "Declaration").

221.    The Association admits the allegations of Paragraph 221 to the extent that it properly quotes Section 8-11 of the Miami-Dade County Code of Ordinances.

222.    The Association denies the allegations of Paragraph 222.

223.    The Association denies the allegations of Paragraph 223.

224.    The Association admits the allegations of Paragraph 224.

225.    The Association admits the allegations of Paragraph 225.

226.    The Association admits the allegations of Paragraph 226.

227.    The Association admits the allegations of Paragraph 227.

228.    The Association admits the allegations of Paragraph 228.

229.    The Association admits the allegations of Paragraph 229.

230.    The Association admits the allegations of Paragraph 230.

231.    The Association admits the allegations of Paragraph 231 to the extent that it properly quotes language from Morabito's 2018 Report.

232.    The Association admits the allegations of Paragraph 232 to the extent that it properly quotes language from Morabito's 2018 Report.

233.    The Association admits the allegations of Paragraph 233 to the extent that it properly quotes language from Morabito's 2018 Report.

62820710;1

234.    The Association admits the allegations of Paragraph 234 to the extent that it properly quotes language from Morabito's 2018 Report.

235.    The Association denies the allegations in Paragraph 235.

236.    The Association admits the allegations of Paragraph 236.

237.    The Association admits the allegations in Paragraph 237.

238.    The Association admits the allegations in Paragraph 238.

239.    The Association admits the allegations in Paragraph 239.

240.    The Association denies the allegations of Paragraph 240.

241.    The Association denies the allegations of Paragraph 241.

242.    The Association denies the allegations of Paragraph 242.

243.    The Association admits the allegations in Paragraph 243.

244.    The Association admits the allegations in Paragraph 244.

245.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 245.

246.    The Association admits the allegations in Paragraph 246.

247.    The Association admits the allegations in Paragraph 247.

248.    The Association denies the allegations in Paragraph 248.

249.    The Association admits the allegations in Paragraph 249.

### _Becker's Callous, Reckless, and Conscious Disregard for the Lives, Safety, and Property of CTS Owners and Occupants_

250.    The Association admits the allegations in Paragraph 250.

251.    The Association admits the allegations in Paragraph 251.

252.    The Association admits the allegations in Paragraph 252.

253.    The Association admits the allegations in Paragraph 253.

16

254.    The Association admits the allegations in Paragraph 254.

255.    The Association admits the allegations in Paragraph 255.

256.    The Association admits the allegations in Paragraph 256.

257.    The Association admits the allegations of Paragraph 257.

258.    The Association admits the allegations in Paragraph 258.

259.    The Association admits the allegations in Paragraph 259.

260.    The Association admits the allegations in Paragraph 260.

261.    The Association admits the allegations in Paragraph 261.

262.    The Association admits the allegations in Paragraph 262.

***Kenneth Direktor***

263.    The Association admits the allegations in Paragraph 263.

264.    The Association admits the allegations in Paragraph 264.

265.    The Association admits the allegations in Paragraph 265.

266.    The Association admits the allegations in Paragraph 266.

267.    The Association admits the allegations in Paragraph 267.

***Steven B. Lesser***

268.    The Association admits the allegations in Paragraph 268.

269.    The Association admits the allegations in Paragraph 269.

270.    The Association admits the allegations in Paragraph 270.

271.    The Association admits the allegations in Paragraph 271.

***Donna DiMaggio Berger***

272.    The Association admits the allegations in Paragraph 272.

273.    The Association admits the allegations in Paragraph 273.

274.    The Association admits the allegations in Paragraph 274.

275.     The Association admits the allegations in Paragraph 275.

276.     The Association admits the allegations in Paragraph 276.

277.     The Association admits the allegations in Paragraph 277.

278.     The Association admits the allegations in Paragraph 278.

279.     The Association admits the allegations in Paragraph 279.

280.     The Association admits the allegations in Paragraph 280.

281.     The Association admits the allegations in Paragraph 281.

282.     The Association admits the allegations in Paragraph 282.

283.     The Association admits the allegations in Paragraph 283.

284.     The Association admits the allegations in Paragraph 284.

285.     The Association admits the allegations in Paragraph 285.

286.     The Association admits that it received a copy of Ms. Rodriguez's correspondence. The Association is without knowledge of the remaining allegations in Paragraph 286.

287.     The Association admits the allegations of Paragraph 287.

288.     The Association admits that Becker issued a letter to Ms. Rodriguez on or about December 13, 2018. The Association is without knowledge of the remaining allegations in Paragraph 288.

289.     The Association admits the allegations of Paragraph 289.

290.     The Association admits the allegations in Paragraph 290.

291.     The Association admits that Ms. Zaidenweber filed a lawsuit against the Association in 2001 and in 2015. The Association is without knowledge of the remaining allegations in Paragraph 291.

292.     The Association admits the allegations in Paragraph 292.

293.    The Association admits the allegations in Paragraph 293.

294.    The Association admits the allegations in Paragraph 294.

295.    The Association admits the allegations in Paragraph 295.

296.    The Association admits the allegations in Paragraph 296.

297.    The Association admits the allegations in Paragraph 297.

298.    The Association admits the allegations in Paragraph 298.

299.    The Association admits the allegations in Paragraph 299.

300.    The Association admits the allegations in Paragraph 300.

301.    The Association admits that a Becker representative and Mr. Prieto attended the Association's Board of Directors meeting on or about November 15, 2018. The Association is without knowledge of the remaining allegations in Paragraph 301.

302.    The Association admits the allegations in Paragraph 302.

303.    The Association admits the allegations in Paragraph 303.

304.    The Association admits that Becker attorneys discussed negotiations with the Terra Defendants and evaluated a proposed term sheet for settlement. The Association is without knowledge of the remaining allegations in Paragraph 304.

305.    The Association admits the allegations in Paragraph 305.

306.    The Association admits the allegations in Paragraph 306.

307.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 307.

308.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 308.

## CLASS REPRESENTATION ALLEGATIONS

### *Class Definitions*

309.    The Association admits the allegations in Paragraph 309.

310.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 310.

## The Liability Class

311.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 311.

## The Personal Injury and Wrongful Death Subclass

312.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 312.

## The Non-Owner Personal Injury and Wrongful Death Subclass

313.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 313.

## The Economic Loss and Property Damage Subclass

314.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 314.

315.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 315.

316.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 316.

317.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 317.

### *Requirements of Rule 1.220(a)*

**Numerosity**

318.    The Association admits that the putative class satisfies the numerosity requirement of Fla. R. Civ. P. 1.220(a)(1). The Association is without knowledge sufficient to respond to the remaining allegations in Paragraph 318.

**Commonality**

319.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 319 and its subparts.

**Typicality**

320.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 320.

**Adequacy of Representation**

321.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 321.

322.    The Association admits that this Court entered an Amended Order Appointing Plaintiffs' Counsel and Addressing Certain Case Management Issues on or about July 16, 2021 and appointed a leadership structure to manage Plaintiffs' claims in this litigation. The Association is without knowledge of the remaining allegations in Paragraph 322.

323.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 323.

### *Requirements of Rule 1.220(b)(1)(B)*

324.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 324.

### *Requirements of Rule 1.220(b)(3)*

**Predominance**

325.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 325.

326.    The Association admits the allegations in Paragraph 326.

327.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 327.

328.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 328.

**Superiority**

329.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 329.

### *Issue Certification*

330.    The Association is without knowledge sufficient to respond to the allegations in Paragraph 330.

**COUNT I**
**NEGLIGENCE**
**(Against the Terra Defendants)**

331.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

332.    This count is not addressed to the Association, and therefore the Association does not respond.

333.    This count is not addressed to the Association, and therefore the Association does not respond.

334.    This count is not addressed to the Association, and therefore the Association does not respond.

335.    This count is not addressed to the Association, and therefore the Association does not respond.

336.    This count is not addressed to the Association, and therefore the Association does not respond.

337.    This count is not addressed to the Association, and therefore the Association does not respond.

338.    This count is not addressed to the Association, and therefore the Association does not respond.

339.    This count is not addressed to the Association, and therefore the Association does not respond.

340.    This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

341.    This count is not addressed to the Association, and therefore the Association does not respond.

342.    This count is not addressed to the Association, and therefore the Association does not respond.

343.    This count is not addressed to the Association, and therefore the Association does not respond.

## COUNT II
## STRICT LIABILITY
### (Against the Terra Defendants)

344.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

345. This count is not addressed to the Association, and therefore the Association does not respond.

346. This count is not addressed to the Association, and therefore the Association does not respond.

347. This count is not addressed to the Association, and therefore the Association does not respond.

348. This count is not addressed to the Association, and therefore the Association does not respond.

349. This count is not addressed to the Association, and therefore the Association does not respond.

350. This count is not addressed to the Association, and therefore the Association does not respond.

351. This count is not addressed to the Association, and therefore the Association does not respond.

352. This count is not addressed to the Association, and therefore the Association does not respond.

353. This count is not addressed to the Association, and therefore the Association does not respond.

354. This count is not addressed to the Association, and therefore the Association does not respond.

355. This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

**COUNT III**
**NEGLIGENCE**
**(Against JMA)**

356.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

357.    This count is not addressed to the Association, and therefore the Association does not respond.

358.    This count is not addressed to the Association, and therefore the Association does not respond.

359.    This count is not addressed to the Association, and therefore the Association does not respond.

360.    This count is not addressed to the Association, and therefore the Association does not respond.

361.    This count is not addressed to the Association, and therefore the Association does not respond.

362.    This count is not addressed to the Association, and therefore the Association does not respond.

363.    This count is not addressed to the Association, and therefore the Association does not respond.

364.    This count is not addressed to the Association, and therefore the Association does not respond.

365.    This count is not addressed to the Association, and therefore the Association does not respond.

366.    This count is not addressed to the Association, and therefore the Association does not respond.

367.     This count is not addressed to the Association, and therefore the Association does not respond.

368.     This count is not addressed to the Association, and therefore the Association does not respond.

369.     This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

370.     This count is not addressed to the Association, and therefore the Association does not respond.

371.     This count is not addressed to the Association, and therefore the Association does not respond.

372.     This count is not addressed to the Association, and therefore the Association does not respond.

**COUNT IV**
**STRICT LIABILITY**
**(Against JMA)**

373.     The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

374.     This count is not addressed to the Association, and therefore the Association does not respond.

375.     This count is not addressed to the Association, and therefore the Association does not respond.

376.     This count is not addressed to the Association, and therefore the Association does not respond.

377.     This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

378.     This count is not addressed to the Association, and therefore the Association does not respond.

379.     This count is not addressed to the Association, and therefore the Association does not respond.

380.     This count is not addressed to the Association, and therefore the Association does not respond.

381.     This count is not addressed to the Association, and therefore the Association does not respond.

382.     This count is not addressed to the Association, and therefore the Association does not respond.

383.     This count is not addressed to the Association, and therefore the Association does not respond.

384.     This count is not addressed to the Association, and therefore the Association does not respond.

385.     This count is not addressed to the Association, and therefore the Association does not respond.

**COUNT V**
**NEGLIGENCE**
**(Against NV5)**

386.     The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

387.     This count is not addressed to the Association, and therefore the Association does not respond.

388.     This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

389.     This count is not addressed to the Association, and therefore the Association does not respond.

390.     This count is not addressed to the Association, and therefore the Association does not respond.

391.     This count is not addressed to the Association, and therefore the Association does not respond.

392.     This count is not addressed to the Association, and therefore the Association does not respond.

393.     This count is not addressed to the Association, and therefore the Association does not respond.

394.     This count is not addressed to the Association, and therefore the Association does not respond.

395.     This count is not addressed to the Association, and therefore the Association does not respond.

396.     This count is not addressed to the Association, and therefore the Association does not respond.

397.     This count is not addressed to the Association, and therefore the Association does not respond.

398.     This count is not addressed to the Association, and therefore the Association does not respond.

399.     This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

400.    This count is not addressed to the Association, and therefore the Association does not respond.

401.    This count is not addressed to the Association, and therefore the Association does not respond.

402.    This count is not addressed to the Association, and therefore the Association does not respond.

403.    This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

404.    This count is not addressed to the Association, and therefore the Association does not respond.

405.    This count is not addressed to the Association, and therefore the Association does not respond.

406.    This count is not addressed to the Association, and therefore the Association does not respond.

**COUNT VI**
**STRICT LIABILITY**
**(Against NV5)**

407.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein

408.    This count is not addressed to the Association, and therefore the Association does not respond.

409.    This count is not addressed to the Association, and therefore the Association does not respond.

410.    This count is not addressed to the Association, and therefore the Association does not respond.

411.    This count is not addressed to the Association, and therefore the Association does not respond.

412.    This count is not addressed to the Association, and therefore the Association does not respond.

413.    This count is not addressed to the Association, and therefore the Association does not respond.

414.    This count is not addressed to the Association, and therefore the Association does not respond.

415.    This count is not addressed to the Association, and therefore the Association does not respond.

416.    This count is not addressed to the Association, and therefore the Association does not respond.

417.    This count is not addressed to the Association, and therefore the Association does not respond.

418.    This count is not addressed to the Association, and therefore the Association does not respond.

419.    This count is not addressed to the Association, and therefore the Association does not respond.

**COUNT VII**
**NEGLIGENCE**
**(Against DeSimone)**

420.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

421.    This count is not addressed to the Association, and therefore the Association does not respond.

422.    This count is not addressed to the Association, and therefore the Association does not respond.

423.    This count is not addressed to the Association, and therefore the Association does not respond.

424.    This count is not addressed to the Association, and therefore the Association does not respond.

425.    This count is not addressed to the Association, and therefore the Association does not respond.

426.    This count is not addressed to the Association, and therefore the Association does not respond.

427.    This count is not addressed to the Association, and therefore the Association does not respond.

428.    This count is not addressed to the Association, and therefore the Association does not respond.

429.    This count is not addressed to the Association, and therefore the Association does not respond.

430.    This count is not addressed to the Association, and therefore the Association does not respond.

431.    This count is not addressed to the Association, and therefore the Association does not respond.

432.    This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

433.     This count is not addressed to the Association, and therefore the Association does not respond.

434.     This count is not addressed to the Association, and therefore the Association does not respond.

435.     This count is not addressed to the Association, and therefore the Association does not respond.

436.     This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

437.     This count is not addressed to the Association, and therefore the Association does not respond.

438.     This count is not addressed to the Association, and therefore the Association does not respond.

439.     This count is not addressed to the Association, and therefore the Association does not respond.

## COUNT VIII
## STRICT LIABILITY
### (Against DeSimone)

440.     The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

441.     This count is not addressed to the Association, and therefore the Association does not respond.

442.     This count is not addressed to the Association, and therefore the Association does not respond.

443.     This count is not addressed to the Association, and therefore the Association does not respond.

444.     This count is not addressed to the Association, and therefore the Association does not respond.

445.     This count is not addressed to the Association, and therefore the Association does not respond.

446.     This count is not addressed to the Association, and therefore the Association does not respond.

447.     This count is not addressed to the Association, and therefore the Association does not respond.

448.     This count is not addressed to the Association, and therefore the Association does not respond.

449.     This count is not addressed to the Association, and therefore the Association does not respond.

450.     This count is not addressed to the Association, and therefore the Association does not respond.

451.     This count is not addressed to the Association, and therefore the Association does not respond.

452.     This count is not addressed to the Association, and therefore the Association does not respond.

### COUNT IX
### NEGLIGENCE
**(Against the Association)**

453.     The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

454.     The Association denies the allegations in Paragraph 454.

455.     The Association admits the allegations in Paragraph 455.

33

62820710;1

456.    The Association admits the allegations in Paragraph 456 to the extent that it properly quotes Section 7.1 of the Declaration

457.    The Association admits the allegations contained in Paragraph 457.

458.    The Association denies the allegations in Paragraph 458.

459.    The Association denies the allegations in Paragraph 459.

460.    The Association denies the allegations in Paragraph 460.

461.    The Association denies the allegations in Paragraph 461.

462.    The Association denies the allegations in Paragraph 462.

463.    The Association denies the allegations in Paragraph 463.

464.    The Association denies the allegations in Paragraph 464.

465.    The Association denies the allegations in Paragraph 465.

466.    The Association denies the allegations of Paragraph 466.

**COUNT X**
**NEGLIGENCE**
**(Against Morabito)**

467.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

468.    This count is not addressed to the Association, and therefore the Association does not respond.

469.    This count is not addressed to the Association, and therefore the Association does not respond.

470.    This count is not addressed to the Association, and therefore the Association does not respond.

471.    This count is not addressed to the Association, and therefore the Association does not respond.

472.    This count is not addressed to the Association, and therefore the Association does not respond.

473.    This count is not addressed to the Association, and therefore the Association does not respond.

474.    This count is not addressed to the Association, and therefore the Association does not respond.

475.    This count is not addressed to the Association, and therefore the Association does not respond.

476.    This count is not addressed to the Association, and therefore the Association does not respond.

477.    This count is not addressed to the Association, and therefore the Association does not respond.

478.    This count is not addressed to the Association, and therefore the Association does not respond.

479.    This count is not addressed to the Association, and therefore the Association does not respond.

480.    This count is not addressed to the Association, and therefore the Association does not respond.

481.    This count is not addressed to the Association, and therefore the Association does not respond.

482.    This count is not addressed to the Association, and therefore the Association does not respond.

483.    This count is not addressed to the Association, and therefore the Association does not respond.

484.    This count is not addressed to the Association, and therefore the Association does not respond.

485.    This count is not addressed to the Association, and therefore the Association does not respond.

486.    This count is not addressed to the Association, and therefore the Association does not respond.

487.    This count is not addressed to the Association, and therefore the Association does not respond.

488.    This count is not addressed to the Association, and therefore the Association does not respond.

489.    This count is not addressed to the Association, and therefore the Association does not respond.

490.    This count is not addressed to the Association, and therefore the Association does not respond.

491.    This count is not addressed to the Association, and therefore the Association does not respond.

492.    This count is not addressed to the Association, and therefore the Association does not respond.

493.    This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

494.    This count is not addressed to the Association, and therefore the Association does not respond.

495.    This count is not addressed to the Association, and therefore the Association does not respond.

496.    This count is not addressed to the Association, and therefore the Association does not respond.

497.    This count is not addressed to the Association, and therefore the Association does not respond.

498.    This count is not addressed to the Association, and therefore the Association does not respond.

499.    This count is not addressed to the Association, and therefore the Association does not respond.

500.    This count is not addressed to the Association, and therefore the Association does not respond.

501.    This count is not addressed to the Association, and therefore the Association does not respond.

502.    This count is not addressed to the Association, and therefore the Association does not respond.

503.    This count is not addressed to the Association, and therefore the Association does not respond.

504.    This count is not addressed to the Association, and therefore the Association does not respond.

505.     This count is not addressed to the Association, and therefore the Association does not respond.

506.     This count is not addressed to the Association, and therefore the Association does not respond.

507.     This count is not addressed to the Association, and therefore the Association does not respond.

508.     This count is not addressed to the Association, and therefore the Association does not respond.

509.     This count is not addressed to the Association, and therefore the Association does not respond.

510.     This count is not addressed to the Association, and therefore the Association does not respond.

511.     This count is not addressed to the Association, and therefore the Association does not respond.

512.     This count is not addressed to the Association, and therefore the Association does not respond.

513.     This count is not addressed to the Association, and therefore the Association does not respond.

514.     This count is not addressed to the Association, and therefore the Association does not respond.

515.     This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

516.     This count is not addressed to the Association, and therefore the Association does not respond.

517.     This count is not addressed to the Association, and therefore the Association does not respond.

518.     This count is not addressed to the Association, and therefore the Association does not respond.

519.     This count is not addressed to the Association, and therefore the Association does not respond.

520.     This count is not addressed to the Association, and therefore the Association does not respond.

521.     This count is not addressed to the Association, and therefore the Association does not respond.

522.     This count is not addressed to the Association, and therefore the Association does not respond.

523.     This count is not addressed to the Association, and therefore the Association does not respond.

524.     This count is not addressed to the Association, and therefore the Association does not respond.

525.     This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

526.     This count is not addressed to the Association, and therefore the Association does not respond.

527.     This count is not addressed to the Association, and therefore the Association does not respond.

528.     This count is not addressed to the Association, and therefore the Association does not respond.

**COUNT XI**
**GROSS NEGLIGENCE**
**(Against Becker)**

529.     The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

530.     This count is not addressed to the Association, and therefore the Association does not respond.

531.     This count is not addressed to the Association, and therefore the Association does not respond.

532.     This count is not addressed to the Association, and therefore the Association does not respond.

533.     This count is not addressed to the Association, and therefore the Association does not respond.

534.     This count is not addressed to the Association, and therefore the Association does not respond.

535.     This count is not addressed to the Association, and therefore the Association does not respond.

536.     This count is not addressed to the Association, and therefore the Association does not respond.

537.     This count is not addressed to the Association, and therefore the Association does not respond.

538.    This count is not addressed to the Association, and therefore the Association does not respond.

539.    This count is not addressed to the Association, and therefore the Association does not respond.

540.    This count is not addressed to the Association, and therefore the Association does not respond.

541.    This count is not addressed to the Association, and therefore the Association does not respond.

542.    This count is not addressed to the Association, and therefore the Association does not respond.

543.    This count is not addressed to the Association, and therefore the Association does not respond.

544.    This count is not addressed to the Association, and therefore the Association does not respond.

545.    This count is not addressed to the Association, and therefore the Association does not respond.

546.    This count is not addressed to the Association, and therefore the Association does not respond.

547.    This count is not addressed to the Association, and therefore the Association does not respond.

548.    This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

549.    This count is not addressed to the Association, and therefore the Association does not respond.

550.    This count is not addressed to the Association, and therefore the Association does not respond.

551.    This count is not addressed to the Association, and therefore the Association does not respond.

552.    This count is not addressed to the Association, and therefore the Association does not respond.

553.    This count is not addressed to the Association, and therefore the Association does not respond.

**COUNT XII**
**NEGLIGENCE**
**(Against Stantec)**

554.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

555.    This count is not addressed to the Association, and therefore the Association does not respond.

556.    This count is not addressed to the Association, and therefore the Association does not respond.

557.    This count is not addressed to the Association, and therefore the Association does not respond.

558.    This count is not addressed to the Association, and therefore the Association does not respond.

559.    This count is not addressed to the Association, and therefore the Association does not respond.

560.    This count is not addressed to the Association, and therefore the Association does not respond.

561.    This count is not addressed to the Association, and therefore the Association does not respond.

562.    This count is not addressed to the Association, and therefore the Association does not respond.

563.    This count is not addressed to the Association, and therefore the Association does not respond.

564.    This count is not addressed to the Association, and therefore the Association does not respond.

565.    This count is not addressed to the Association, and therefore the Association does not respond.

566.    This count is not addressed to the Association, and therefore the Association does not respond.

567.    This count is not addressed to the Association, and therefore the Association does not respond.

568.    This count is not addressed to the Association, and therefore the Association does not respond.

569.    This count is not addressed to the Association, and therefore the Association does not respond.

570.    This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

571.     This count is not addressed to the Association, and therefore the Association does not respond.

572.     This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

573.     This count is not addressed to the Association, and therefore the Association does not respond.

574.     This count is not addressed to the Association, and therefore the Association does not respond.

575.     This count is not addressed to the Association, and therefore the Association does not respond.

## COUNT XIII
## STRICT LIABILITY
### (Against Stantec)

576.     The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

577.     This count is not addressed to the Association, and therefore the Association does not respond.

578.     This count is not addressed to the Association, and therefore the Association does not respond.

579.     This count is not addressed to the Association, and therefore the Association does not respond.

580.     This count is not addressed to the Association, and therefore the Association does not respond.

581.     This count is not addressed to the Association, and therefore the Association does not respond.

582.    This count is not addressed to the Association, and therefore the Association does not respond.

583.    This count is not addressed to the Association, and therefore the Association does not respond.

584.    This count is not addressed to the Association, and therefore the Association does not respond.

585.    This count is not addressed to the Association, and therefore the Association does not respond.

586.    This count is not addressed to the Association, and therefore the Association does not respond.

587.    This count is not addressed to the Association, and therefore the Association does not respond.

588.    This count is not addressed to the Association, and therefore the Association does not respond.

## COUNT XIV
## NEGLIGENCE
### (Against Geosonics)

589.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

590.    This count is not addressed to the Association, and therefore the Association does not respond.

591.    This count is not addressed to the Association, and therefore the Association does not respond.

592.    This count is not addressed to the Association, and therefore the Association does not respond.

593.    This count is not addressed to the Association, and therefore the Association does not respond.

594.    This count is not addressed to the Association, and therefore the Association does not respond.

595.    This count is not addressed to the Association, and therefore the Association does not respond.

596.    This count is not addressed to the Association, and therefore the Association does not respond.

597.    This count is not addressed to the Association, and therefore the Association does not respond.

598.    This count is not addressed to the Association, and therefore the Association does not respond.

599.    This count is not addressed to the Association, and therefore the Association does not respond.

600.    This count is not addressed to the Association, and therefore the Association does not respond.

601.    This count is not addressed to the Association, and therefore the Association does not respond.

602.    This count is not addressed to the Association, and therefore the Association does not respond.

603.    This count is not addressed to the Association, and therefore the Association does not respond.

604.    This count is not addressed to the Association, and therefore the Association does not respond.

605.    This count is not addressed to the Association, and therefore the Association does not respond.

606.    This count is not addressed to the Association, and therefore the Association does not respond.

607.    This count is not addressed to the Association, and therefore the Association does not respond.

608.    This count is not addressed to the Association, and therefore the Association does not respond.

609.    This count is not addressed to the Association, and therefore the Association does not respond.

610.    This count is not addressed to the Association, and therefore the Association does not respond.

611.    This count is not addressed to the Association, and therefore the Association does not respond.

612.    This count is not addressed to the Association, and therefore the Association does not respond.

613.    This count is not addressed to the Association, and therefore the Association does not respond.

614.    This count is not addressed to the Association, and therefore the Association does not respond.

615.     This count is not addressed to the Association, and therefore the Association does not respond.

616.     This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

617.     This count is not addressed to the Association, and therefore the Association does not respond.

618.     This count is not addressed to the Association, and therefore the Association does not respond.

619.     This count is not addressed to the Association, and therefore the Association does not respond.

**COUNT XV**
**STRICT LIABILITY**
**(Against Geosonics)**

620.     The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

621.     This count is not addressed to the Association, and therefore the Association does not respond.

622.     This count is not addressed to the Association, and therefore the Association does not respond.

623.     This count is not addressed to the Association, and therefore the Association does not respond.

624.     This count is not addressed to the Association, and therefore the Association does not respond.

625.     This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

626.    This count is not addressed to the Association, and therefore the Association does not respond.

627.    This count is not addressed to the Association, and therefore the Association does not respond.

628.    This count is not addressed to the Association, and therefore the Association does not respond.

629.    This count is not addressed to the Association, and therefore the Association does not respond.

630.    This count is not addressed to the Association, and therefore the Association does not respond.

631.    This count is not addressed to the Association, and therefore the Association does not respond.

632.    This count is not addressed to the Association, and therefore the Association does not respond.

**COUNT XVI**
**NEGLIGENCE**
**(Against Florida Civil)**

633.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

634.    This count is not addressed to the Association, and therefore the Association does not respond.

635.    This count is not addressed to the Association, and therefore the Association does not respond.

636.    This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

637.    This count is not addressed to the Association, and therefore the Association does not respond.

638.    This count is not addressed to the Association, and therefore the Association does not respond.

639.    This count is not addressed to the Association, and therefore the Association does not respond.

640.    This count is not addressed to the Association, and therefore the Association does not respond.

641.    This count is not addressed to the Association, and therefore the Association does not respond.

642.    This count is not addressed to the Association, and therefore the Association does not respond.

643.    This count is not addressed to the Association, and therefore the Association does not respond.

644.    This count is not addressed to the Association, and therefore the Association does not respond.

645.    This count is not addressed to the Association, and therefore the Association does not respond.

646.    This count is not addressed to the Association, and therefore the Association does not respond.

647.    This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

648.     This count is not addressed to the Association, and therefore the Association does not respond.

649.     This count is not addressed to the Association, and therefore the Association does not respond.

650.     This count is not addressed to the Association, and therefore the Association does not respond.

651.     This count is not addressed to the Association, and therefore the Association does not respond.

652.     This count is not addressed to the Association, and therefore the Association does not respond.

653.     This count is not addressed to the Association, and therefore the Association does not respond.

654.     This count is not addressed to the Association, and therefore the Association does not respond.

655.     This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

656.     This count is not addressed to the Association, and therefore the Association does not respond.

657.     This count is not addressed to the Association, and therefore the Association does not respond.

658.     This count is not addressed to the Association, and therefore the Association does not respond.

## COUNT XVII
## NEGLIGENCE
### (Against the 8701 Association)

659.    The Association incorporates its responses to Paragraphs 1-330 as if fully restated herein.

660.    This count is not addressed to the Association, and therefore the Association does not respond.

661.    This count is not addressed to the Association, and therefore the Association does not respond.

662.    This count is not addressed to the Association, and therefore the Association does not respond.

663.    This count is not addressed to the Association, and therefore the Association does not respond.

664.    This count is not addressed to the Association, and therefore the Association does not respond.

665.    This count is not addressed to the Association, and therefore the Association does not respond.

666.    This count is not addressed to the Association, and therefore the Association does not respond.

667.    This count is not addressed to the Association, and therefore the Association does not respond.

668.    This count is not addressed to the Association, and therefore the Association does not respond.

669.    This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

670. This count is not addressed to the Association, and therefore the Association does not respond.

671. This count is not addressed to the Association, and therefore the Association does not respond.

672. This count is not addressed to the Association, and therefore the Association does not respond.

673. This count is not addressed to the Association, and therefore the Association does not respond.

674. This count is not addressed to the Association, and therefore the Association does not respond.

675. This count is not addressed to the Association, and therefore the Association does not respond.

676. This count, and its subparts, are not addressed to the Association, and therefore the Association does not respond.

677. This count is not addressed to the Association, and therefore the Association does not respond.

678. This count is not addressed to the Association, and therefore the Association does not respond.

679. This count is not addressed to the Association, and therefore the Association does not respond.

680. This count is not addressed to the Association, and therefore the Association does not respond.

62820710;1

681.    This count is not addressed to the Association, and therefore the Association does not respond.

682.    This count is not addressed to the Association, and therefore the Association does not respond.

## GENERAL DENIAL

683.    The Association denies each and every allegation not expressly admitted above.

## AFFIRMATIVE AND OTHER DEFENSES

By including a defense herein, the Association does not accept the burden of proof or persuasion, unless otherwise provided for by law.

### First Affirmative Defense

684.    Plaintiffs' complaint is barred, in whole or in part, because the Association fulfilled its duty of care by retaining and relying upon appropriate professionals, including, but not limited to, Morabito Consultants, Inc. and Becker and Poliakoff, P.A.

### Second Affirmative Defense

685.    Plaintiffs' complaint is barred, in whole or in part, by Section 10.2 of the Amended and Restated Declaration of Condominium of Champlain Towers South Condominium, which provides:

> Limitation Upon Liability of Association. Notwithstanding the duty of the Association to maintain and repair parts of the Condominium Property, the Association shall not be liable to Unit Owners for injury or damage, other than for the cost of maintenance and repair, caused by any latent condition of the Condominium Property. Further, the Association shall not be liable for any such injury or damage caused by defects in design or workmanship or any other reason connected with any additions, alterations or improvements done by or on behalf of any Unit Owners regardless of whether or not same shall have been approved by the Association pursuant hereto. Further, the Association shall not be liable to any Unit Owner or lessee or to any other person or entity for any property damage, personal injury, death or other liability on the grounds that the Association did not obtain or maintain insurance (or carried insurance with any particular deductible amount) for any particular matter where (i) such insurance is not required hereby

or (ii) the Association could not obtain such insurance at reasonable costs or upon reasonable terms.

## Third Affirmative Defense

686.    Plaintiffs' complaint is barred, in whole or in part, by Article 12 of the Amended and Restated By-laws of the Champlain Towers South Condominium, which provides:

## LIMITATION OF LIABILITY

Notwithstanding the duty of the Association to maintain and repair parts of the property, the Association shall not be liable for injury or damage caused by a latent condition in the property, nor for injury or damage caused by the elements, or other Unit Owners or persons.

## Fourth Affirmative Defense

687.    The damages alleged by Plaintiffs were solely or partially caused by the negligence of other parties or non-parties over whom the Association had no control and for whose conduct the Association is not responsible. Liability and damages, therefore, must be apportioned upon the parties and non-parties consistent with Florida Statute 768.81 and *Fabre v. Marin*, 623 So. 2d 1182 (Fla. 1993). In addition to other parties that may later be revealed through discovery, responsible parties include, as fully detailed in the crossclaim:

    a. Morabito Consultants, Inc.;
    b. Becker and Poliakoff, P.A.;
    c. 8701 Collins Development, LLC;
    d. Terra Group, LLC;
    e. Terra World Investments, LLC;
    f. John Moriarity &Associates, of Florida, Inc.;
    g. NV5, Inc.;
    h. DeSimone Consulting Engineers, LLC;
    i. Stantec Architecture Inc.;
    j. Geosonics, Inc.;
    k. Florida Civil, Inc.; and
    l. 8701 Collins Avenue Condominium Association, Inc.

### Fifth Affirmative Defense

688.    Plaintiffs' claims are barred, in whole or in part, based upon the statute of limitations and or statute of response, should it be determined that the defects were known more than four years (limitations) and/or ten years (repose) prior to the initiation of this action.

### Sixth Affirmative Defense

689.    Plaintiffs' claims are barred, in whole or in part, based upon the intervening and superseding actions of third parties.

### Seventh Affirmative Defense

690.    Plaintiffs' claims are barred, in whole or in part, to the extent the damages resulted from acts of god or other unavoidable causes such as floods, hurricanes, and unknowable underground erosion.

### Eight Affirmative Defense

691.    To the extent Plaintiffs have or will settle with, obtain judgment against, or otherwise receive payment from any party or non-party, or otherwise receive payment from a collateral source, including but not limited to, insurance policies either paid or payable, for the same damages sought from the Association, the Association is entitled to a set-off against Plaintiffs' damages.

### Ninth Affirmative Defense

692.    Plaintiffs' claims are barred, in whole or in part, based upon the provisions of Florida Statute Section 718.119. To the extent that the Association has any liability, it is entitled to indemnification, contribution, and set-off from and against each Plaintiff Unit Owner to the extent of his or her pro-rata share of that liability in the same percentage as his or her interest in the common elements.

## AMENDED CROSSCLAIM

### (Amending Count II against Morabito and Adding Crossclaim Defendants Stantec, Geosonics, Florida Civil, and 8701 Condo Assn.)

Defendant, Cross-claimant Champlain Towers South Condominium Association, Inc. (the "**Association**"), files this Amended Crossclaim against Morabito Consultants, Inc.; 8701 Collins Development, LLC; Terra Group, LLC; Terra World Investments, LLC; John Moriarty & Associates of Florida, Inc.; NV5, Inc.; DeSimone Consulting Engineers, LLC, Stantec Architecture Inc.; Geosonics, Inc.; Florida Civil, Inc.; and 8701 Collins Avenue Condominium Association, Inc.; as grounds therefore states:

## INTRODUCTION

1.      This action arises out of the tragic collapse of the Champlain Towers South condominium building in Surfside, Florida (the "**CTS Building**") on June 24, 2021, which killed 98 people, caused multiple injuries and losses, and resulted in the complete destruction of the building, with the almost complete loss of the entirety of the building's contents.

2.      As set forth herein, the Association relied upon retained experts to advise it as to the condition of the building and the need for any repairs, emergency or otherwise, to the Champlain Towers South ("CTS") property, including the CTS Building.

3.      The Association's reliance upon on those experts, while reasonable, turned out to be misplaced.

4.      Had the experts on which the Association justifiably relied performed their services competently, and to the minimum standards required of such professionals, the tragedy would have been mitigated, if not completely avoided.

5.      In addition, the actions of other parties named herein, who were not retained by or associated with the Association, directly contributed to and, indeed, caused the collapse and resultant deaths, injuries, and losses.

6.      By this lawsuit, the Association seeks recompense from those parties whose actions or inactions contributed to the collapse of the CTS Building and the corresponding damages suffered as a result.

## PARTIES, JURISDICTION, AND VENUE

7.      The Association is a not-for-profit corporation organized and existing under the laws of Florida. The Association is currently operating through its court appointed receiver, Michael I. Goldberg.

8.      Defendant Morabito Consultants, Inc. (hereinafter referred to as "**Morabito**"), is a corporation organized and existing under the laws of Maryland, with its principal place of business located at 952 Ridgebrook Road, Suite 1700, Sparks, Maryland.

9.      Morabito is authorized to conduct business, and actually conducts business in Florida, including Miami-Dade County.

10.      Defendant 8701 Collins Development, LLC, is a Delaware limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida, and is, or at times material hereto was, conducting business in Florida, including in Miami-Dade County.

11.      Defendant Terra Group, LLC, is a Florida limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida, and is, or at times material hereto was, doing business in Florida, including Miami-Dade County.

12.     Defendant Terra World Investments, LLC, is a Florida limited liability company with its principal place of business at 3310 Mary Street, Suite 302, Coconut Grove, Florida, and is, or at times material hereto was, doing business in Florida, including Miami-Dade County.

13.     Defendants 8701 Collins Development, LLC, Terra Group, LLC, and Terra World Investments, LLC, are collectively referred to herein as the "**Terra Defendants**."

14.     By and through their agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, the Terra Defendants owned, operated, constructed, managed, supervised, and/or developed a construction project known as "**Eighty-Seven Park**," located at 8701 Collins Avenue, Miami Beach, Florida.

15.     Defendant, John Moriarity & Associates of Florida, Inc. (hereinafter referred to as "**JMA**"), is a Massachusetts corporation with its principal place of business located at 3 Church Street, Winchester, Massachusetts, and was, at times material hereto, licensed to conduct business in Florida.

16.     JMA, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired or retained as, or otherwise acted as, the general contractor on the construction project known as Eighty-Seven Park.

17.     Defendant NV5, Inc. (hereinafter referred to as "**NV5**"), is a Delaware corporation with its principal place of business at 200 South Park Road, Suite 350, Hollywood, Florida and is doing business in Florida.

18.     NV5, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired or retained as, or otherwise acted as the geotechnical engineer and inspector on the construction project known as Eighty-Seven Park.

62820710;1

19.     Defendant DeSimone Consulting Engineers, LLC (hereinafter referred to as "**DeSimone**"), was and is a Delaware limited liability company with its principal place of business at 140 Broadway, 25th Floor, New York, New York, and was and is doing business in Florida.

20.     DeSimone, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired or retained as, or otherwise acted as the structural engineer on the construction project known as Eighty-Seven Park.

21.     Defendant Stantec Architecture Inc. (hereinafter referred to as "**Stantec**") was and is a North Carolina corporation with its principal place of business at 224 South Michigan Avenue, Suite 1400, Chicago, Illinois and was and is authorized to do and is doing business in Florida. Stantec, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired, retained, and/or otherwise acting as the architect of record and a construction administrator at the Eighty-Seven Park development.

22.     Defendant Geosonics, Inc. (hereinafter referred to as "**Geosonics**"), was and is authorized to do and/or is doing business in Florida, duly organized, created and existing under and by virtue of the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 359 Northgate Drive, Warrendale, Pennsylvania 15086. Geosonics, by and through its agents, servants, workmen, employees, ostensible agents, and/or alter egos, was hired, retained, and/or otherwise responsible for vibration monitoring services on the Eighty-Seven Park project, located at 8701 Collins Avenue, Miami Beach, Florida.

23.     Defendant Florida Civil, Inc. (hereinafter referred to as "**Florida Civil**"), was and is authorized to do and is doing business in Florida, duly organized, created and existing under and by virtue of the laws of the State of Florida, with its principal place of business located at 4491 NE 6th Terrace, Oakland Park, Florida 33334. Florida Civil, by and through its agents, servants,

workmen, employees, ostensible agents, and/or alter egos, was hired, retained, and/or otherwise responsible for developing the dewatering plans and procedures for the Eighty-Seven Park project, located at 8701 Collins Avenue, Miami Beach, Florida.

24.     Defendant 8701 Collins Avenue Condominium Association, Inc. (hereinafter referred to as "**8701 Association**"), is a Florida not-for-profit corporation with its principal place of business at 8701 Collins Avenue, Miami Beach, Florida 33154, and was and is doing business in Florida. Defendant 8701 Association, by and through its agents, officers, directors, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, owned, operated, constructed, managed, supervised, maintained and/or developed Eighty-Seven Park.

25.     The crossclaims seek damages exceeding $30,000, exclusive of interest, costs, and attorneys' fees. Accordingly, this action falls within this Court's exclusive jurisdiction under section 26.012, Florida Statutes (2021).

26.     Venue is proper in Miami-Dade County, Florida, pursuant to sections 47.011 and 47.051, Florida Statutes (2021), as this is the place where the acts and omissions complained of herein took place, where the causes of action accrued, where the defendants reside, and/or the place where the affected property is the subject of this action is situated.

## GENERAL ALLEGATIONS

27.     By this action, the Association seeks damages in excess of $750,000, exclusive of interest, costs, and attorneys' fees.

28.     All conditions precedent to the institution of this action have occurred, been performed, or been excused.

29.     The CTS Building was a thirteen-story condominium building situated at the southernmost border of the Town of Surfside, at 87th and Collins Avenue.

30.     Completed in 1981, the CTS Building had 136 units.

62820710;1

31.     The Association was created in accordance with Florida Statute Chapter 718 and performed those duties required of it pursuant to Chapter 718, and the Amended and Restated Declaration of Condominium of the Champlain Towers South Condominium Association, Inc. (the "**Declaration**"), which is recorded in the Public Records of Miami-Dade County at Book 31420, page 1165; the Amended and Restated Articles of Incorporation of the Champlain Towers South Condominium Association, Inc. (the "**Articles**"),which are recorded in the Public Records of Miami-Dade County at Book 31420, page 1223; and the Amended and Restated By-laws of the Champlain Towers South Condominium Association, Inc. (the "**By-laws**"), which are  recorded in the Public Records of Miami-Dade County at Book 31420, page 1230.

32.     The Declaration, the Articles, the By-laws, and all prior versions thereof, are referenced herein as the "**Condominium Documents**."

33.     Pursuant to Florida Statute Section 718.113(1) and the Declaration (§ 7.1), the Association had a duty to maintain, repair, and replace the CTS Building's Common Elements, Limited Common Elements, and Association Property.[2]

34.     Additionally, pursuant to the Miami-Dade Code of Ordinances, Section 8-11 (a), the Association had a duty to maintain the CTS Building in a safe condition.

35.     The Association, which is responsible for the operation of the condominium (Declaration § 10.1) operated through a Board of Directors, each of whom was, at all material times, a unit owner (Articles, Art. IX; By-laws, Art. 4, 5).

36.     The Board of Directors was elected by Members and was not required to have any specialized knowledge or training.

---

[2] Any capitalized terms not specifically defined herein have the meaning ascribed to them in the Condominium Documents.

37.     Accordingly, the Association and the Board of Directors were authorized to, and did, retain and rely upon professionals to advise them with respect to the operation of the condominium, including, but not limited to, licensed property managers, engineers, contractors, and attorneys.

***The Association Hires Morabito***

38.     Pursuant to Miami-Dade County Ordinance 8-11(f)(ii)(1), buildings in Miami-Dade County (except for single-family residences) must be recertified forty years after completion to ensure the safety of residents and visitors.

39.     Beginning in the summer of 2018, the Association hired Morabito to oversee and guide the Association through the 40-year recertification process, and to ensure that the CTS Building met all safety requirements contemplated thereby.

40.     No member of the Board of Directors was a professional engineer, general contractor, or otherwise qualified to conduct or oversee the 40-year recertification process without professional assistance.

41.     The Association, directly and through the Board of Directors, relied upon Morabito, and reposed its complete trust and confidence in Morabito to properly advise the Association.

42.     Morabito specifically represented to the Association that it was well-qualified to undertake the task and provide the professional services required.

43.     On July 20, 2018, Morabito sent a proposal to the Association "for professional consulting structural engineering services for the recertification of the existing Champlain Towers South Condominium Complex (CTS) in Surfside, FL," specifically including "a review of the existing 12-story plus penthouse 136 unit residential building, below-grade parking garage and at-grade exterior pool and recreation area."

44.    On July 24, 2018, the Association accepted the proposal resulting in a contract between the Association and Morabito (the "**2018 Morabito Contract,**" a true and correct copy of which is attached hereto as **Exhibit A**).

45.    The scope of work for structural engineering services pursuant to the 2018 Morabito Contract were defined to include (emphasis added):

### *Phase I — Preparation of Recertification Report and Preliminary Cost Estimate:*

The scope of this initial phase is to prepare the recertification report required by Miami-Dade County and to provide to CTS a preliminary estimate of the probable construction cost to address the structural and electrical maintenance items that exist at this condominium complex. To complete these professional services, MC [Morabito Consultants, Inc.] . . . *will visit the site and complete a visual examination of the building structures sufficiently to certify that the buildings and surrounding recreation deck is safe for continued occupancy as a residential condominium.* Structural testing and manual procedures are not deemed to be necessary to complete this certification and as such these services are not included in this proposal.

In order to provide this certification, MC & TEH will review the available architectural, structural, and mechanical, electrical, and plumbing drawings and complete a visual review of the parking garage, common areas, recreational deck, roof and numerous condominium units to prepare the structural and electrical engineering recertification "Form Checklist" as required by the "Minimum Inspection Procedural Guidelines for Buildings" as prepared by Miami-Dade County Department of Regulatory and Economic Resources.

### MC Scope of Structural Engineering Services:

- MC will visit the site and complete a visual review which will include the structural elements, ‾50% (68 units) of the unit balconies, windows, doors, caulking, paint, walls, parking garage, pool deck, planters and roof of the building.

- MC will note the identified/observed deficient areas on prints of AutoCAD base plans that MC will prepare prior to commencement of the Phase 1 field investigation.

- MC will perform invasive inspection of damaged concrete/masonry building elements as required to develop approximate quantities and costs to repair the identified damage.

- A structural engineering recertification report will be prepared by MC for issuing to Miami-Dade County that will note the following:

- Location of the structure.

- Describe the type of construction.

- General magnitude of the structure.

- The existence of drawings.

- The history of the structure to the extent reasonably known.

- A description of the type and manner of the inspection completed.

- ***Note (if required) problem areas and recommended repairs required to maintain structural integrity.***

- ***Include a statement to the effect that the building or structure is structurally safe, safe with qualifications, or unsafe.***

- A preliminary estimate of the probable construction cost to address the structural maintenance items that exist at this condominium complex will be prepared. This estimate will include a detail breakdowns of repair items, estimated quantities, and unit prices based on MC experience with similar Miami condominium projects. A contingency will be included to address unknown items that are not discovered during this initial project phase.

46.     Morabito represented that "[s]tructural testing and manual procedures are not deemed to be necessary to complete this certification and as such these services are not included in this proposal," but did agree to "perform invasive inspection of damaged concrete/masonry building elements as required to develop approximate quantities and costs to repair the identified damage."

47.     Among Morabito's obligations in the 2018 Morabito Contact was the creation of a "a structural engineering recertification report for Miami-Dade County" specifically "not[ing] (if required) problem areas and recommended repairs to maintain structural integrity" and to "[i]nclude a statement to the effect that the building or structure is structurally safe, safe with qualifications, or unsafe."

48.     Morabito conducted its investigation in the summer and fall of 2018.

49.     It is unclear whether Morabito ever completed and submitted the recertification report required by Miami-Dade County. According to the Town of Surfside, the report was first filed with the Town on June 24, 2021 at 5:35 pm, hours after the collapse. See "Minimum Inspection Procedural Guidelines for Building's Structural Recertification" (the "Recertification Report," a copy of which is attached hereto as **Exhibit B**).

50.     Conspicuously absent from the Recertification Report is "a statement to the effect that the building or structure is structurally safe, safe with qualifications, or unsafe."

51.     Morabito did deliver to the Association its "Structural Field Survey Report" dated October 8, 2018 (the "**2018 Morabito Report**" or the "**Report**").

52.     A true and correct copy of the 2018 Morabito Report is attached hereto as **Exhibit C**.

53.     The nine-page Report stated its purpose is to "understand and document the extent of structural issues that require repair and/or remediation in the immediate and near future . . . to enable the Condominium Board to adequately assess the overall condition of the building, notify tenants how they may be affected, and provide a safe and functional infrastructure for the future."

54.     The Report identified eleven areas in need of repair, by letter designations:

a.      Items A through H identified the following issues: (A) and (F) water intrusion through windows and balcony doors; (B) damaged balcony tiles indicating structural damage to the balcony slabs; (C) spalling or cracking at the edges of balconies; (D) deterioration under painted surfaces on balcony soffits; (E) deterioration at designated areas at the entrance soffit; (G) significant cracking in the stucco exterior façade at the mortar bed joint between top of the concrete floor slab and the first block masonry course; and (H) the absence of window washing / suspension hooks.

66

  b. Item I stated that "the waterproofing below the Pool Deck & Entrance Drive as well as all of the planter waterproofing is beyond its useful life and therefore must all be completely removed and replaced. The failed waterproofing is causing major structural damage to the concrete structural slab below these areas. Failure to replace the waterproofing in the near future will cause the extent of the concrete deterioration to expand exponentially."

  c. Items J and K noted that abundant "cracking and spalling of varying degrees was observed in the concrete columns, beams and walls."

55. Significantly, nothing in the 2018 Morabito Report warned the Association, as non-professionals, that any of the identified issues threatened the life or safety of the condominium's occupants and visitors.

56. Nothing in the 2018 Morabito Report warned the Association, as non-professionals, of any imminent threat to the structural integrity of the building.

57. Morabito met with, and presented to, the Association and condominium management on several occasions to discuss the findings contained in the 2018 Report and the recommended repairs.

58. At no point did Morabito warn the Association or even suggest the possibility that any of the defects identified by their inspection created an immediate need to conduct repairs in order to avoid life-safety issues.

59. Similarly, while Morabito indicated that further testing would be required to determine the scope and extent of some the identified defects, it did not advise the Association, as non-professionals, of any urgency or an immediate need to conduct further testing to ensure the safety of the CTS Building and its residents and invitees.

60.     On April 15, 2020, some 19 months after the 2018 Report, Morabito addressed the Association utilizing a thirty-three-page PowerPoint Presentation.

61.     In the April 15, 2020, presentation, Morabito recommended the hiring of a "roof waterproofing contractor to evaluate the existing roof system and recommend a repair program," and "selective demolition" to "pool deck pavers," "entrance landscaping beds," "plaza driving surface," and "soffit of entry drive" in order "to understand existing waterproofing systems."

62.     Similarly, on May 19, 2020, Morabito addressed the Association, this time utilizing a twenty-eight-page PowerPoint Presentation.

63.     Again, in the May 19, 2020, presentation Morabito recommended "evaluat[ion] of the roof" and "waterproofing and infrastructure more fully," including "selective demolition [of the] driveway and pool deck.

64.     Nothing in the April 2020 or May 2020 presentations warned the Association of any imminent threat or need to repair or conduct additional testing on an expedited or urgent basis to protect against imminent harm to the CTS Building, and its occupants.

65.     As a result of these presentations and other discussions, on or about June 10, 2020, the Association retained Morabito through the "Engineering Services Agreement" (the "**2020 Morabito Contract**") to provide "professional engineering services for the structural engineering along with the architectural design and landscape-hardscape design services and other related engineering services for the 40 year certification of the buildings and improvements at the Champlain Towers South Condominium."

66.     A true and correct copy of the 2020 Morabito Contract is attached hereto as **Exhibit D**.

68

67.     In accordance with the terms of the 2020 Morabito Contract, Morabito's duties included identifying and contracting with "sub-consultants" and "advis[ing] and consult[ing] with the Association during the "Construction Phase Services."

68.     Further, Morabito was obligated under the 2020 Morabito Contract to have on-site field personnel to observe the progress and quality of the construction and to report any concerns to the Association in writing.

69.     Specifically, included in Morabito's scope of work in the 2020 Morabito Contract was the obligation to "prepare initial documents to complete . . . [s]elective demolition of the plaza driving surface and the pool deck pavers to understand the existing waterproofing systems, details, and buildings structural infrastructure."

70.     At no point in time while providing its services did Morabito ever warn or alert the Association, as non-professionals, of any imminent threat or the need to act on an urgent basis to correct defects or conduct further testing due to potential life-safety issues arising from the structural integrity of the building.

### *The Terra Defendants' Dangerous Expansion of the 8701 Collins Avenue Property*

71.     "Keep moving the job forward . . . Do not let any neighbor delay us" was the theme of the construction project now known as Eighty-Seven Park.

72.     David Martin, chief executive officer of Defendant Terra Group, LLC, succinctly articulated this safety-be-damned philosophy:

---

From: David Martin <david@terragroup.com>
Sent: Friday, March 22, 2019 8:32 AM
To: Jason Gilg <jgilg@terragroup.com>
Cc: Robert Nordling <rnordling@jmaf.net>; John Leete <JLeete@jmaf.net>; Fernando Vilela <FVilela@jmaf.net>; Michael Patrizio <mpatrizio@terragroup.com>; Michael Piazza <mpiazza@terragroup.com>; Andres Moncada <amoncada@terragroup.com>; Ryan Mahoney <RMahoney@jmaf.net>
Subject: Re: Champlain Tower | Neighbor Complaint + Call to City for Work After Hours

Keep moving the job forward. If there are any issues with city call my cell. The city will help us they want to us to finish. Do not let any neighbor delay us let just be nice!

Sent from my iPhone

---

73.     Eighty-Seven Park is a sprawling, 18-story luxury condominium building that was developed and constructed between 2015 and 2020.

74.     Eighty-Seven Park loomed over the CTS Building, with only a narrow beach access walkway separating the properties.

75.     Eighty-Seven Park and the CTS property border the municipal dividing line: Eighty-Seven Park is situated in the City of Miami Beach ("**the City**"), while the CTS property is in the Town of Surfside.

76.     On or about August 19, 2013, Terra World Investments, LLC ("**Terra**"), entered into an agreement with Dezer Properties LLC to purchase the Howard Johnson Dezerland Beach Hotel ("**Dezerland Hotel**") located at 8701 Collins Avenue, Miami Beach, Florida (hereinafter, the "**8701 Collins Property**"), for a reported $65 million.

77.     The purchase agreement between Terra and Dezer Properties LLC was later assigned to 8701 Collins Development, LLC.

78.     Shortly after purchasing the 8701 Collins Property, the Terra Defendants started a public relations campaign indicating they intended both to renovate the existing Dezerland Hotel and add a condominium tower to the 8701 Collins Property.

79.     When the Terra Defendants purchased the 8701 Collins Property, the applicable zoning requirements limited building height to 60 feet.

80.     But this height limitation was unacceptable to the Terra Defendants, who, notwithstanding their public campaign touting renovation and preservation, began lobbying the City to lift this height limitation and upzone the property to increase value.

81.     The Terra Defendants needed the zoning change to effectuate their true plan: to raze the Dezerland Hotel and redevelop the property into a brand-new luxury condominium.

82.     These lobbying efforts were successful.

83.     On April 30, 2014, the City Commission for the City of Miami Beach passed Ordinance 2014-3857, which amended section 142-217 of the Code of the City of Miami Beach.

84.     That amendment adopted a 200-foot maximum building height and a 21-story maximum but only for all lots fronting the Atlantic Ocean with a property line within 250 feet of the North Shore Open Space Park.

85.     The 8701 Collins Property was—and is—the only property that the zoning change impacted.

86.     Internal emails among senior Terra Defendant executives and members of their architectural firm show the Terra Defendants made a concerted effort to hide their actual building plans from the public all along.

87.     Months before obtaining the zoning changes and design approval, the Terra Defendants' then-chief operating officer, David Martin, instructed his colleagues and members of architectural firm Shulman + Associates that "[w]e do not want anyone thinking we are building something here."

88.     On May 6, 2014, the Terra Defendants won approval from the City's Design Review Board to partially demolish the Dezerland Hotel and to begin construction of a 20-story residential condominium building with an urban plaza to replace a surface parking lot.

71

89.     The Terra Defendants' plan also featured a secret negotiation to illegally purchase 87th Terrace, a 50-foot-wide public right-of-way, with a sidewalk and parking, from the City.

90.     In 2014, 87th Terrace sat immediately between CTS and the Dezerland Hotel.

91.     87th Terrace provided beach access, light, air, and parking to CTS residents, visitors, and the general public.

92.     Under Florida law, CTS had an interest to the east-west centerline of 87th Terrace by virtue of being the adjacent northern property.

93.     By acquiring 87th Terrace, the Terra Defendants could add almost a half-acre to the footprint of the 8701 Collins Avenue Property, increase the density, build additional units and square feet, and maximize their profits.

94.     Florida law, however, does not permit the purchase of a public right-of-way.

95.     To avoid the legal impediment to the purchase of the public right-of-way—*i.e.*, 87th Terrace—the Terra Defendants retained attorneys to devise a creative solution.

96.     Terra Defendants' lawyers crafted a plan: the City would enter into a development agreement (hereinafter, the "Development Agreement") with the Terra Defendants, whereby the City would "vacate" 87th Terrace in exchange for a "voluntary contribution" of $10.5 million. As a result of this exchange, the entire width of 87th Terrace would, as a matter of Florida law, become part of the land at the 8701 Collins Property. Having taken ownership of 87th Terrace, the Terra Defendants would, following payment of the "voluntary contribution," then provide the City with a perpetual pedestrian access easement across a small sidewalk where 87th Terrace used to exist.

97.     Of course, there was nothing "voluntary" about the Terra Defendants' payment to the City. 87th Terrace would not be "abandoned" until the Terra Defendants paid the money—all

$10.5 million—to the City, which the City ensured by appointing an official to oversee the transaction.

98.     In the fall of 2014, the City Commission adopted resolutions approving the vacation of the 87th Terrace right-of-way, subject to the City's approval of the Development Agreement, the parties' execution of that agreement, and the receipt of the entire $10.5 million "voluntary contribution" from the Terra Defendants.

99.     CTS received nothing from the City's "sale" of 87th Terrace to the Terra Defendants, notwithstanding that it abutted the street and held an interest in the centerline.

100.    Ultimately, the Terra Defendants overtook 87th Terrace, expanding the 8701 Collins Property's footprint as much as possible, right up against the southern property foundation wall of CTS.

101.    The Terra Defendants undertook a destructive and intensive street demolition of 87th Terrace, tearing out the existing roadway and sidewalks, and building in its place a small footpath, approximately eight to ten feet wide, which served as the only space between Eighty-Seven Park and CTS.

102.    Had the Terra Defendants not "purchased" 87th Terrace from the City, the construction of Eighty-Seven Park would have occurred approximately 60 to 70 feet away from CTS.

103.    As it happened, however, the Terra Defendants undertook excavation and construction of Eighty-Seven Park a mere ten feet from the exterior foundational wall and support columns of the CTS Building.

104.    As part of that excavation and construction of Eighty-Seven Park, the Terra Defendants used large tractor cranes to drive 40-foot sheet piles into the ground.

73

***Defendants Ignored Warnings About the Risk of Construction to CTS***

105.    Before the construction of Eighty-Seven Park began, the applicable building codes required the Terra Defendants to conduct a geotechnical investigation.

106.    Section 1803.1 of the Florida Building Code mandated that "Geotechnical investigations shall be conducted in accordance with Section 1803.2 and reported in accordance with Section 1803.6."

107.    Florida Building Code Section 1803.6 provides, and at all relevant times provided, in relevant part:

**1803.6 Reporting.**

Where geotechnical investigations are required, a written report of the investigations shall be submitted to the *building official* by the permit applicant at the time of permit application. This geotechnical report shall include, but need not be limited to, the following information:

1. A plot showing the location of the soil investigations.

2. A complete record of the soil boring and penetration test logs and soil samples.

3. A record of the soil profile.

4. Elevation of the water table, if encountered.

5. ***Recommendations for foundation type and design criteria***, including but not limited to: bearing capacity of natural or compacted soil; provisions to mitigate the effects of expansive soils; mitigation of the effects of liquefaction, differential settlement and varying soil strength; and the effects of adjacent loads.

6. Expected total and differential settlement.

7. ***Deep foundation information in accordance with Section 1803.5.5.***

8. ***Special design and construction provisions for foundations of structures founded on expansive soils, as necessary***.

9. Compacted fill material properties and testing in accordance with Section 1803.5.8.

      10. Controlled low-strength material properties and testing in accordance with Section 1803.5.9.

(Emphasis added).

108.    In 2015, the Terra Defendants retained NV5 to perform a geotechnical study and render the report that section 1803 of the Florida Building Code required (the "NV5 Report").

109.    The purpose of the April 17, 2015, NV5 Report was "to explore the subsurface conditions in order to provide recommendations for foundation design and construction."

110.    The NV5 Report contained critical findings and recommendations regarding potentially destructive effects that the development of Eighty-Seven Park would have on the adjacent CTS Building.

111.    NV5 provided the NV5 Report to the Terra Defendants.

112.    NV5 provided the NV5 Report to JMA.

113.    NV5 provided the NV5 Report to DeSimone.

114.    The NV5 Report warned that vibrations caused during site preparation and foundation work and dewatering activities would damage the CTS Building's foundation and CTS property if precautions were not taken.

115.    Given that the NV5 Report made numerous references to the dangers that vibrations associated with the construction of Eighty-Seven Park would pose to adjacent structures like CTS, there is no doubt that the Terra Defendants, JMA, and DeSimone knew long before construction began that uncontrolled or unmonitored vibrations and ground disturbances would negatively impact CTS.

116.    In particular, the NV5 Report emphasized the potentially disastrous impact that site preparation and compaction procedures would have on adjacent existing structures, including the CTS Building if that work was not safely accomplished.

62820710;1

117.    The NV5 Report also instructed that *"[t]he vibrations produced by the operation of the compactor should be monitored for potential adverse effect on adjacent existing structures, pavements, and utilities."*

> The vibrations produced by the operation of the compactor should be monitored for potential adverse effect on adjacent existing structures, pavements, and utilities.   If nearby structures will be affected by the vibration of the compactor, the compaction procedure may require modification as approved by NV5.

118.    The NV5 Report similarly cautioned that Eighty-Seven Park's foundation and basement garage construction required proper excavation, shoring, adequate lateral support, and preservation of subjacent support.

119.    The NV5 Report warned, "[p]articular attention should be paid to any deep excavations such as for the basement and elevator shafts and the potential impacts these could have on adjacent structures, *especially where such excavations are close to project property lines.*"

> 2.    Particular attention should be paid to any deep excavations such as for the basement and for elevator shafts, and the potential impacts these could have on adjacent structures, especially where such excavations are close to project property lines.

120.    The NV5 Report cautioned the Terra Defendants, JMA, and DeSimone, that "all excavations should comply with Occupational Safety and Health Administration [("OSHA")] design and safety requirements."

121.    Title 29, section 1926.651(i), of the Code of Federal Regulations (2014), titled Stability of adjacent structures, provides *"[w]here the stability of adjoining buildings, walls, or other structures is endangered by excavation operations, support systems such as shoring, bracing, or underpinning shall be provided to ensure the stability of such structures[.]"* (Emphasis added).

62820710;1

122.     Title 29 CFR, section 1926.650(b) of the Code of Federal Regulations (2014), mandates "Protective Systems" that must be used during excavation procedures, including those that protect against "the collapse of adjacent structures."

123.     Further, 29 CFR, section 1926.651(k)(1) required the Terra Defendants, JMA, NV5, and DeSimone, individually and collectively, to conduct "[d]aily inspections of excavations, *the adjacent areas*, and protective systems . . . for evidence of a situation that could result in possible cave-ins, indications of failure of protective systems, hazardous atmospheres, or other hazardous conditions." (Emphasis added).

124.     Code Section 1803.5.7 of the Florida Building states, and at all relevant times stated, that "[w]here excavation will reduce support from any foundation, a registered design professional shall prepare an assessment of the structure as determined from examination of the structure, the review of available design documents and, if necessary, excavation of test pits." The registered design professional must "determine the requirements for underpinning and protection and prepare site-specific plans, details and sequence of work for submission. Such support shall be provided by underpinning, sheeting and bracing, or by other means acceptable to the building official."

125.     Florida Building Code Section 1804.1 further states, and at all relevant times stated, that "[e]xcavation for any purpose shall not reduce lateral support from any foundation or adjacent foundation without first underpinning or protecting the foundation against detrimental lateral or vertical movement, or both."

126.     The Terra Defendants, JMA, NV5, and DeSimone each knew, or should have known, that they were individually and collectively responsible for ensuring Eighty-Seven Park

site preparation work—including but not limited to excavation, shoring, compaction, and dewatering—would preserve, rather than undermine, the CTS Building's structural integrity.

127. The Terra Defendants, JMA, NV5, and DeSimone also each knew, or should have known that failing to meet their responsibilities would necessarily expose CTS owners and occupants to unreasonable risks of catastrophic injuries, death, and loss of property.

128. Despite their knowledge of their responsibilities and the devasting toll of not meeting them, the Terra Defendants, JMA, NV5, and DeSimone ignored NV5's warnings and instructions, ignored OSHA's requirements, ignored the Florida Building Code, ignored CTS resident warnings and complaints, and ignored what they could see happening during construction at the CTS property line.

129. For the sake of greed, speed, or, most likely, both, the Terra Defendants, JMA, NV5, and DeSimone time and again defaulted to the least expensive, but most disruptive and most dangerous, practices for its Eighty-Seven Park site-preparation work.

130. As is set forth in more detail below, the Terra Defendants, JMA, NV5, and DeSimone knew or should have known what their negligent practices would do to the CTS Building.

### *Ultrahazardous Sheet Pile Driving at Eighty-Seven Park Damaged CTS*

**Defendants Ignored NV5's Warnings and Used Sheet Pile Driving**

131. Pile driving was, and is, an ultrahazardous and abnormally dangerous construction activity.

132. Great care and caution must be taken to ensure that pile driving does not cause damage to adjacent structures.

133.    The NV5 Report made recommendations regarding the different types of basement excavation support systems and methods that could be utilized, and outlined the following methods for basement excavation support: Sheet Piles, Tangent and Secant Pile Walls, Deep Soil Mix ("DSM") Wall, and Slurry Wall.

134.    The NV5 Report noted that "conventional sheet pile walls are typically installed using ***vibratory hammer to vibrate the piles into place.***" (Emphasis added).

135.    Among the advantages NV5 identified in the NV5 Report that were associated with utilizing driven sheet piles were that "most local contractors are familiar with the installation procedures for sheet pile systems," it is "relatively quick," and the sheets "can be pulled and re-used if needed."

136.    Notably, the major disadvantage associated with driven sheet piles, to which NV5 explicitly alerted the Terra Defendants, JMA, and DeSimone in the NV5 Report, was the inherent risk that ***"[s]heets installed by vibratory driving can cause damaging vibrations to adjacent properties and structures."***

137.    Unlike driven sheet piles, the other methods of basement excavation support identified in the NV5 Report—including tangent and secant pile walls, DSM wall, and slurry wall—were all identified to be "[p]ractically vibration free" but "costly compared to other methods."

138.    NV5 informed the Terra Defendants, JMA, and DeSimone through the NV5 Report that tangent and secant pile walls were "[p]ractically vibration free," among other benefits, but took longer to install and incorporated a waiting period of at least one to two weeks to allow the grout in the piles to gain strength.

139.     Similarly, NV5 informed the Terra Defendants, JMA, and DeSimone through the NV5 Report that the DSM wall method of basement excavation support was "[p]ractically vibration-free" and "[w]ell-suited for site subsurface conditions" but required a specialty contractor and was more expensive than other methods.

140.     The final method of basement excavation support NV5 identified in the NV5 Report was a slurry wall, which, like the DSM wall and the tangent and secant pile wall, was "[p]ractically vibration-free" but was costlier than more conventional methods.

141.     NV5 specifically told the Terra Defendants, JMA, and DeSimone in the NV5 Report that all viable methods of basement excavation support systems were "practically vibration free," except for the sheet pile system.

142.     Despite knowing viable methods of basement excavation support that eliminated or substantially reduced the risk of damaging the CTS Building were available and could be used on the project, the Terra Defendants, JMA, NV5, and DeSimone made a purely profit-driven decision to use driven sheet piles to develop Eighty-Seven Park.

143.     The Terra Defendants, JMA, NV5, and DeSimone knew or should have known that they exposed the owners, residents, and guests of CTS to a dangerous construction activity that they knew could negatively impact and damage the CTS Building's foundational structure, including the concrete structural support columns and structural connections to the pool deck.

144.     The installation of sheet piles on the Eighty-Seven Park project occurred in early 2016 and was accomplished by using a large vibratory hammer, specifically a PVE 23, Model No. 23VM, pile hammer attached to a JCB 0174583 tractor crane, to drive the 35 to 41 foot-long metal sheet piles into the ground.

145.    Throughout the entire installation process for every sheet pile, the large vibratory hammer and attached sheet piles emitted strong and dangerous vibrations.

146.    JMA hired subcontractor ASAP Installations, LLC ("ASAP") to perform the sheet pile installation work.

147.    ASAP performed vibratory sheet pile driving around the perimeter of the Eighty-Seven Park project from approximately February 24, 2016 through March 28, 2016.

148.    The sheet piles on the north side of the Eighty-Seven Park project were driven into the ground only about 10 feet away from the CTS Building's south foundation wall.

**Defendants Failed to Adequately Monitor Sheet Pile Driving**

149.    On February 13, 2016, JMA's Frank Wiza asked the Terra Defendants' Project Manager, Curt Wyborny, whether the Terra Defendants wanted NV5 to monitor vibrations during all sheet pile installations or only those that would be installed on the north side of the project.

150.    Before receiving a response from Mr. Wyborny, Eric Stern, a Professional Engineer for NV5, inquired how long the sheet pile installation would take.

151.    After learning the sheet pile installation would take approximately two weeks, Eric Stern reached out to Geosonics, the subcontractor hired to perform vibration monitoring.

152.    Eric Stern informed Geosonics that there would be two weeks of sheet pile installation at the Eighty-Seven Park project and that the plan was to "put[] a technician onsite full time to move with the sheet pile operation" and monitor vibration levels for all sheet pile installations.

153.    Eric Stern then informed the Terra Defendants and JMA that the "intent is to have a technician on site to monitor vibrations in real time as close to the adjacent property as possible."

81

154.    The plan to monitor all sheet pile installations changed, however, when the Terra Defendants decided that instead of monitoring all sheet pile installations for dangerous vibrations, the installations would be selectively monitored—taking place on only some days and not continuously throughout those days.

155.    On February 16, 2016, Eric Stern asked JMA if the vibration monitoring was still needed the following day, when sheet pile installation was set to begin.

156.    In response to Eric Stern's February 16, 2016, inquiry, JMA informed Stern that the Terra Defendants' Curt Wyborny had decided that monitoring would occur only along the north line of the project.

157.    Instead of heeding the warnings from the April 17, 2015, NV5 Report concerning the dangers of unmonitored and uncontrolled vibrations caused by driving sheet piles with a vibratory hammer, the Terra Defendants, JMA, NV5, and DeSimone allowed the vast majority of sheet pile installation work to be completed with absolutely no vibration monitoring and no other measures in place to limit damaging vibrations, as monitoring took place on only some days and for only some parts of those days—even along the north wall of the project.

158.    In addition to sheet piles installed around the north, south, east, and west perimeters of the project site, sheet piles were also installed at interior locations on the project.

159.    The vibratory sheet pile driving installation work for the interior locations occurred on or about May 26, 2016.

160.    Not only did installing interior sheet piles with the vibratory hammer cause vibrations that damaged the CTS Building, but removing interior sheet piles with the same vibratory hammer subjected the CTS Building to yet another round of the same damaging vibrations.

161.    Neither the Terra Defendants, nor JMA, NV5, or DeSimone performed any vibration monitoring for sheet pile installations at the east, west, or south perimeters of the project or for the interior sheet pile installations or removals.

162.    Instead, NV5 hired Geosonics to perform vibration monitoring only for some (but not all) sheet piles installed along the north perimeter of the project.

163.    During portions of the north sheet pile installation, Geosonics installed two portable vibration monitors on the Eighty-Seven Park project site directly adjacent to the CTS Building's south foundation wall.

164.    The vibration monitors installed and used by Geosonics were Safeguard Seismic Unit 3000EZ-Plus.

165.    Geosonics monitored vibrations intermittently on March 3, 7, 8, 9, 10, 11, and 14, 2016.

166.    Even though, according to Geosonics, the Safeguard Seismic Unit 3000EZ-plus vibration monitor is capable of "continuous ground vibration and air overpressure monitor[ing]," the Terra Defendants, JMA, NV5, and DeSimone only performed selective vibration monitoring for short periods of time on the above-referenced dates. Further, upon information and belief, NV5 did not advise the Terra Defendants or JMA that, in light of the hazardous activities being engaged in, and the likelihood of damage to the adjacent property, that monitoring should have been continuous throughout all of the pile driving activities.

167.    NV5 explained in its March 28, 2016, Vibration Summary Report that, although vibration limits were never formally established for the Eighty-Seven Park project, industry standards dictated that vibrations of 0.5 inches per second can cause property damage.

62820710;1

168.    Thus, the Terra Defendants, JMA, NV5, and DeSimone established a vibration limit of 0.5 inches per second for the sheet pile installation.

169.    The apparent goal of the Terra Defendants, JMA, NV5, and DeSimone was to ensure that vibrations produced during sheet pile installation did not exceed the 0.5 inches per second threshold for sheet pile installation.

170.    The Terra Defendants, JMA, NV5, and DeSimone failed to ensure that the vibrations produced during the sheet pile installation along the CTS Building's south foundation wall remained below the 0.5 inches per second threshold they set.

171.    The Geosonics data, subsequently incorporated into NV5's March 28, 2016, Vibration Summary Report, confirmed that during almost the entirety of the sheet pile installation along the south CTS foundation wall, the vibrations exceeded acceptable and safe levels.

172.    ***A staggering 29 out of 36 vibration readings incorporated into NV5's March 28, 2016, Vibration Summary Report exceeded the allowable threshold of 0.5 inches per second.***

173.    Even though more than 80% of the vibration readings taken, as reflected in NV5's March 28, 2016, Vibration Summary Report, confirmed that vibrations from driving the sheet piles exceeded safe and allowable limits, the Terra Defendants, JMA, NV5, and DeSimone continued their vibratory sheet pile installations.

174.    At a weekly project meeting between the Terra Defendants and JMA, it was noted that *"[d]ue to high vibration readings at the north side ASAP will begin pre drilling today."*

175.    Despite ASAP's attempts to pre-drill for the sheet pile installations and the confirmed knowledge of the Terra Defendants, JMA, NV5, and DeSimone that vibration readings along the CTS Building's south foundation wall were exceeding safe and allowable limits, they allowed the vibratory sheet pile installation to continue producing vibrations at an unsafe level.

176.     Even after the March 7, 2016, meeting at which the Terra Defendants and JMA explicitly acknowledged the high vibration readings, 28 vibration readings exceeded the allowable limit.

177.     But, the Terra Defendants, JMA, NV5, and DeSimone continued with vibratory pile driving anyway.

178.     At the next weekly project meeting, on March 14, 2016, the Terra Defendants and JMA noted that ASAP's pre-drilling, changes to the frequency setting on the power head, and changes to how the piles were driven "dropped the readings back to the 4 range."

179.     However, data from Geosonics confirmed that the vibrations continued to exceed the safe and allowable threshold.

180.     The March 14, 2016, meeting minutes also revealed that the sheet pile installation along the north end of the Eighty-Seven Park project could not be completed because the existing waterline had not yet been capped.

181.     ***The meeting minutes also reflected that the Terra Defendants and JMA received numerous complaints from CTS owners and residents regarding the construction activities***.

182.     The last day that any vibration monitoring was performed for sheet pile installation at the Eighty-Seven Park project was March 14, 2016.

183.     Yet, the project meeting minutes confirmed that the sheet pile installation along the north end of the project, which was the southern CTS foundation wall, would be completed after the waterline was capped.

184.     ***There was no vibration monitoring performed for the final sheet pile installation at the north end of the project.***

62820710;1

185.    The fact that sheet pile installation work continued after Geosonics took the final vibration reading on March 14 at 4:41 PM is confirmed through email communications between the Terra Defendants and JMA.

186.    At the end of the day on March 14, at 5:54 PM, the Terra Defendant Project Manager, Curt Wyborny, wrote to JMA and informed JMA that the sheet pile installers had not even reached the water line yet, that the sheet pile installers "have yet to finish the north side," and "[t]hey have sheets to install and 100 [linear feet] that must go deeper.

187.    By driving the sheet pilings deeper, the Eighty-Seven Park construction caused additional vibrations and further damage to the CTS Building.

188.    As a result, upon information and belief, the Terra Defendants, JMA, NV5, and DeSimone decided to cease monitoring the vibrations because it would be best not to have a record of the extreme vibrations that would inevitably occur.

189.    The Terra Defendants, JMA, NV5, and DeSimone did not perform any vibration monitoring for the remainder of the sheet pile installations along the north perimeter of the project and south CTS foundation wall despite their knowledge that vibrations were exceeding safe and allowable limits, and that the vibrations would foreseeably cause damage to CTS's foundational structure, disregarding the health and safety of CTS residents and occupants.

**Defendants Ignored CTS Warnings, Dismissed Residents' Fear for their Lives and Safety, and Continued Using Sheet Pile Driving**

190.    The Terra Defendants, JMA, NV5, and DeSimone also received notice directly from the Association and/or CTS owners, residents, and occupants that vibrations being emitted during the vibratory sheet pile driving were damaging CTS.

191.    On March 17, 2016, the Radulescu Family, residents of CTS who resided in Apartment 404, wrote a tragically prophetic email to one of the Terra Defendants' Project Managers, Francisco Canestri.

192.    The Radulescu Family's March 17, 2016, email stated that they, along with the other residents of CTS, *"are very concerned because of the daily TREMORS we encounter, in our apartments, sitting, standing, laying in bed."*

193.    The Radulescu Family's March 17, 2016, email informed Mr. Canestri that on March 17, 2016, *"standing on our balcony we found [] a crack on the wall near our balcony. It is not fair, you, Terra Group, are doing your job, our building will be damaged, and our residents['] lives will be in danger to have apartments walls demolished."*

194.    The Radulescu Family concluded the March 17, 2016, email with a notice and warning to the Terra Defendants by stating, *"We write this message, to inform you of what our residents encounter, daily, because you must be aware of what happens with your workers, and heavy machinery, and you must be concerned of what happens to us the residents of our building, Champlain Towers, South."*

195.    The Radulescu Family's March 17, 2016, email confirmed that the construction activities on the Eighty-Seven Park project, including the vibratory sheet pile driving, were causing noticeable damage to the CTS Building and that residents were afraid for their lives and property as a result of the construction of Eighty-Seven Park.

196.    Tragically, the worst fears of the Radulescu Family came true: Maria Popa and Mihai Radulescu of the Radulescu Family perished when the CTS Building collapsed.

197.    The Terra Defendants, JMA, NV5, and De Simone should have taken proper corrective measures and appropriately responded to the high vibration readings at the start of the sheet pile driving along the north perimeter of the project.

198.    The Terra Defendants, JMA, NV5, and DeSimone did not take proper corrective measures or appropriately respond to the high vibration readings they received.

199.    In response to the Radulescu Family's March 17, 2016, the Terra Defendants immediately retained lawyers and looped in their counsel.

200.    That counsel informed the Terra Defendants and JMA that he had a meeting scheduled the following week at the site with CTS's counsel and that he needed to receive the vibration reports prior to that meeting.

201.    In response, David Martin, then-chief operating officer for Terra Defendants, instructed JMA and his subordinate, Michael Piazza, to help Terra Defendants' counsel "be completely prepared."

202.    The Terra Defendants' Curt Wyborny then reached out to NV5's Eric Stern and requested the vibration reports.

203.    Eric Stern immediately contacted Geosonics in response to Wyborny's request and asked that the vibration reports be provided as soon as possible, noting, "The lawyers are now involved in this one. They want everything by Tuesday[.] We need the report as quick as possible."

204.    Meeting minutes from the weekly March 21, 2016 project meeting also confirm that the Terra Defendants had scheduled a meeting with CTS "to address complaints by their residents."

205.    The vibration monitoring, which confirmed that vibrations were overwhelmingly exceeding the allowable and safe limit, immediately raised red flags for the Terra Defendants,

88

JMA, NV5, and DeSimone and should have caused them to stop the sheet pile driving until they confirmed that vibrations could be reduced to safe levels.

206.    When Terra Defendants received the alarming March 17, 2016, email from the Radulescu Family, they failed to treat the vibrations as a critical safety issue putting people's lives at risk.

207.    Instead, the Terra Defendants, JMA, NV5, and DeSimone treated the Radulescu Family's March 17, 2016, email as a claims matter and simply passed it along to their lawyers.

208.    While the Terra Defendants eagerly awaited the vibration report, which only confirmed what they knew as early as March 7, that the vibrations caused by sheet pile driving exceeded safe and allowable limits, the Terra Defendants' Curt Wyborny asked NV5's Eric Stern to speak with attorneys for the Terra Defendants about the vibration report.

209.    Shortly following the realization that the vibratory sheet pile driving had caused damage to CTS, which the Terra Defendants were warned was a foreseeable outcome if they did not undertake appropriate vibration monitoring and control, the Terra Defendants' attorneys were in discussions with CTS's attorneys to schedule inspections and estimates to "quantify the cost of some of the mitigation items[.]"

210.    Unfortunately, the Radulescu Family's March 17, 2016, email report of daily tremors and structural damage to CTS was neither unique nor uncommon.

211.    In fact, CTS owners, residents, and occupants voiced numerous complaints regarding the impact the Eighty-Seven Park construction was having on CTS.

212.    The reports from owners, residents, and occupants elicited no meaningful safety-regarding response, other than for the Terra Defendants, JMA, NV5, and DeSimone to shift responsibility to their lawyers to handle the matter.

213.    Minutes from a March 10, 2016, CTS Board Meeting, which occurred in the middle of the vibratory sheet pile driving along the CTS south foundation wall, reflects that the Eighty-Seven Park construction was causing *"Excessive vibrations."*

214.    Even though the Terra Defendants, JMA, NV5, and DeSimone knew that the Eighty-Seven Park construction site was emitting dangerously high vibrations during vibratory sheet pile driving, and even though they knew neighbors had complained about the daily tremors and structural damage being done, the Terra Defendants, JMA, NV5, and DeSimone never performed more than a cursory inspection of the CTS Building following the vibratory sheet pile driving.

215.    The Terra Defendants, JMA, NV5, and DeSimone knew about the dangerously excessive vibrations and should have conducted a thorough inspection and analysis of damage the vibratory sheet pile driving had done to the CTS Building, but failed to conduct any such inspection or analysis.

216.    Damage caused to the CTS Building during this vibratory sheet pile phase of the Eighty-Seven Park project became the subject of settlement discussions between the Association and the Terra Defendants.

217.    On May 7, 2019, after vibrations from the sheet pile driving had penetrated and damaged CTS, and after numerous CTS residents had lodged complaints about that damage, the Terra Defendants sought a settlement agreement from the Association for "any alleged nuisance or adverse impact claim." That settlement agreement would, in part, provide the Terra Defendants with a "broad form general release of all claims," including claims for damage that the construction activity on the Eighty-Seven Park project did to CTS's property, in exchange for $200,000.

218.    As settlement discussions stalled and as CTS owner and resident complaints regarding the construction activities at the Eighty-Seven Park project mounted, Terra Defendants' David Martin was determined not to let neighbors' complaints delay the project and cost the Terra Defendants money. Mr. Martin advised everyone to "[k]eep moving the job forward," to "not let any neighbor delay us," and to "just be nice."

219.    The Terra Defendants, JMA, NV5, and DeSimone focused on pushing their luxury condominium project forward, without any regard for the lives, well-being, and safety of CTS owners, residents, occupants, and guests.

220.    Money motivated the Terra Defendants to advance the Eighty-Seven Park project at all costs, and those costs included 98 lives and 136 homes.

221.    The NV5 Report informed the Terra Defendants, JMA, and DeSimone that vibratory sheet pile driving was not necessary in the first place, as there were other suitable, alternative methods of basement excavation support available.

222.    The Terra Defendants, JMA, NV5, and DeSimone chose to prioritize corporate profits over the safety of CTS's owners, residents, occupants, and guests by deciding to use driven sheet piles instead of the other available methods, knowing the risks driven sheet piles presented to the immediately adjacent CTS.

223.    Further, the Terra Defendants, JMA, NV5, and DeSimone's informed decision to continue driving sheet piles with a vibratory hammer, despite knowing that vibration levels were exceeding safe and allowable limits, disregarded the health and safety of the residents and occupants of CTS.

### *Soil Compaction Vibrations at Eighty-Seven Park Damaged CTS*

224.    Soil compaction at Eighty-Seven Park also caused vibrations that damaged CTS.

225.    NV5's April 2015 report explicitly informed the Terra Defendants, JMA, and DeSimone that ***"[t]he vibrations produced by the operation of the compactor should be monitored for potential adverse effect on adjacent existing structures, pavements, and utilities."***

226.    Despite knowing that preparatory site compaction procedures would produce vibrations that could adversely affect adjacent structures, including the extremely close CTS Building, the Terra Defendants, JMA, NV5, and DeSimone performed no vibration monitoring during site compaction procedures.

227.    The Terra Defendants, JMA, NV5, and DeSimone knew, or should have known, that a failure to monitor vibration levels appropriately and vigilantly to ensure safe preparatory site compaction procedures would expose the owners, residents, occupants, and guests of the CTS Building to an unreasonable and unacceptable risk of severe injury, death, and property loss.

228.    Despite their knowledge of the unreasonable and unacceptable risk of severe injury, death, and property loss caused by their actions, the Terra Defendants, JMA, NV5, and DeSimone failed to monitor vibrations produced during the preparatory site compaction procedures.

229.    In addition to preliminary site compaction procedures, the Terra Defendants, JMA, NV5, and DeSimone engaged in on-site vibratory compaction procedures related to installation of a "Silva Cell" system, or a modular suspended pavement system that uses soil volumes to support large tree growth, on the Eighty-Seven Park site.

230.    On April 26, 2019, during the installation procedures for the Silva Cell system, the manufacturer of the Silva Cell system requested that the Terra Defendants and JMA "make 2-3 passes with a vibratory plate" over the location where the Silva Cell system was being installed in order "to consolidate/lock the aggregate particles together."

231.    In response to this April 26, 2019, request, a Project Manager for the Terra Defendants, Andres Moncada, forwarded the email to NV5's Eric Stern, who responded that NV5 "can visually observe the compaction process."

232.    The Terra Defendants, JMA, NV5, and DeSimone did not monitor vibration levels during these compaction procedures related to installation of the Silva Cell system on the Eighty-Seven Park construction site.

233.    The Terra Defendants, JMA, NV5, and DeSimone knew that the compaction activities on the Eighty-Seven Park construction site had the potential to negatively impact the CTS Building and that a failure to vigilantly monitor and control vibration levels during compaction activities would expose the residents and occupants of the CTS Building to an unreasonable and unacceptable risk of severe injury, death, and property loss.

234.    Despite their knowledge of the unreasonable and unacceptable risk of severe injury, death, and property loss caused by their actions, the Terra Defendants, JMA, NV5, and DeSimone failed to monitor or control vibration emissions and levels during compaction procedures related to the installation of the Silva Cell systems at the Eighty-Seven Park site.

235.    By 2019, the vibratory sheet pile driving on the Eighty-Seven Park construction project and other vibration and tremor-emitting activities, such as site compaction and excavation, had inflicted extensive damage to the CTS Building's foundation structure.

236.    The damage to the CTS Building's foundation structure resulting from the actions by the Terra Defendants, JMA, NV5, and DeSimone caused or contributed to its ultimate collapse.

237.    The construction activities on the Eighty-Seven Park project site, namely, the vibratory sheet pile driving and vibration-producing compaction activities, decreased the structural

stability and life expectancy of the CTS Building, and were a proximate cause of and contributor to the CTS Building's collapse on June 24, 2021.

238.    The NV5 Report explicitly informed the Terra Defendants, JMA, and DeSimone that vibrations emitted during vibratory sheet pile driving and vibration-producing compaction activities could cause damage to adjacent buildings, including the CTS Building, if the vibrations were not properly monitored and controlled.

### *Dewatering at Eighty-Seven Park Damaged CTS*

239.    Dewatering is the process of removing and controlling the presence of groundwater and stormwater during a construction project for purposes of facilitating deep excavation work and allowing the foundation construction to occur in dry soil rather than wet and unstable soil.

240.    Dewatering on a site carries with it the inherent risk of impacting the water table underlying adjacent properties by creating a differential, which causes stress and load re-distribution in the adjacent structure, and which may ultimately cause a catastrophic failure of the structure.

241.    Accordingly, special care must be taken to ensure that dewatering on a construction site does not dangerously impact adjacent structures.

242.    Asymmetrical drawdown of the water table underlying adjacent properties creates the potential for differential settlement, and the water table underlying the adjacent property must be adequately "recharged" such that no differential settlement occurs.

243.    Because of the known risks that dewatering in construction poses, the April 2015 NV5 Report explicitly warned the Terra Defendants, JMA, and DeSimone, that ***"[d]uring dewatering the adjacent properties must be monitored for adverse impacts from dewatering***

*drawdown. **The potential for adverse impacts from dewatering is especially heightened where the peaty layer exists.***"*

244.    Drawing down the water table beneath a heavy structure was a hazard that was known, or should have been known, to the Terra Defendants, JMA, NV5, and DeSimone.

245.    The Terra Defendants, JMA, NV5, and DeSimone should have ensured against and monitored adverse impacts on CTS and the underlying water table that dewatering activities on the Eighty-Seven Park project site caused.

246.    Given the proximity of the Eighty-Seven Park project to the CTS Building, the Terra Defendants, JMA, NV5, and DeSimone should have undertaken measures to closely monitor the underlying water table and the CTS Building during the dewatering process.

247.    Despite the proximity of the CTS Building to the Eighty-Seven Park construction project, the Terra Defendants, JMA, NV5, and DeSimone performed the site dewatering in a dangerous manner and failed to appropriately monitor and analyze the impact that dewatering was having on the CTS Building.

248.    An October 2015 Proposed Dewatering Plan submitted to the Miami-Dade County Division of Environmental Resources Management by Florida Civil, Inc., on behalf of the Terra Defendants noted that "[d]ue to the depth of excavation into the water table and other concerns, the contractor proposes the installation of two (2) continuous sheet pile cofferdams for support of excavation."

249.    According to the October 2015 Proposed Dewatering Plan, a proposed point of discharge where a deep dewatering drainage well was to be installed at the north side of the Eighty-Seven Park project site and immediately adjacent to the CTS Building's southern foundation wall.

250.    Despite the known risk of impacting the water table underlying the CTS Building and despite the proximity of the point of discharge and deep dewatering drainage well to the CTS Building, the Terra Defendants, JMA, NV5, and DeSimone did not monitor and/or failed to monitor adequately the impact of dewatering procedures of the Eighty-Seven Park project on the CTS Building.

251.    Industry standards required the Terra Defendants, JMA, NV5, and DeSimone to perform an analysis of the Radius of Influence of the Eighty-Seven Park dewatering activities by using the Sichardt's Equation.

252.    The Terra Defendants, JMA, NV5, and DeSimone failed to do any type of analysis regarding the Radius of Influence of Eighty-Seven Park's dewatering activities despite knowing of the risks that dewatering posed to the CTS Building.

253.    On November 29, 2015, the Terra Defendants' Curt Wyborny sent an email to JMA, among others, and laid out the step-by-step dewatering plan.

254.    Noticeably absent from the November 29, 2015 dewatering plan was any discussion of measures taken to monitor the impact the dewatering and water table drawdown would have on the CTS Building, or any efforts to ensure that an asymmetrical drawdown was not occurring and/or that the CTS Building was not subjected to any differential settlement.

255.    The dewatering activities of the Terra Defendants, JMA, NV5, and DeSimone on the Eighty-Seven Park construction site caused both an asymmetric drawdown of the water table underlying the CTS Building and differential settlement, which resulted in excessive and dangerous structural stress and load re-distribution.

256.    The Terra Defendants, JMA, NV5, and DeSimone failed to "recharge" the water table underlying the CTS Building and thus failed to correct the differential settlement and asymmetric drawdown of the water table.

257.    Photographs of damage occurring to the CTS Building's south foundation wall from 2020 documented step cracking, a telltale sign that the CTS Building suffered from differential settlement caused by Terra Defendants', JMA's, NV5's, and DeSimone's improper and unmonitored dewatering at Eighty-Seven Park.

258.    The CTS Building's differential settlement caused by improper dewatering at Eighty-Seven Park damaged the CTS Building's foundation and dramatically reduced its structural stability, contributing to the June 24, 2021, collapse.

259.    The failure of the Terra Defendants, JMA, NV5, and DeSimone to monitor the dewatering procedures appropriately and to ensure that the water table was not dangerously drawn down was inexcusable since the April 2015 NV5 Report warned them that their failure to adequately monitor dewatering would have disastrous effects on the CTS Building.

***Excavation and Water Diversion at 87th Terrace Damaged the CTS Building***

260.    In addition to damaging the CTS Building by excessive vibrations and improper dewatering, the Terra Defendants, JMA, NV5, and DeSimone excavated and built the 87th Terrace footpath in a manner that damaged the CTS Building's south foundation wall in construction, then caused exponential damage over time, as the footpath diverted water away from Eighty-Seven Park and into the CTS Building's adjacent structural components.

261.    In early 2019, the Terra Defendants, JMA, NV5, and DeSimone built the beach access walkway in place of the prior 87th Terrace and against the CTS Building's south foundation wall.

262.    Pursuant to a November 24, 2014, Development Agreement with the City of Miami Beach, the Terra Defendants agreed to construct, enhance, and maintain the 87th Terrace beach access walkway and provide a permanent pedestrian access easement to give the public pedestrian access from Collins Avenue to the beach.

263.    As alleged above, the Terra Defendants agreed to expend funds and construct the beach access walkway and to pay the City of Miami Beach a "voluntary monetary contribution of $10,500,000" in exchange for the right to expand the Eighty-Seven Park project and to build upon the then-existing 87th Terrace.

264.    In overtaking 87th Terrace, excavating and re-grading the site, and constructing the 87th Terrace beach access walkway the Terra Defendants, JMA, NV5, and DeSimone excavated against the CTS Building's south foundation wall, causing it critical damage.

265.    Eighty-Seven Park's excavation against the CTS Building's south foundation wall exposed and caused extensive damage to the base of the CTS Building's foundation wall.

266.    Post-collapse photographs show that Eighty-Seven Park's excavation for the 87th Terrace footpath penetrated the CTS Building's foundation wall, leaving gaps and holes where water intruded and saturated the CTS Building's structural elements in and beneath its pool deck.

267.    On January 23, 2019, Mara Chouela, a CTS resident and member of the Board emailed Town of Surfside Building Official Rosendo Prieto and complained, "We are concerned that the construction next to Surfside is too close. ***The [T]erra project on Collins and 87 are digging too close to our property and we have concerns regarding the structure of our building.***"

268.    Due to the proximity of the north end of the Eighty-Seven Park construction project and the explicit warnings NV5 provided, the Terra Defendants, JMA, NV5, and DeSimone were obligated to ensure that excavating near and against the CTS Building would not damage the

building during construction and would not damage it in the long term by diverting water runoff away from Eighty-Seven Park and into the CTS Building's structural members.

269.    However, the Terra Defendants, JMA, NV5, and DeSimone failed to ensure that excavations and construction along the CTS Building's south foundation wall would not damage the CTS Building's structural members.

270.    The damage that the Terra Defendants, JMA, NV5, and/or DeSimone caused along the CTS Building's south foundation wall had catastrophic consequences.

271.    Not only did the construction of the 87th Terrace beach access walkway damage the CTS Building's south foundation wall, but the access walkway was also constructed so that the walkway cleared water away from Eighty-Seven Park by running it directly into the CTS Building's foundational structure.

272.    CTS resident Jean Wodnicki confirmed the infiltration of water into the CTS Building's foundational structure and basement parking garage because of the improper construction of the beach access walkway.

273.    Ms. Wodnicki noted in an email to CTS's attorneys that ***"every time it rains the water pours off the path, right into our (damaged) wall and then[] down to the garage, flooding it every time."***

274.    The improper construction of the beach access walkway directly damaged the CTS Building's foundation structure by causing water to infiltrate CTS.

275.    After significant water leaks began occurring in the CTS Building's basement parking garage during the Eighty-Seven Park construction, the Association retained Morabito to investigate whether the Eighty-Seven Park construction activities were causing and/or contributing to the water leaks.

62820710;1

276.    In a December 29, 2020, report, Morabito detailed how Eighty-Seven Park construction also sloped the 87th Terrace footpath toward the CTS Building's foundation wall, diverting runoff away from Eight-Seven Park and into the CTS's Building's foundation wall, basement parking garage, and the critical structural members in them.

277.    The Terra Defendants', JMA's, NV5's, and/or DeSimone's improper construction of the beach access walkway caused water to infiltrate, flood, and saturate the CTS Building's foundation wall, basement parking garage, and the critical structural foundation.

278.    As a result of the water infiltration the Terra Defendants', JMA's, NV5's, and DeSimone's excavation and construction of the beach access walkway caused and the damage done to the CTS Building's south foundation wall, the pool deck slab was severely damaged at the point it connected to the CTS Building's south foundation wall.

279.    The water damage the Terra Defendants, JMA, NV5, and DeSimone caused resulted in the pool deck slab of the CTS Building separating from the CTS Building's south foundation wall, which reduced the structural stability of the entire pool deck slab, as well as the CTS Building's tower structure.

### *The 2016 Pre-Construction Survey Confirmed That the Eighty-Seven Park Construction Project Damaged the CTS Building*

280.    Before any sheet pile driving, excavation, or dewatering activities at Eighty-Seven Park, the Terra Defendants enlisted NV5 to perform an extensive and thorough pre-construction survey of the CTS Building.

281.    On January 6, 2016, the Terra Defendants' attorney contacted the Association's attorney and requested access to the CTS Building to perform a "pre-existing conditions survey of CTS." This survey would set up a framework for potential future discussions regarding the Association's claims for damage the Eighty-Seven Park construction caused.

282.     After the Terra Defendants scheduled the pre-construction survey and informed NV5 that they are "getting permission to survey the adjacent building," they later followed-up and confirmed that they were "set for 8:00 am Thursday[, January 14, 2016] for access to [the] adjacent property" to conduct the survey.

283.     On January 14, 2016, NV5 conducted an extensive survey of the CTS Building and meticulously documented every area of pre-existing damage, including the smallest of hairline stucco fractures.

284.     The very purpose of the pre-construction survey was to document every observable defect or area of damage at the CTS Building, so that if a claim were made during or following the Eighty-Seven Park construction that the project had inflicted damage on the CTS Building, the Terra Defendants could determine whether the claim related to pre-existing damage.

285.     The NV5 pre-construction survey left no stone unturned, taking hundreds of photographs of the entire exterior of the CTS Building and the basement parking garage.

286.     NV5 thoroughly documented every observable defect or area of damage at the CTS Building that existed as of January 14, 2016 and presented the findings of the pre-construction survey in a report dated January 27, 2016 and addressed to the Terra Defendants' then-chief operating officer, David Martin.

287.     Although the January 27, 2016, NV5 Report stated that the survey "consisted of documenting the pre-existing defects observable on the exterior portion" of the CTS Building, the photographs included in the survey confirmed that NV5 also extensively examined the CTS Building's basement parking garage and inspected it for pre-existing damage.

288.    The vast majority of the damage CTS owners, residents, occupants, and others documented during and after the construction of Eighty-Seven Park was not present in January 2016 when NV5 conducted its pre-construction survey.

289.    A comparison of the conditions documented in the January 2016 pre-construction survey with the 2018 and 2020 photographs Morabito took as part of the CTS Building's 40-year recertification inspection and analysis reveals the severe damage the Eighty-Seven Park construction project inflicted on the CTS Building.

290.    Photographs Morabito took in 2018 and 2020 documented significant structural damage that NV5 did ***not*** document in 2016 and that could not have occurred from normal and expected wear and tear, supporting the conclusion that the following extensive structural damage to the CTS Building was caused by Eighty-Seven Park construction activities:

a.    The extensive NV5 2016 pre-construction survey did not document any of the damage that Morabito found in 2018 and 2020, thus, confirming that none of it existed in 2016 prior to the Eighty-Seven Park construction and operations.

b.    A video taken in the CTS garage in July 2020 showed additional damage not depicted in the pre-construction survey. Notably, the water damage to the garage ceiling was located on the side closer to Eighty-Seven Park, and there was no observable water damage on the side farther away from Eighty-Seven Park.

c.    The water damage to the structural concrete slab in the CTS garage was exponentially worse the closer it was to Eighty-Seven Park.

291.    The Terra Defendants', JMA's, NV5's, and DeSimone's dangerous construction activities at Eighty-Seven Park substantially contributed to structural damage to the CTS Building, including but not limited to, dangerous and sporadically monitored vibrations, improper and

unmonitored dewatering, excavation work that damaged the CTS Building's south foundation wall, and sloping 87th Terrace to divert runoff away from Eighty-Seven Park and into the CTS Building's structural components.

292.    The Terra Defendants', JMA's, NV5's, and DeSimone's dangerous construction activities at Eighty-Seven Park all combined to trigger, contribute to, accelerate, and result in the CTS Building's collapse.

**_The Collapse_**

293.    On June 24, 2021, at approximately 1:38 a.m., a portion of CTS suffered a catastrophic failure and partial collapse, killing 98 residents.

294.    Upon information and belief, the collapse began at the pool deck, progressed to the adjacent parking garage area, and then lacking lateral support, progressed through the building resulting in the collapse of a section of the building containing 55 units.

295.    The remaining structure was demolished days later because of the life-safety hazards created by the initial collapse.

296.    Defendants, individually and collectively, are responsible, in whole or in part, for the CTS Building's collapse and resultant deaths, injuries, and losses, for which recovery is sought herein.

**COUNT I**
**BREACH OF 2018 MORABITO CONTRACT**
**(Against Morabito)**

297.    The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against Morabito.

298.    The Association and Morabito were parties to the 2018 Morabito Contract.

299.    Pursuant to the 2018 Morabito Contact, Morabito was obligated to prepare a structural engineering report, specifically "not[ing] (if required) problem areas and

recommend[ing] repairs to maintain structural integrity" and to "[i]nclude a statement to the effect that the building or structure is structurally safe, safe with qualifications, or unsafe."

300. Morabito conducted its investigation and delivered the 2018 Morabito Report.

301. The 2018 Morabito Contract defined the applicable standard of care as "the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services."

302. Morabito breached the 2018 Contract by failing to identify "problem areas and recommend[ing] repairs to maintain structural integrity," and by failing to include in the 2018 Morabito Report a statement that the building was unsafe when, in fact, the then current condition of the property posed an immediate threat to the life and safety of the CTS Building residents and visitors.

303. Morabito further breached the contract, knowing that the Association was relying upon its professional expertise to advise and guide it, by:

a. Failing to conduct a thorough and adequate structural inspection of the CTS Building;

b. Failing to identify significant structural damage and deficiencies during the inspection of the CTS Building;

c. Failing to conduct a sufficient inquiry to determine whether the CTS Building was structurally safe and fit for continued occupancy;

d. Failing to adequately analyze the risks and dangers presented by the significant structural damage and deterioration identified during its inspection;

e. Failing to recognize that the CTS Building was at an imminent risk of collapse;

f.      Failing to adequately communicate the risks and dangers presented by the significant structural damage and deterioration identified in its inspection to the Association;

g.      Failing to inform the Association that structural repairs had to be made immediately otherwise a collapse could occur;

h.      Failing to advise the Association of an urgent need to conduct additional testing in order to determine the structural integrity of the CTS Building;

i.      Failing to advise and/or demand that the building be evacuated until such time that the significant structural damage could be thoroughly investigated, repaired, and/or otherwise addressed;

j.      Failing to conduct a proper structural engineering analysis of the CTS Building;

k.      Failing to conduct a structural analysis of the foundation of the CTS Building, despite knowledge of the major structural damage that was clearly visible during its 2018 inspection;

l.      Failing to recognize that the CTS Building had been sinking since at least the 1990's and that this sinking potentially compromised the structural integrity of the building's foundation;

m.      Violating the Miami-Dade County Building Code; and

n.      Otherwise failing to act with the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services.

304.    The Association, as a representative for its member unit owners, has been damaged as direct result of Morabito's breach of contract, including loss of the value of the CTS Building,

loss of other personal property, personal injury, wrongful death, and exposure to lawsuits and judgments from third parties.

WHEREFORE, the Association demands judgment against Morabito for compensatory damages (including costs and attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## COUNT II
## BREACH OF THE 2020 MORABITO CONTRACT
### (Against Morabito)

305.    The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against Morabito.

306.    The Association and Morabito were parties to the 2020 Morabito Contract.

307.    Pursuant to the 2020 Morabito Contact, Morabito was obligated to, *inter alia*:

a.      Provide professional engineering services for the structural engineering along with the architectural design and landscape-hardscape design services and other related engineering services for the 40-year certification of the buildings and improvements at the Champlain Towers South Condominium;

b.      Provide field personnel to observe progress and quality of the remediation efforts and report any concerns to the Association in writing; and

c.      Advise and consult with the Association during the Construction Phase Services.

308.    The scope of work was further defined in a letter July 14, 2020, which provided:

**Pool Corbel/Wall Repairs**—The contractor shall conduct a full survey of the area surrounding the visibly damaged and deteriorated concrete corbel, soffit, and pool wall. All areas noted to be deficient (including spalls, delamination, cracks, etc.) shall be repaired per the details provided in the Phase IIA contract documents.

**Deteriorated Stair Column Base**—The base of the continuous center column in Stair 1 is severely deteriorated. The stairs shall be shored as required and the deteriorated bottom portion of the column will be removed and a new HSS steel section will be spliced to the existing column.

106

**First Floor Exploratory Demolition**—The contractor shall review the exploratory demolition locations indicated on the Phase IIA contract documents. They shall demolish the paver system at the pool deck, stamped concrete at the parking/drive aisle, and landscaping within a planter down to the existing waterproofing. Morabito Consultants shall be notified of the completion of the demolition and will conduct a site visit to document the full system at each location. Upon completion of the review and documentation, the contractor shall restore each area back to its original condition or as directed by the Association.

**Hung Soffit Exploratory Demolition**—The contractor shall review the exploratory demolition locations indicated on the Phase IIA contract documents. They shall open areas in the framed soffit large enough to access the space to review and document the existing framing conditions. Morabito Consultants shall be notified of the completion of the demolition and will conduct a site visit to document the existing framing, overall condition of the soffit, and the general locations of immovable MEP piping and ductwork. Upon completion of the review and documentation, the contractor shall restore each area back to its original condition or as directed by the Association.

**Balcony Soffit Remedial Demolition**—Morabito Consultants has provided a preliminary schedule of observed deficiencies of the balcony soffit concrete and stucco. Morabito Consultants did not complete an exhaustive survey, therefore the contractor shall conduct their own hands-on review of the noted balcony soffits and address all areas of debonded stucco and concrete damage. No repairs are to be completed at this time, the contractor is responsible for removing all loose, spalled, deteriorated, and delaminated concrete and all deteriorated, debonded, or failing stucco. The contractor is required to supply all overhead and fall protection to complete the work as well as disposal of all removed material. The Association shall facilitate the contractor's access to the units noted on the contract documents.

309.    The 2020 Morabito Contract expressly stated that "[t]he Engineer [Morabito] shall be responsible for its negligent acts or omissions."

310.    Morabito negligently performed its engineering services in breach of the 2020 Morabito contract, knowing that the Association was relying upon its professional expertise to advise and guide it, by:

a.    Failing to identify significant structural damage and deficiencies in the CTS Building and failing to report same to the Association in writing;

b.    Failing to ensure that the CTS Building was structurally safe and fit for continued occupancy;

c.      Failing to adequately analyze the risks and dangers presented by the significant structural damage and deterioration present within the CTS Building and reporting same to the Association in writing;

d.      Failing to recognize that the CTS Building was at an imminent risk of collapse and failing to report same to the Association in writing;

e.      Failing to adequately communicate the risks and dangers presented by the significant structural damage and deterioration within the CTS Building and reporting same to the Association in writing;

f.      Failing to inform the Association that structural repairs had to be made immediately, otherwise a collapse could occur;

g.      Failing to advise the Association of an urgent need to conduct additional testing in order to determine the structural integrity of the CTS Building;

h.      Failing to advise and/or demand that the building be evacuated until such time that the significant structural damage could be thoroughly investigated, repaired, and/or otherwise addressed;

i.      Failing to conduct a proper structural engineering analysis of the CTS Building;

j.      Failing to conduct a structural analysis of the foundation of the CTS Building, despite knowing of the major structural damage that was clearly visible during its 2018 inspection;

k.      Failing to recognize that the CTS Building had been sinking since at least the 1990's and that this sinking potentially compromised the structural integrity of the building's foundation; and

l.     Otherwise failing to act with the degree of skill and diligence normally employed by professional engineers or consultants performing the same or similar services.

311.   Additionally, pursuant to the 2020 Morabito Contract, Morabito was obligated to obtain Professional Liability, Commercial General Liability, and Worker's Compensation Insurance that names the Association as additional insured.

312.   One or more insurers has asserted that the Association may not be an additional insured, and that Morabito failed satisfy certain conditions in the insurance contracts potentially affecting insurance.

313.   Morabito breached the 2020 Morabito Contract to the extent that it is determined that the Association is not an additional insured or that Morabito's actions defeated the Association's claims under the relevant insurance policies.

314.   The Association, as a representative for its member unit owners, has been damaged as direct result of Morabito's breach of contract, including loss of the value of the CTS Building, loss of other personal property, personal injury, wrongful death, and exposure to lawsuits and judgments from third parties.

WHEREFORE, the Association demands judgment against Morabito for compensatory damages (including costs and attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## COUNT III
## PROFESSIONAL NEGLIGENCE
### (Against Morabito)

315.   The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against Morabito.

62820710;1

316.    Morabito, a licensed professional engineer, was engaged by the Association to provide structural engineering services and analysis in connection with the 40-year recertification of the CTS Building.

317.    Morabito, directly and through its respective agents, servants, and employees, was charged with overseeing the 40-year recertification process, to determine if the CTS Building was safe for occupancy as required by the Miami-Dade Code, the Florida Building Code, and other applicable industry standards, and to advise the Association accordingly (the "Engineering Services").

318.    Morabito owed a duty to the Association and its members to perform the Engineering Services with the degree of skill and diligence normally employed by professional structural engineers performing the same or similar services, and consistent with local, state, and national building codes and standards.

319.    Morabito performed the Engineering Services in a negligent manner and below the applicable standard of care by:

a.      Failing to conduct a thorough and adequate structural inspection of the CTS Building;

b.      Failing to identify significant structural damage and deficiencies during the inspection of the CTS Building;

c.      Failing to conduct a sufficient inquiry to determine whether the CTS Building was structurally safe and fit for continued occupancy;

d.      Failing to adequately analyze the risks and dangers presented by the significant structural damage and deterioration identified during its inspection;

e.      Failing to recognize that the CTS Building was at an imminent risk of collapse;

f.      Failing to adequately communicate the risks and dangers presented by the significant structural damage and deterioration identified in its inspection to the Association;

g.      Failing to inform the Association that structural repairs had to be made immediately, otherwise a collapse could occur;

h.      Failing to advise the Association of an urgent need to conduct additional testing in order to determine the structural integrity of the CTS Building;

i.      Failing to advise and/or demand that the building be evacuated until such time that the significant structural damage could be thoroughly investigated, repaired and/or otherwise addressed;

j.      Failing to conduct a proper structural engineering analysis of the CTS Building;

k.      Failing to conduct a structural analysis of the foundation of the CTS Building, despite knowing of the major structural damage that was clearly visible during its 2018 inspection;

l.      Failing to recognize that the CTS Building had been sinking since at least the 1990's and that this sinking potentially compromised the structural integrity of the building's foundation; and

m.      Violating the Miami-Dade County Building Code; and

n.      Otherwise failing to act with the degree of skill and diligence normally employed by professional structural engineers performing the same or similar services.

320.    The Association, as a representative for its member unit owners, has been damaged as direct and proximate result of Morabito's negligence, including loss of the value of the CTS

Building, loss of other personal property, personal injury, wrongful death, and exposure to lawsuits and judgments from third parties.

WHEREFORE, the Association demands judgment against Morabito for compensatory damages (including costs and attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (Against Morabito)

321.    The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against Morabito.

322.    Beginning in the summer of 2018 and continuing into 2021, the Association hired and relied upon Morabito to oversee and guide the Association through the 40-year recertification process, and to ensure that the CTS Building met all safety requirements contemplated thereby.

323.    No member of the Board of Directors was a professional engineer, general contractor, or otherwise qualified to conduct or oversee the 40-year recertification process without professional assistance. Accordingly, the Association relied upon Morabito, and reposed its complete trust and confidence in Morabito to properly advise the Association.

324.    Morabito specifically represented to the Association that it was well-qualified to undertake the task and provide the professional services required.

325.    Morabito breached its fiduciary duties to the Association by:

a.      Failing to conduct a thorough and adequate structural inspection of the CTS Building;

b.      Failing to identify significant structural damage and deficiencies during the inspection of the CTS Building;

c.      Failing to conduct a sufficient inquiry to determine whether the CTS Building was structurally safe and fit for continued occupancy;

d.      Failing to adequately analyze the risks and dangers presented by the significant structural damage and deterioration identified during its inspection;

e.      Failing to recognize that the CTS Building was at an imminent risk of collapse;

f.      Failing to adequately communicate the risks and dangers presented by the significant structural damage and deterioration identified in its inspection to the Association;

g.      Failing to inform the Association that structural repairs had to be made immediately otherwise, a collapse could occur;

h.      Failing to advise the Association of an urgent need to conduct additional testing in order to determine the structural integrity of the CTS Building;

i.      Failing to advise and/or demand that the building be evacuated until such time that the significant structural damage could be thoroughly investigated, repaired and/or otherwise addressed;

j.      Failing to conduct a proper structural engineering analysis of the CTS Building;

k.      Failing to conduct a structural analysis of the foundation of the CTS Building, despite knowing of the major structural damage that was clearly visible during its 2018 inspection;

l.      Failing to recognize that the CTS Building had been sinking since at least the 1990's and that this sinking potentially compromised the structural integrity of the building's foundation; and

m.      Violating the Miami-Dade County Building Code; and

62820710;1

n.      Otherwise failing to act with the degree of skill and diligence normally employed by professional structural engineers performing the same or similar services.

326.    The Association, as a representative for its member unit owners, has been damaged as a direct and proximate result of Morabito's breaches of fiduciary duty, including loss of the value of the CTS Building, loss of other personal property, personal injury, wrongful death, and exposure to lawsuits and judgments from third parties.

WHEREFORE, the Association demands judgment against Morabito for compensatory damages (including costs and attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

### COUNT V
### COMMON LAW NEGLIGENCE – FAILURE TO WARN
### (Against Morabito)

327.    The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against Morabito.

328.    As a result of the services provided to the Association, Morabito knew or should have known that the CTS Building was structurally unsound and in danger of imminent collapse.

329.    Morabito owed a duty to the Association and its members to act in a reasonable manner, including a duty to warn of the potential hazards posed by the condition of the CTS Building.

330.    Morabito breached its duty to warn and acted in an unreasonable manner by failing to advise the Association and its members of the risks posed to the occupants of the CTS Building and their invitees by the structural conditions at the building.

331.    The Association, as a representative for its member unit owners, has been damaged as a direct and proximate result of Morabito's failure to warn, including loss of the value of the

CTS Building, loss of other personal property, personal injury, wrongful death, and exposure to lawsuits and judgments from third parties.

WHEREFORE, the Association demands judgment against Morabito for compensatory damages (including costs and attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

**COUNT VI**
**CONTRACTUAL INDEMNITY**
**(Against Morabito)**

332.    The Association adopts and realleges paragraphs 1 through 296, and 305 through 314 above and brings this claim against Morabito.

333.    As discussed above, the Association has a duty to maintain, repair, and replace the CTS Building's Common Elements, Limited Common Elements and Association Property, keep them in a safe condition, and to conduct the 40-year recertification process.

334.    Because the Association acts through a Board of Directors made up unit owners that are not required to have any specialized knowledge or training, the Association relies upon professionals to assist with the fulfillment of these duties.

335.    The Association hired and relied upon Morabito to provide structural engineering services to fulfill the Association's duty to ensure the structural integrity of the building and comply with the requirements of the 40-year certification process.

336.    The Association has been named a defendant is this putative class action and other third party claims arising out of the collapse of the CTS Building (collectively, the "**Third Party Claims**").

337.    The allegations stem from the Association's alleged failure to fulfill the Association's duty to ensure the structural integrity of the building and comply with the

62820710;1

requirements of the 40-year certification process, duties which the Association delegated to Morabito.

338.    The 2018 Morabito Contract provided for Morabito to indemnify the Association for any damages arising from Morabito's breach of that contract:

**Indemnification**

The A/E [Morabito] shall indemnify and hold the Owner [Association and its members] and the Owner's officers and employees harmless from and against damages, losses and judgments arising from claims by third parties, including reasonable attorneys' fees and expenses recoverable under applicable law, but only to the extent they are caused _solely_ by the negligent acts or omissions of the A/E, its employees and its consultants in the performance of professional services under this Agreement.

339.    The 2020 Morabito Contract provided for Morabito to indemnify the Association for any damages arising from Morabito's breach of that contract:

Indemnification: To the fullest extent permitted by law, Engineer shall indemnify, and hold harmless the Association, its directors, officers, members, and their respective employees (hereafter collectively referred to as "Related Parties"), from and against all liability, claims, damages, losses and expenses, including, but not limited to, attorneys' fees, expert witness fees and other engineering fees, but only if such claims, damages, loss or expense result from the failure of the Engineer and/or its Engineers to exercise due care in the performance of its Services relating to this Project. The parties hereto specifically _acknowledge and_ agree the foregoing indemnity shall be construed in accordance with Section 725.06, Florida Statutes in force as of the date of this Agreement. This Agreement does not require the Engineer to provide indemnification for the negligence of the Association. However, should Section 725.06, Florida Statutes, be held applicable to this provision then and only then will the indemnification obligation of the Engineer will have a monetary limitation of One Million Dollars ($1,000,000.00). The foregoing amount bears a reasonable commercial relationship to the risks undertaken by each party in accordance with this Agreement and is incorporated by reference into the Agreement. This Indemnification obligation of Engineer to the Association shall survive termination or expiration of this Agreement.

340.    As detailed in Counts I-V above, the factual allegations of which are incorporated herein by reference, the Association is entitled to full indemnification for the Third Party Claims due to Morabito's failure to exercise due in the performance of its engineering services.

341.    The Association is exposed to extreme and ongoing economic risks and damages as a result of Morabito's breach of its duties to the Association.

342.    Regarding the facts and circumstances alleged in support of plaintiffs' claims in the Third Party Claims, the Association has been damaged and has been exposed to extreme economic risks, costs, and attorneys' fees as a direct result of Morabito's breaches of contract and failure to satisfy the applicable standard of care demanded by those contracts.

343.    The Association has incurred damages and may be further damaged and/or obligated to pay aggrieved parties, because of the Association's vicarious, constructive, derivative, or technical liability for Morabito's breaches of duty.

344.    Accordingly, Morabito should bear all costs, expenses, damages, and obligations that the Association has paid or incurred (and may pay or incur in the future) resulting from the Third Party Claims.

WHEREFORE, the Association demands judgment against Morabito for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## COUNT VII
## COMMON LAW INDEMNITY
### (Against Morabito)

345.    The Association adopts and realleges paragraphs 1 through  296 above and brings this claim against Morabito.

346.    As discussed above, the Association has a duty to maintain, repair, and replace the CTS Building's Common Elements, Limited Common Elements and Association Property, keep them in a safe condition, and to conduct the 40-year recertification process.

62820710;1

347.     Because the Association acts through a Board of Directors made up unit owners that are not required to have any specialized knowledge or training, the Association relies upon professionals to assist with the fulfillment of these duties.

348.     The Association hired and relied upon Morabito to provide structural engineering services to fulfill the Association's duty to ensure the structural integrity of the building and comply with the requirements of the 40-year recertification process.

349.     The Association has been named a defendant is this putative class action and other third party claims arising out of the collapse of the CTS Building (collectively, the "Third Party Claims").

350.     The allegations stem from the Association's alleged failure to fulfill the Association's duty to ensure the structural integrity of the building and comply with the requirements of the 40-year recertification process, duties which the Association delegated to Morabito.

351.     As detailed in Counts I-VI above, the factual allegations of which are incorporated herein by reference, the Association is entitled to full indemnification for the Third Party Claims due to Morabito's failure to exercise due in the performance of its engineering services.

352.     The Association is exposed to extreme and ongoing economic risks and damages solely as a result of Morabito's breach of its duties to the Association.

353.     The Association liability, if any, is vicarious, constructive, derivative, or technical liability arising solely from Morabito's breaches of duty.

354.     Accordingly, Morabito should bear all costs, expenses, damages, and obligations that the Association has paid or incurred (and may pay or incur in the future) resulting from the Third Party Claims.

WHEREFORE, the Association demands judgment against Morabito for compensatory damages (including costs and attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

**COUNT VIII**
**NEGLIGENCE**
**(Against the Terra Defendants)**

355.    The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against the Terra Defendants.

356.    The Terra Defendants were the owners, developers, and managers of the Eighty-Seven Park construction/development project and had final supervisory authority over all decision-making related to the project.

357.    The Terra Defendants owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to ensure that its development and construction activities on the Eighty-Seven Park project did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including the CTS Building.

358.    The Terra Defendants' aforementioned duty was heightened by the fact that the Terra Defendants were warned, explicitly notified, and made aware that certain activities on the Eighty-Seven Park project, including site compaction activities, pile driving, dewatering, and excavation activities had the potential to negatively impact the structural stability of adjacent structures, including the CTS Building.

359.    Given the Terra Defendants' knowledge of the risks that certain construction activities posed to the CTS Building and its residents, the Terra Defendants had a duty and responsibility to vigilantly monitor and control those risks and ensure that their construction activities did not negatively impact the structural stability of the CTS Building.

119

360.    Further, because of the inherently dangerous nature of the street demolition construction activities on the Eighty-Seven Park project, the Terra Defendants were under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities they undertook.

361.    Given that the Terra Defendants' duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities they undertook was nondelegable, the Terra Defendants are accountable and responsible for the negligent actions of their subcontractors, employees, and/or agents in the performance of these dangerous activities.

362.    The NV5 Report presented the Terra Defendants with several available and appropriate options for basement excavation support methods.

363.    Only one of the options identified in the NV5 Report would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive.

364.    The Terra Defendants had a duty to consider the impact on adjacent properties, including the CTS Building, when choosing basement excavation support methods.

365.    The Terra Defendants had an additional duty to ensure that a reasonably safe method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

366.    The Terra Defendants failed to abide by their duties when they chose to prioritize profits over safety by selecting driven sheet piles as the basement excavation support method for the Eighty Seven Park project.

367.    The Terra Defendants were also explicitly warned that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact the CTS Building if they were not vigilantly monitored and controlled and absent specific measures to ensure the CTS Building was not being negatively impacted.

368.    As discussed, despite the risks about which NV5 warned the Terra Defendants, the Terra Defendants failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures.

369.    The Terra Defendants also failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting the CTS Building.

370.    The Terra Defendants, acting by and through their agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to the Association and its members by:

a.    Placing the residents and occupants of CTS at grave and immediate risk of harm;

b.    Damaging the CTS Building by impacting its structural condition and stability through construction and street excavation site activities at the Eighty-Seven Park project and causing economic damages;

c.    Conducting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including the CTS Building;

d.    Choosing to utilize a vibratory hammer to drive sheet piles on the project site, despite knowing that said pile driving activities would emit dangerous and destructive vibrations that would foreseeably penetrate and damage the CTS Building;

121

e.      Choosing to utilize driven sheet piles for basement excavation support, despite knowing that pile driving activities would cause damaging vibrations to impact the CTS Building and despite knowing that available and suitable alternatives existed that were vibration free;

f.      Prioritizing corporate profits over the safety of the residents and occupants of the CTS Building and trying to save money by choosing to use driven sheet piles rather than available alternative methods that were vibration free;

g.      Performing pile driving without monitoring vibration levels;

h.      Performing pile driving along and/or immediately adjacent to the CTS Building's south foundation wall;

i.      Performing pile driving along and/or immediately adjacent to the CTS Building's south foundation wall without monitoring vibration levels;

j.      Selectively monitoring vibration levels during pile driving activities;

k.      Continuing to use a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

l.      Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m.      Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

n.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including the CTS Building;

o.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including the CTS Building, and despite knowing that allowing the emission of the vibrations at dangerous levels would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

p.      Failing to warn the Association and any CTS residents and/or occupants that vibrations in excess of safe and allowable limits were being emitted from the Eighty-Seven Park project site;

q.      Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused to the CTS Building;

r.      Failing to inspect and analyze the structural condition and stability of the CTS Building after they knew or should have known the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s.      Failing to inspect and analyze the structural condition and stability of the CTS Building after they knew or should have known the construction activates emitted vibrations in excess of the safe and allowable limit during pile driving activities and after receiving a complaint from CTS residents regarding tremors felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t.      Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u.      Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v.      Performing numerous vibration-emitting construction activities without monitoring or controlling vibrations;

w.      Performing site compaction work without monitoring vibrations;

x.      ailing to appropriately control vibrations during site compaction procedures;

y.      ailing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z.      ailing to appropriately monitor and control vibrations emitted during site compaction procedures, despite knowing that such vibrations could and foreseeably would damage the CTS Building and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa.     Excavating dangerously close to the CTS Building's south foundation wall;

bb.     Damaging the CTS Building's south foundation wall during excavation work;

cc.     Damaging the CTS Building's south foundation wall during construction of the beach access walkway;

dd.      Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS Building's south foundation wall;

ee.     Failing to properly perform dewatering work at the Eighty-Seven Park site;

ff.     Performing dewatering work at the Eighty-Seven Park site in a manner that negatively impacted the structural stability of the CTS Building;

gg.     Dangerously drawing down the water table underlying the CTS Building through dewatering procedures at the Eighty-Seven Park site;

124

hh.     Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on the CTS Building and the CTS Building's structural stability;

ii.     Failing to appropriately monitor and analyze the impact of drawing down the water table underlying the CTS Building;

jj.     Drawing down the water table underlying the CTS Building asymmetrically;

kk.     Failing to recharge the water table underlying the CTS Building;

ll.     Impacting the structural stability and condition of the CTS Building through dewatering activities undertaken at Eighty-Seven Park;

mm.     Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of the CTS Building, despite knowing that such a failure would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

nn.     Causing and allowing water to infiltrate the CTS Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

oo.     Causing and allowing water to infiltrate the CTS Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that the water infiltration would damage the CTS Building and impact its structural stability;

pp.     Failing to warn the Association and CTS residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of the CTS Building;

62820710;1

qq.     Excavating and constructing the beach access walkway immediately adjacent to the CTS Building's south foundation wall in such a way that caused water to infiltrate the CTS Building's foundation wall and seep into the basement parking garage;

rr.     Excavating and constructing the beach access walkway immediately adjacent to the CTS Building's south foundation wall in such a way that caused water to infiltrate the CTS Building's foundation and damage its structural foundation;

ss.     Constructing the beach access walkway so that it was pitched and angled toward the CTS Building's south foundation wall;

tt.     Causing water runoff to infiltrate the CTS Building's south foundation wall and cause damage to the CTS Building's foundation;

uu.     Damaging the CTS Building's south foundation wall such that water runoff was able to infiltrate the CTS Building's foundation;

vv.     Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww.     Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

xx.     Prioritizing corporate profits over the safety of CTS residents and occupants.

371.     The Terra Defendants' conduct and failures, as described herein, demonstrated disregard for the safety and health of CTS residents and occupants.

372.    The Terra Defendants' negligence caused one of the most devastating and deadly building collapses in United States history, and the Association suffered the damages set forth herein.

373.    By conducting themselves as set forth herein, the Terra Defendants' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to the Association and its members.

WHEREFORE, the Association demands judgment against the Terra Defendants for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs and such relief as the Court deem just and proper.

**COUNT IX**
**STRICT LIABILITY**
**(Against the Terra Defendants)**

374.    The Association adopts and realleges paragraphs 1 through 296  above and brings this claim against the Terra Defendants.

375.    As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the direction of and under the supervision of the Terra Defendants.

376.    The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging & Dock Co. v. Sea Gull Operating Corp.*, 460 So. 2d 510, 512-13 (Fla. 3d DCA 1984).

377.    Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*.

378.    Pile driving, including sheet pile driving, necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care.

379.    Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

380.    The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

381.    Pile driving on the Eighty-Seven Park project, carried out at the direction and under the supervision of the Terra Defendants, was inappropriate given the project's proximity to the CTS Building, a highly populated condominium building.

382.    Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized—the only "value" provided by pile driving was to the Terra Defendants' wallets.

383.    The April 2015 NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including CTS and its residents, occupants, and guests.

384.    The April 2015 NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including CTS, if not properly monitored and controlled.

385.    The pile driving that the Eighty-Seven Park project performed damaged the CTS Building and negatively impacted its structural stability.

386.     Damage to the CTS Building's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk pile driving presents.

387.     The ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project caused significant structural damage to the CTS Building and are a substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to the Association and its members and the structural damage to the CTS Building, which ultimately led to the third deadliest building collapse in United States history.

388.     As a result of the Terra Defendants' ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to CTS Building's structure, Terra Defendants are strictly liable for the injuries and damages the Association and its members suffered, as alleged herein.

WHEREFORE, the Association demands judgment against the Terra Defendants for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

**COUNT X**
**NEGLIGENCE**
**(Against JMA)**

389.     The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against JMA.

390.     JMA was the general contractor and/or construction manager that the Terra Defendants retained for the Eighty-Seven Park project.

391.     JMA had extensive knowledge of all construction activities performed on the Eighty-Seven Park project and was intimately involved with the construction activities primarily

discussed herein, including but not limited to, pile driving, dewatering, excavation, and site compaction procedures.

392.    Each piece of information and every warning concerning pile driving, dewatering, excavation, and site compaction procedures that NV5 provided to the Terra Defendants was also relayed to JMA.

393.    As the general contractor and/or construction manager, JMA owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to ensure that its development and construction activities on the Eighty-Seven Park project did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including the CTS Building.

394.    JMA's aforementioned duty was heightened by the fact that JMA was warned, explicitly notified, and made aware that certain activities on the Eighty-Seven Park project, including site compaction activities, pile driving, dewatering, and excavation activities had the potential to negatively impact the structural stability of adjacent structures, including the CTS Building.

395.    Given JMA's knowledge of the risks that certain construction activities posed to the CTS Building and its residents, JMA had a duty and responsibility to vigilantly monitor and control those risks and ensure that their construction activities did not negatively impact the structural stability of the CTS Building.

396.    As the general contractor and/or construction manager, JMA had a duty to ensure that all work on the Eighty-Seven Park project, including all pile driving, dewatering, site compaction, and excavation work, was carried out safely and in such a way that did not damage or otherwise negatively impact adjacent properties, namely, the CTS Building.

62820710;1

397.     Further, because of the inherently dangerous nature of the construction activities on the Eighty-Seven Park project, JMA was under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities it undertook.

398.     Given that JMA's duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities it undertook was nondelegable, JMA is accountable and responsible for the negligent actions of its subcontractors, employees, and/or agents in the performance of these dangerous activities.

399.     The NV5 Report presented several available and appropriate options for basement excavation support methods.

400.     Only one of the options presented in the NV5 Report would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive.

401.     JMA had a duty to consider the impact on adjacent properties, including the CTS Building, when choosing basement excavation support methods for the Eighty-Seven Park project.

402.     JMA had a further duty to ensure that the safest method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

403.     JMA failed these aforementioned duties when it permitted the most dangerous method of basement excavation support—driven sheet piles—to be chosen and implemented on the project, despite the known and foreseeable risks to the CTS Building.

404.     Even after choosing and/or permitting the use of driven sheet piles on the project, JMA had a duty to ensure that vibrations emitted through the vibratory sheet pile driving activities

131

were vigilantly monitored and that the work would not be permitted to proceed if vibration levels exceeded safe and allowable limits.

405.    NV5 also explicitly warned JMA that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact the CTS Building if those activities were not vigilantly monitored and controlled and absent specific measures to ensure that the CTS Building was not being negatively impacted.

406.    As discussed, despite the risks about which NV5 warned JMA, JMA failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures and failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting the CTS Building.

407.    JMA, acting by and through their agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to the Association and its members by:

a.    Placing the residents and occupants of CTS at grave and immediate risk of harm;

b.    Damaging the CTS Building by impacting its structural condition and stability through construction and street excavation site activities at the Eighty-Seven Park project and causing economic damages;

c.    Conducting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including the CTS Building;

132

d.      Choosing to utilize a vibratory hammer to drive sheet piles on the project site, despite knowing that said pile driving activities would emit dangerous and destructive vibrations that would foreseeably penetrate and damage the CTS Building;

e.      Choosing to utilize driven sheet piles for basement excavation support, despite knowing that pile driving activities would cause damaging vibrations to impact the CTS Building and despite knowing that available and suitable alternatives existed that were vibration free;

f.      Prioritizing corporate profits over the safety of the residents and occupants of the CTS Building and trying to save money by choosing to use driven sheet piles rather than available alternative methods that were vibration free;

g.      Performing pile driving without monitoring vibration levels;

h.      Performing pile driving along and/or immediately adjacent to the CTS Building's south foundation wall;

i.      Performing pile driving along and/or immediately adjacent to the CTS Building's south foundation wall without monitoring vibration levels;

j.      Selectively monitoring vibration levels during pile driving activities;

k.      Continuing to use a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

l.      Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m.      Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

133

n.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could, and would, foreseeably damage adjacent structures, including the CTS Building;

o.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could, and would, foreseeably damage adjacent structures, including the CTS Building, and despite knowing that allowing the emission of the vibrations at dangerous levels would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

p.      Failing to warn the Association and any CTS residents and/or occupants that vibrations in excess of safe and allowable limits were being emitted from the Eighty-Seven Park project site;

q.      Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused to the CTS Building;

r.      Failing to inspect and analyze the structural condition and stability of the CTS Building after they knew, or should have known, the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s.      Failing to inspect and analyze the structural condition and stability of the CTS Building after they knew or should have known the construction activates emitted vibrations in excess of the safe and allowable limit during pile driving activities and after

receiving a complaint from CTS residents regarding tremors felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t.      Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u.      Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v.      Performing numerous vibration-emitting construction activities without monitoring or controlling vibrations;

w.      Performing site compaction work without monitoring vibrations;

x.      Failing to appropriately control vibrations during site compaction procedures;

y.      Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z.      Failing to appropriately monitor and control vibrations emitted during site compaction procedures, despite knowing that such vibrations could and foreseeably would damage the CTS Building and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa.     Excavating dangerously close to the CTS Building's south foundation wall;

bb.     Damaging the CTS Building's south foundation wall during excavation work;

cc.     Damaging the CTS Building's south foundation wall during construction of the beach access walkway;

dd.     Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS Building's south foundation wall;

ee.     Failing to properly perform dewatering work at the Eighty-Seven Park site;

135

ff.    Performing dewatering work at the Eighty-Seven Park site in a manner that negatively impacted the structural stability of the CTS Building;

gg.    Dangerously drawing down the water table underlying the CTS Building through dewatering procedures at the Eighty-Seven Park site;

hh.    Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on the CTS Building and the CTS Building's structural stability;

ii.    Failing to appropriately monitor and analyze the impact of drawing down the water table underlying the CTS Building;

jj.    Drawing down the water table underlying the CTS Building asymmetrically;

kk.    Failing to recharge the water table underlying the CTS Building;

ll.    Impacting the structural stability and condition of the CTS Building through dewatering activities undertaken at Eighty-Seven Park;

mm.    Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of the CTS Building, despite knowing that such a failure would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

nn.    Causing and allowing water to infiltrate the CTS Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

oo.    Causing and allowing water to infiltrate the CTS Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that the water infiltration would damage the CTS Building and impact its structural stability;

136

pp.     Failing to warn the Association and CTS residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of the CTS Building;

qq.     Excavating and constructing the beach access walkway immediately adjacent to the CTS Building's south foundation wall in such a way that caused water to infiltrate the CTS Building's foundation wall and seep into the basement parking garage;

rr.     Excavating and constructing the beach access walkway immediately adjacent to the CTS Building's south foundation wall in such a way that caused water to infiltrate the CTS Building's foundation and damage its structural foundation;

ss.     Constructing the beach access walkway so that it was pitched and angled toward the CTS Building's south foundation wall;

tt.     Causing water runoff to infiltrate the CTS Building's south foundation wall and cause damage to the CTS Building's foundation;

uu.     Damaging the CTS Building's south foundation wall such that water runoff was able to infiltrate the CTS Building's foundation;

vv.     Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww.     Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

xx.     Prioritizing corporate profits over the safety of CTS residents and occupants.

137

408.   JMA's conduct and failures, as described herein, demonstrated disregard for the safety and health of CTS residents and occupants.

409.   JMA's negligence caused one of the most devastating and deadly building collapses in United States history, and the Association and its members suffered the damages set forth herein.

410.   By conducting itself as set forth herein, JMA's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to the Association and its members.

WHEREFORE, the Association demands judgment against JMA for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

### COUNT XI
### STRICT LIABILITY
### (Against JMA)

411.   The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against JMA.

412.   As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the direction of and under the supervision of JMA.

413.   As the general contractor and/or construction manager, JMA was intimately involved in the performance and progress of the pile driving activities on the project.

414.   The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging*, *supra*, 460 So. 2d at 512-13.

415.    Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*.

416.    Pile driving, including sheet pile driving necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care.

417.    Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

418.    The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

419.    Pile driving on the Eighty-Seven Park project, carried out under the supervision of JMA, was inappropriate given the project's proximity to the CTS Building, a highly populated condominium building.

420.    Pile driving at the Eighty-Seven Park project was of no value to the community given that available and suitable alternative methods of basement excavation support could have been utilized—the only "value" provided by pile driving was to JMA's wallet as it was the cheapest option for basement excavation support.

421.    The NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including the CTS Building and its residents and occupants.

422.    The NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including the CTS Building, if not properly monitored and controlled.

423.    The pile driving that the Eighty-Seven Park project performed damaged the CTS Building and negatively impacted its structural stability.

424.    Damage to the CTS Building's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk pile driving presents.

425.    The ultrahazardous and abnormally dangerous pile driving activities carried out  on the Eighty-Seven Park project caused significant structural damage to the CTS Building and are a substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to the Association and its members and the structural damage to the CTS Building, which ultimately led to one of the deadliest building collapse in United States history.

426.    As a result of the ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to the CTS Building's structure, JMA is strictly liable for the injuries and damages the Association and its members suffered, as alleged herein.

WHEREFORE, the Association demands judgment against JMA for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## COUNT XII
## NEGLIGENCE
## (Against NV5)

427.    The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against NV5.

428.    NV5 was the geotechnical engineer and construction inspector the Terra Defendants hired to work on the Eighty-Seven Park project.

429.    NV5 had extensive knowledge of all construction activities performed on the Eighty-Seven Park project and was intimately involved with the construction activities primarily

discussed herein, including but not limited to pile driving, dewatering, excavation, and site compaction procedures.

430.    NV5 issued many of the warnings to the Terra Defendants, JMA, and DeSimone regarding the danger that pile driving, site compaction, dewatering, and excavation work on the Eighty-Seven Park project posed to the CTS Building.

431.    Unfortunately, NV5 ignored its own warnings and allowed dangerous work to proceed on the Eighty-Seven Park project, despite the harm it was inflicting on the CTS Building.

432.    NV5 owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to ensure that the development and construction activities on the Eighty-Seven Park project did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including the CTS Building.

433.    NV5's aforementioned duty was heightened by the fact that NV5 itself issued warnings regarding the danger that certain construction activities posed to CTS if performed improperly or were not appropriately monitored and controlled.

434.    These construction activities at the Eighty-Seven Park Project included site compaction activities, pile driving, dewatering, and excavation activities that NV5 explicitly warned had the potential to negatively impact the structural stability of adjacent structures, including the CTS Building.

435.    NV5 was responsible for ensuring both that all of its warnings regarding construction activities on the Eighty-Seven Park project were heeded and that the work not be permitted to negatively impact or damage the CTS Building in the very ways NV5 warned against.

436.    Given NV5's knowledge of the risks that certain construction activities posed to the CTS Building and its residents, NV5 had a duty and responsibility to vigilantly monitor and

control those risks and ensure that the identified risky and dangerous construction activities did not negatively impact the structural stability of the CTS Building.

437.     NV5 had a duty to ensure that all work on the Eighty-Seven Park project, including all pile driving, dewatering, site compaction, and excavation work, was carried out safely and in a manner that did not damage or otherwise negatively impact adjacent properties, namely the CTS Building.

438.     NV5's April 2015 Report presented several available and appropriate options for basement excavation support methods.

439.     Only one of the options identified in the April 2015 Report would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive.

440.     NV5 had a duty to ensure that the Terra Defendants, JMA, and DeSimone appropriately considered the potentially devastating impact on adjacent properties, including the CTS Building, when choosing basement excavation support methods.

441.     NV5 had a further duty to ensure that the safest method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

442.     NV5 should have recommended only the safest methods of basement excavation support for the Eighty-Seven Park project that were practically vibration free and that would not have had a negative structural impact on the CTS Building.

443.     Further, because of the inherently dangerous nature of the construction activities on the Eighty-Seven Park project, NV5 was under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities it undertook.

444.    Given that this NV5's duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities was nondelegable, NV5 is accountable and responsible for the negligent actions of its subcontractors, employees and/or agents in the performance of these dangerous activities.

445.    NV5 failed its duties when it initially proposed pile driving as a viable option for basement excavation support for the Eighty-Seven Park project.

446.    NV5 further failed its duties when it permitted the most dangerous method of basement excavation support—driven sheet piles—to be chosen and implemented on the Eighty-Seven Park project, despite the known and foreseeable risks to the CTS Building.

447.    Even after proposing and allowing the use of driven sheet piles on the project, NV5 had a duty to ensure that vibrations emitted through the vibratory sheet pile driving activities were vigilantly monitored and that the work would not be permitted to proceed if vibration levels exceeded safe and allowable limits.

448.    NV5 was also unquestionably aware that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact the CTS Building if those activities were not vigilantly monitored and controlled and absent specific measures to ensure that the CTS Building was not being negatively impacted.

449.    As discussed, despite the risks about which NV5 was aware and warned others, NV5 failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures.

450.    NV5 also failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting the CTS Building.

451.    The National Society of Professional Engineers Code of Ethics for Engineers establishes the fundamental canon and rule of practice that professional engineers must "Hold paramount the safety, health, and welfare of the public."

452.    NV5 failed to abide by the fundamental canon of the Code of Ethics for Engineers to hold the safety, health, and welfare of the public, and specifically of CTS residents and occupants, of paramount importance by engaging in the acts and omissions discussed herein.

453.    NV5, acting by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to the Association and its members by:

a.      Placing the residents and occupants of CTS at grave and immediate risk of harm;

b.      Damaging the CTS Building by impacting its structural condition and stability through construction and street excavation site activities at the Eighty-Seven Park project and causing economic damages;

c.      Conducting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including the CTS Building;

d.      Choosing to utilize a vibratory hammer to drive sheet piles on the project site, despite knowing that said pile driving activities would emit dangerous and destructive vibrations that would foreseeably penetrate and damage the CTS Building;

e.      Choosing to utilize driven sheet piles for basement excavation support, despite knowing that pile driving activities would cause damaging vibrations to impact the CTS Building and despite knowing that available and suitable alternatives existed that were vibration free;

f.      Prioritizing corporate profits over the safety of the residents and occupants of the CTS Building and trying to save money by choosing to use driven sheet piles rather than available alternative methods that were vibration free;

g.      Performing pile driving without monitoring vibration levels;

h.      Performing pile driving along and/or immediately adjacent to the CTS Building's south foundation wall;

i.      Performing pile driving along and/or immediately adjacent to the CTS Building's south foundation wall without monitoring vibration levels;

j.      Selectively monitoring vibration levels during pile driving activities;

k.      Continuing to use a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

l.      Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m.      Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

n.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including the CTS Building;

o.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could, and would, foreseeably damage adjacent structures, including the CTS Building, and despite knowing that allowing the emission of the vibrations at dangerous levels would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

p.      Failing to warn the Association and any CTS residents and/or occupants that vibrations in excess of safe and allowable limits were being emitted from the Eighty-Seven Park project site;

q.      Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused to the CTS Building;

r.      Failing to inspect and analyze the structural condition and stability of the CTS Building after they knew, or should have known, the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s.      Failing to inspect and analyze the structural condition and stability of the CTS Building after they knew, or should have known, the construction activates emitted vibrations in excess of the safe and allowable limit during pile driving activities and after receiving a complaint from CTS residents regarding tremors felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t.      Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

62820710;1

u.      Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v.      Performing numerous vibration-emitting construction activities without monitoring or controlling vibrations;

w.      Performing site compaction work without monitoring vibrations;

x.      Failing to appropriately control vibrations during site compaction procedures;

y.      Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z.      Failing to appropriately monitor and control vibrations emitted during site compaction procedures, despite knowing that such vibrations could, and foreseeably would, damage the CTS Building and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa.     Excavating dangerously close to the CTS Building's south foundation wall;

bb.     Damaging the CTS Building's south foundation wall during excavation work;

cc.     Damaging the CTS Building's south foundation wall during construction of the beach access walkway;

dd.     Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS Building's south foundation wall;

ee.     Failing to properly perform dewatering work at the Eighty-Seven Park site;

ff.     Performing dewatering work at the Eighty-Seven Park site in a manner that negatively impacted the structural stability of the CTS Building;

gg.     Dangerously drawing down the water table underlying the CTS Building through dewatering procedures at the Eighty-Seven Park site;

147

hh.     Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on the CTS Building and the CTS Building's structural stability;

ii.     Failing to appropriately monitor and analyze the impact of drawing down the water table underlying the CTS Building;

jj.     Drawing down the water table underlying the CTS Building asymmetrically;

kk.     Failing to recharge the water table underlying the CTS Building;

ll.     Impacting the structural stability and condition of the CTS Building through dewatering activities undertaken at Eighty-Seven Park;

mm.     Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of the CTS Building, despite knowing that such a failure would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

nn.     Causing and allowing water to infiltrate the CTS Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

oo.     Causing and allowing water to infiltrate the CTS Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that the water infiltration would damage the CTS Building and impact its structural stability;

pp.     Failing to warn the Association and CTS residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of the CTS Building;

qq.     Excavating and constructing the beach access walkway immediately adjacent to the CTS Building's south foundation wall in such a way that caused water to infiltrate the CTS Building's foundation wall and seep into the basement parking garage;

rr.     Excavating and constructing the beach access walkway immediately adjacent to the CTS Building's south foundation wall in such a way that caused water to infiltrate the CTS Building's foundation and damage its structural foundation;

ss.     Constructing the beach access walkway so that it was pitched and angled toward the CTS Building's south foundation wall;

tt.     Causing water runoff to infiltrate the CTS Building's south foundation wall and cause damage to the CTS Building's foundation;

uu.     Damaging the CTS Building's south foundation wall such that water runoff was able to infiltrate the CTS Building's foundation;

vv.     Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to, those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww.     Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

xx.     Prioritizing corporate profits over the safety of CTS residents and occupants.

454.    NV5's conduct and failures, as described herein, demonstrated a disregard for the safety and health of the CTS residents and occupants, including the Association and its members.

455.    NV5's negligence caused one of the most devastating and deadly building collapses in United States history, and the Association and its members suffered the damages set forth herein.

149

456.   By conducting itself as set forth herein, NV5's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to the Association and its members.

WHEREFORE, the Association demands judgment against NV5 for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

**COUNT XIII**
**<u>STRICT LIABILITY</u>**
**<u>(Against NV5)</u>**

457.   The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against NV5.

458.   As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the suggestion of and under the supervision of NV5.

459.   NV5 was intimately involved in the performance and progress of the pile driving activities on the project and was responsible for closely monitoring the vibration levels during portions of the pile driving work.

460.   The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging*, *supra*, 460 So. 2d at 512-13.

461.   Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*.

462.    Pile driving, including sheet pile driving, necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care.

463.    Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

464.    The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

465.    Pile driving on the Eighty-Seven Park project, carried out under the supervision of NV5, was inappropriate given the project's proximity to the CTS Building, a highly populated condominium building.

466.    Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized.

467.    The NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including the CTS Building and its residents and occupants.

468.    The NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including the CTS Building, if not properly monitored and controlled.

469.    The pile driving that the Eighty-Seven Park project performed damaged the CTS Building and negatively impacted its structural stability.

470.     Damage to the CTS Building's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk that pile driving presents.

471.     The ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project caused significant structural damage to the CTS Building and are substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to the Association its members and the structural damage to the CTS Building, which ultimately led to one of the deadliest building collapse in United States history.

472.     As a result of NV5's ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to the CTS Building's structure, NV5 is strictly liable for the injuries and damages the Association and its members suffered, as alleged herein.

WHEREFORE, the Association demands judgment against NV5 for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

### COUNT XIV
### NEGLIGENCE
### (Against DeSimone)

473.     The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against DeSimone.

474.     DeSimone was the structural engineer on for the Eighty-Seven Park project.

475.     DeSimone had extensive knowledge of all construction activities performed on site at the Eight-Seven Park project and was intimately involved with the construction activities primarily discussed herein, including but not limited to pile driving, dewatering, excavation, and site compaction procedures.

62820710;1

476.     Each piece of information and every warning concerning pile driving, dewatering, excavation, and site compaction procedures that NV5 provided to the Terra Defendants was also relayed to DeSimone.

477.     As the structural engineer, DeSimone owed a duty to persons present in and occupying adjacent structures, including the Association and its members.

478.     DeSimone's duty included ensuring that the development the Eighty-Seven Park project and the related construction activities did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including the CTS Building.

479.     DeSimone's aforementioned duty was heightened by the fact that DeSimone was warned, explicitly notified, and made aware that certain activities on the Eighty-Seven Park project, including site compaction activities, pile driving, dewatering, and excavation activities had the potential to negatively impact the structural stability of adjacent structures, including the CTS Building.

480.     Given DeSimone's knowledge of the risks that certain construction activities posed to CTS and its residents and occupants, DeSimone had a duty and responsibility to vigilantly monitor and control those risks and ensure that they did not negatively impact the structural stability of the CTS Building.

481.     As the structural engineer on the Eighty-Seven Park project, DeSimone had a duty to ensure that all work on the Eighty-Seven Park project, including all pile driving, dewatering, site compaction, and excavation work, was carried out safely and in a manner that did not damage or otherwise negatively impact the structural stability of adjacent properties, namely the CTS Building.

482.    The NV5 Report presented several available and appropriate options for basement excavation support methods.

483.    Only one of the options presented in the NV5 Report would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive.

484.    DeSimone had a duty to consider the impact on the structural stability of adjacent properties, including the CTS Building, when a basement excavation support method was chosen for the Eighty-Seven Park project.

485.    Defendant DeSimone had a further duty to ensure that the safest method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

486.    DeSimone failed these aforementioned duties when it permitted the most dangerous method of basement excavation support—driven sheet piles—to be chosen and implemented on the project, despite the known and foreseeable risks to the structural stability of the CTS Building.

487.    Even after the driven sheet piles was chosen for the Eighty-Seven Park project, DeSimone had a duty to ensure that the vibratory sheet pile driving work would not impact the structural stability of the CTS Building.

488.    NV5 also explicitly warned DeSimone that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact the CTS Building if those activities were not vigilantly monitored and controlled and absent specific measures to ensure the CTS Building was not being negatively impacted.

489.    As the structural engineer, DeSimone had a duty to actively monitor and report on the status of the water table underlying the Eighty-Seven Park site and the CTS Building and to

ensure that the water table was not drawn down in a dangerous manner to cause differential settlement at the CTS site.

490.    If the water table drawdown for the Eighty-Seven Park project was not being performed properly, or was occurring in an asymmetrical manner, DeSimone had an obligation to take corrective action.

491.    Further, because of the inherently dangerous nature of the construction activities on the Eighty-Seven Park project, DeSimone was under a non-delegable duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities it undertook.

492.    Given that DeSimone's duty to exercise a heightened degree of care to prevent and avoid risk of harm associated with the compaction activities, pile driving, dewatering, and excavation activities was nondelegable, DeSimone is accountable and responsible for the negligent actions of its subcontractors, employees, and/or agents in the performance of these dangerous activities.

493.    As discussed, despite the risks about which NV5 warned DeSimone, DeSimone failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures and failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting the CTS Building.

494.    The National Society of Professional Engineers Code of Ethics for Engineers establishes the fundamental canon and rule of practice that professional engineers must "Hold paramount the safety, health, and welfare of the public."

62820710;1

495.   DeSimone failed to abide by the fundamental canon of the Code of Ethics for Engineers to hold the safety, health, and welfare of the public, and, specifically, of CTS residents and occupants, of paramount importance by engaging in the acts and omissions discussed herein.

496.   DeSimone, acting by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to the Association and its members by:

a.   Placing the residents and occupants of CTS at grave and immediate risk of harm;

b.   Damaging the CTS Building by impacting its structural condition and stability through construction and street excavation site activities at the Eighty-Seven Park project and causing economic damages;

c.   Conducting activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including the CTS Building;

d.   Choosing to utilize a vibratory hammer to drive sheet piles on the project site, despite knowing that said pile driving activities would emit dangerous and destructive vibrations that would foreseeably penetrate and damage the CTS Building;

e.   Choosing to utilize driven sheet piles for basement excavation support, despite knowing that pile driving activities would cause damaging vibrations to impact the CTS Building and despite knowing that available and suitable alternatives existed that were vibration free;

f.   Prioritizing corporate profits over the safety of the residents and occupants of the CTS Building and trying to save money by choosing to use driven sheet piles rather than available alternative methods that were vibration free;

g.      Performing pile driving without monitoring vibration levels;

h.      Performing pile driving along and/or immediately adjacent to the CTS Building's south foundation wall;

i.      Performing pile driving along and/or immediately adjacent to the CTS Building's south foundation wall without monitoring vibration levels;

j.      Selectively monitoring vibration levels during pile driving activities;

k.      Continuing to use a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

l.      Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

m.      Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

n.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could, and would, foreseeably damage adjacent structures, including the CTS Building;

o.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including the CTS Building, and despite knowing that allowing the emission of the vibrations at dangerous levels would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

p.      Failing to warn the Association and any CTS residents and/or occupants that vibrations in excess of safe and allowable limits were being emitted from the Eighty-Seven Park project site;

q.      Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused to the CTS Building;

r.      Failing to inspect and analyze the structural condition and stability of the CTS Building after they knew, or should have known, the construction activities emitted vibrations in excess of the safe and allowable limit during pile driving activities;

s.      Failing to inspect and analyze the structural condition and stability of the CTS Building after they knew, or should have known, the construction activates emitted vibrations in excess of the safe and allowable limit during pile driving activities and after receiving a complaint from CTS residents regarding tremors felt and structural damage done to their property as a result of the Eighty-Seven Park construction activities;

t.      Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u.      Concealing from the Association the results of vibration monitoring performed during pile driving activities;

v.      Performing numerous vibration-emitting construction activities without monitoring or controlling vibrations;

w.      Performing site compaction work without monitoring vibrations;

x.      Failing to appropriately control vibrations during site compaction procedures;

y.      Failing to monitor and appropriately control vibrations during compaction procedures required for the installation of Silva Cell systems;

z.      Failing to appropriately monitor and control vibrations emitted during site compaction procedures, despite knowing that such vibrations could and foreseeably would damage the CTS Building and expose the residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

aa.     Excavating dangerously close to the CTS Building's south foundation wall;

bb.     Damaging the CTS Building's south foundation wall during excavation work;

cc.     Damaging the CTS Building's south foundation wall during construction of the beach access walkway;

dd.     Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS Building's south foundation wall;

ee.     Failing to properly perform dewatering work at the Eighty-Seven Park site;

ff.      Performing dewatering work at the Eighty-Seven Park site in a manner that negatively impacted the structural stability of the CTS Building;

gg.     Dangerously drawing down the water table underlying the CTS Building through dewatering procedures at the Eighty-Seven Park site;

hh.     Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on the CTS Building and the CTS Building's structural stability;

ii.      Failing to appropriately monitor and analyze the impact of drawing down the water table underlying the CTS Building;

jj.      Drawing down the water table underlying the CTS Building asymmetrically;

kk.     Failing to recharge the water table underlying the CTS Building;

159

ll.     Impacting the structural stability and condition of the CTS Building through dewatering activities undertaken at Eighty-Seven Park;

mm.    Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of the CTS Building, despite knowing that such a failure would expose the residents and occupants of CTS to an unreasonable and unacceptable risk of severe injury and/or death;

nn.    Causing and allowing water to infiltrate the CTS Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

oo.    Causing and allowing water to infiltrate the CTS Building and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that the water infiltration would damage the CTS Building and impact its structural stability;

pp.    Failing to warn the Association and CTS residents and occupants that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of the CTS Building;

qq.    Excavating and constructing the beach access walkway immediately adjacent to the CTS Building's south foundation wall in such a way that caused water to infiltrate the CTS Building's foundation wall and seep into the basement parking garage;

rr.     Excavating and constructing the beach access walkway immediately adjacent to the CTS Building's south foundation wall in such a way that caused water to infiltrate the CTS Building's foundation and damage its structural foundation;

ss.     Constructing the beach access walkway so that it was pitched and angled toward the CTS Building's south foundation wall;

160

tt.     Causing water runoff to infiltrate the CTS Building's south foundation wall and cause damage to the CTS Building's foundation;

uu.     Damaging the CTS Building's south foundation wall such that water runoff was able to infiltrate the CTS Building's foundation;

vv.     Failing to abide by applicable Florida Building Code rules and regulations, including but not limited to, those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

ww.     Failing to abide by applicable OSHA rules and regulations, including but not limited to those pertaining to excavation support and protective systems, pile driving, dewatering activities, and other applicable rules and regulations;

xx.     Prioritizing corporate profits over the safety of CTS residents and occupants.

497.     DeSimone's conduct and failures, as described herein, demonstrated disregard for the safety and health of CTS residents and occupants, including the Association and its members.

498.     DeSimone's negligence caused one of the most devastating and deadly building collapses in United States history, and the Association and its members suffered the damages set forth herein.

499.     By conducting itself as set forth herein, DeSimone's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to the Association and its members.

WHEREFORE, the Association demands judgment against DeSimone for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## COUNT XV
## STRICT LIABILITY
### (Against DeSimone)

500.    The Association adopts and realleges paragraphs 1 through 296 above and brings this claim against DeSimone.

501.    As discussed hereinbefore, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done at the direction and under the supervision of DeSimone.

502.    As the structural engineer on the Eighty-Seven Park project, DeSimone was intimately involved in the performance and progress of the pile driving activities on the project and was extremely knowledgeable regarding the pile driving activities on site.

503.    The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging*, *supra*, 460 So. 2d at 512-13.

504.    Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*.

505.    Pile driving, including sheet pile driving, necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care.

506.    Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

507.    The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

162

508.    Pile driving on the Eighty-Seven Park project, carried out under the supervision of DeSimone, was inappropriate given the project's proximity to the CTS Building, a highly populated condominium building.

509.    Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized.

510.    The NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including the CTS Building and its residents and occupants.

511.    The NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including the CTS Building, if not properly monitored and controlled.

512.    The pile driving that the Eighty-Seven Park project performed damaged the CTS Building and negatively impacted its structural stability.

513.    Damage to the CTS Building's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk that pile driving presents.

514.    The ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project caused significant structural damage to the CTS Building are a substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to the Association and its members and the structural damage to the CTS Building, which ultimately led to one of the deadliest building collapse in United States history.

515.     As a result of DeSimone's ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to the CTS Building's structure, DeSimone is strictly liable for the injuries and damages the Association and its members suffered, as alleged herein.

WHEREFORE, the Association demands judgment against DeSimone for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## COUNT XII
## NEGLIGENCE
## (Against Stantec)

516.     The Association adopts and realleges paragraphs 1 to 296 as though fully set forth herein.

517.     Stantec was the architect of record for the Eighty-Seven Park project and was a Construction Administrator for the project. Stantec was present onsite daily and at ongoing meetings with the owner and contractor where the construction activities and complaints from CTS were discussed. Thus, Stantec had extensive knowledge of all construction activities performed on site and was intimately involved with the construction activities primarily discussed herein, including but not limited to, pile driving, dewatering, excavation, and site compaction procedures.

518.     Through its contract with the Terra Defendants, Stantec agreed that its "services" would include and it would be responsible for "the architectural design of the project," "all structural engineering," "the civil engineering for the Project," and "the aquatic design and engineering," among other responsibilities. Stantec further had a contractual obligation to conduct site visits at a minimum of once per week "to ensure the Work is being completed in accordance

with the Construction Documents" and to "review construction activities" in order to "monitor Contractor's workmanship."

519.    The "Construction Documents" with which Stantec was responsible for ensuring compliance required action be taken during construction activities to protect and maintain the integrity of adjacent structures, and to monitor the impact of construction on those adjacent structures, including CTS.

520.    Stantec attended weekly progress meetings on the project and at these meetings became aware that the construction was not being carried out in a manner that protected adjacent structures and that CTS was specifically being harmed by the construction activities.

521.    Each piece of information and every warning concerning pile driving, dewatering, excavation, and site compaction procedures that NV5 provided to the Terra Defendants was also provided to Stantec.

522.    In its role, Stantec owed a duty to persons present in and occupying adjacent structures, including the Association and its members. This duty included ensuring that the design and development of the Eighty-Seven Park project and the related construction activities did not negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, including CTS.

523.    Stantec's aforementioned duty was heightened by the fact that Stantec was warned, explicitly notified, and made aware that certain activities on the Eighty-Seven Park project, including site compaction activities, pile driving, dewatering, and excavation activities, had the potential to negatively impact the structural stability of adjacent structures, including CTS.

524.    Given Stantec's knowledge of the risks that certain design and construction activities posed to CTS and its residents and occupants, Stantec had a duty and responsibility to

vigilantly monitor and control those risks and ensure that they did not negatively impact the structural stability of CTS, and advise the Terra Defendants of any such risks and monitoring recommendations.

525.    As the architect and a construction administrator on the Eighty-Seven Park project, Stantec had a duty to ensure that all work on the Eighty-Seven Park project, including all pile driving, dewatering, site compaction, and excavation work, was designed and carried out safely and in a manner that did not damage or otherwise negatively impact the structural stability of adjacent properties, namely CTS.

526.    The NV5 Report presented several available and appropriate options for basement excavation support methods. Only one of these options would produce damaging vibrations that would have to be closely monitored and controlled, while the other identified methods were "practically vibration free" but slightly more expensive. Stantec had a duty to consider the impact on the structural stability of adjacent properties, including CTS, when a basement excavation support method was chosen for the Eighty-Seven Park project. Stantec had a further duty to ensure that the safest method of basement excavation support was chosen and implemented on the Eighty-Seven Park project site.

527.    Stantec failed these aforementioned duties when it permitted the most dangerous method of basement excavation support—driven sheet piles—to be chosen and implemented on the project, despite the known and foreseeable risks to the structural stability of CTS.

528.    Even after the driven sheet pile method was chosen for the Eighty-Seven Park project, Stantec had a duty to ensure that the vibratory sheet pile driving work would not impact the structural stability of CTS. And, given that Stantec was onsite daily and knew or should have known of the dangerous vibrations being caused by the sheet pile driving, it had a duty to stop

such work or report such work as a threat to public safety and the safety of the adjacent structure, CTS.

529.    NV5 also explicitly warned Stantec that dewatering activities, site compaction activities, and excavation activities had the potential to damage and negatively impact CTS if those activities were not vigilantly monitored and controlled and absent specific measures to ensure CTS was not being negatively impacted.

530.    As the architect and a construction administrator on the Eighty-Seven Park project, Stantec had a duty to safely design a dewatering plan and actively monitor and report on the status of the water table underlying the Eighty-Seven Park site and CTS and to ensure that the water table was not drawn down in a dangerous manner to cause differential settlement at the CTS site. If the water table drawdown was not being performed properly, or was occurring in an asymmetrical manner, Stantec had an obligation to report the danger and/or take corrective action.

531.    As discussed, despite the risks about which NV5 warned Stantec, Stantec failed to appropriately monitor and control the risks associated with dewatering, site compaction, pile driving, and excavation procedures and failed to undertake appropriate and necessary measures to analyze and ensure that the Eighty-Seven Park construction activities were not negatively impacting CTS.

532.    In addition, Stantec's design called for the pedestrian walkway between Eighty-Seven Park to be sloped toward to CTS, allowing for run-off water to infiltrate CTS's south wall, allowing water to seep into the basement parking garage, and causing degradation to those structural components of CTS.

533.     Stantec, acting by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to the Association and its members:

a.     Designing the Eighty-Seven Park development in a manner which did not protect the public from safety hazards, including the adjacent structure, CTS;

b.     Failing to act as a reasonably prudent Construction Administrator would act during the construction of the Eighty-Seven Park development;

c.     Placing the Association and its members at grave and immediate risk of harm;

d.     Damaging CTS by impacting its structural condition and stability through design and construction site activities at the Eighty-Seven Park project and causing economic damages;

e.     Allowing activities on the Eighty-Seven Park construction site that produced dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

f.     Allowing use of a vibratory hammer to drive sheet piles on the project site and/or permitting the use a vibratory hammer, despite knowing that the pile driving activities would emit dangerous and destructive vibrations that would foreseeably damage CTS;

g.     Choosing to utilize driven sheet piles for basement excavation support and/or permitting the use of sheet piles, despite knowing that pile driving activities would cause damaging vibrations to impact CTS and despite knowing that available and suitable alternatives existed that were vibration free;

h.      Prioritizing corporate profits over the safety of CTS, it's residents and occupants, and trying to save money by choosing to use driven sheet piles rather than available alternative methods that were vibration free and/or permitting the use of driven sheet piles;

i.      Permitting pile driving to be performed without monitoring vibration levels;

j.      Permitting pile driving to be performed along and/or immediately adjacent to the CTS south foundation wall;

k.      Permitting pile driving to be performed along and/or immediately adjacent to the CTS south foundation wall without monitoring vibration levels;

l.      Allowing the selective monitoring of vibration levels during pile driving activities;

m.      Permitting the continued use of a vibratory hammer to drive sheet piles after being informed that vibrations were exceeding safe and allowable limits;

n.      Failing to take appropriate corrective action after being notified that vibrations caused by sheet pile driving were exceeding safe and allowable limits;

o.      Failing to stop the pile driving work after being notified that vibrations were exceeding safe and allowable limits;

p.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS;

q.      Failing to stop the pile driving work or take appropriate corrective action after being notified that vibrations were exceeding safe and allowable limits, despite knowing that vibrations from pile driving could and would foreseeably damage adjacent structures, including CTS, and despite knowing that allowing the emission of vibrations at dangerous

169

levels would expose CTS to an unreasonable and unacceptable risk of damage and severe injury and/or death to Association members;

r.      Failing to warn the Association and CTS residents and/or occupants that vibrations in excess of safe and allowable limits were being emitted from the Eighty-Seven Park project site;

s.      Failing to conduct a proper and adequate post-construction survey to determine the existence and extent of damage the construction site activities at Eighty-Seven Park caused CTS;

t.      Ignoring the vibration monitoring results confirming that vibrations emitted during pile driving activities were exceeding safe and allowable limits;

u.      Concealing the results of vibration monitoring performed during pile driving activities from the Association;

v.      Permitting numerous vibration-emitting construction activities to be performed without monitoring or controlling vibrations or otherwise considering and analyzing the impact of such vibrations on CTS;

w.      Permitting site compaction work to be performed without monitoring vibrations;

x.      Planning for excavation to occur dangerously close to the CTS south foundation wall;

y.      Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS south foundation wall;

z.      Failing to prevent the excavation work from damaging the CTS south foundation wall and/or failing to recognize that such damage had occurred;

62820710;1

aa.      Failing to prevent the construction work for the beach access walkway from damaging the CTS south foundation wall and/or failing to recognize that such damage had occurred;

bb.      Failing to plan for a safe dewatering plan at the Eighty-Seven Park site and/or otherwise ensure that dewatering work was properly performed;

cc.      Allowing the dangerous draw down of the water table underlying CTS through dewatering procedures at the Eighty-Seven Park site and/or failing to recognize the dangerous draw down of the water table;

dd.      Failing to appropriately monitor and analyze the impact of dewatering activities at the Eighty-Seven Park site on CTS and its structural stability;

ee.      Failing to appropriately monitor and analyze the impact of drawing down the water table underlying CTS;

ff.      Drawing down the water table underlying CTS asymmetrically;

gg.      Failing to recharge the water table underlying CTS;

hh.      Impacting the structural stability and condition of CTS through dewatering activities undertaken at Eighty-Seven Park;

ii.      Failing to monitor and analyze the impact of dewatering activities on the Eighty-Seven Park project site on the structural stability and condition of CTS, despite knowing that such a failure would expose the Association and its members and CTS occupants to an unreasonable and unacceptable risk of severe injury and/or death;

jj.      Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project;

171

kk.     Causing and allowing water to infiltrate CTS and its structural foundation as a result of dewatering activities undertaken at the Eighty-Seven Park project, despite knowing that said water infiltration would damage CTS and impact stability;

ll.     Failing to warn the Association and its members that dewatering activities at the Eighty-Seven Park site could and were impacting the structural stability of CTS;

mm.     Designing, excavating, and constructing the beach access walkway immediately adjacent to the CTS south foundation wall in a manner that caused water to infiltrate the CTS foundation wall and seep into the basement parking garage;

nn.     Allowing the excavation and construction of the beach access walkway immediately adjacent to the CTS south foundation wall to occur in a manner that caused water to infiltrate the CTS foundation and damage its structural foundation;

oo.     Designing and constructing the beach access walkway so it was pitched and angled toward the CTS south foundation wall;

pp.     Causing water runoff to infiltrate the CTS south foundation wall and damage the CTS foundation;

qq.     Damaging the CTS south foundation wall so that water runoff was able to infiltrate the CTS foundation;

rr.     Failing to abide by applicable Florida Building Code rules and regulations, including, but not limited to, those pertaining to excavation support and protective systems, pile driving, and dewatering activities, and other applicable rules and regulations;

ss.     Failing to abide by applicable OSHA rules and regulations, including, but not limited to, those pertaining to excavation support and protective systems, pile driving, and dewatering activities, and other applicable rules and regulations;

tt.     Violating the Code of Ethics for Architects;

uu.     Knowing or having had reason to know its conduct violated the Code of Ethics for

Architects; and

vv.     Prioritizing corporate profits over the safety of CTS residents and occupants.

534.     Stantec's conduct and failures, as described herein, demonstrated disregard for the

property of the Association and the property, safety and health of its members.

535.     Stantec's negligence contributed to one of the most devastating and deadly building

collapses in United States history, and the Association and its members suffered the damages set

forth herein.

536.     By conducting itself as set forth herein, Stantec's acts and/or omissions were a

substantial factor in, a factual cause of, and/or increased the risk of harm to the Association and its

members.

WHEREFORE, the Association demands judgment against Stantec for compensatory

damages (including attorneys' fees expended in defending third party claims), interest, costs, and

such relief as the Court deem just and proper.

### COUNT XIII
### STRICT LIABILITY
### (Against Stantec)

537.     The Association adopts and realleges paragraphs 1 to 296 as though fully set forth

herein.

538.     As discussed above, sheet pile driving was extensively performed on the Eighty-

Seven Park project, and it was under the supervision of Stantec.

539.     As the architect and a construction administrator on the Eighty-Seven Park project,

Stantec was intimately involved in the performance and progress of the pile driving activities on

the project and was extremely knowledgeable regarding the pile driving activities on site.

540.     The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging*, *supra*, 460 So. 2d at 512-13.

541.     Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*. Pile driving, including sheet pile driving, necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care. Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

542.     The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

543.     Pile driving on the Eighty-Seven Park project, carried out under the supervision of Stantec, was inappropriate given the project's proximity to CTS, a highly populated condominium building.

544.     Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized.

545.     The NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties

adjacent to the site, including CTS and its residents and occupants. The NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including CTS, if not properly monitored and controlled.

546.    The pile driving that the Eighty-Seven Park project performed damaged CTS and negatively impacted its structural stability.

547.    Damage to CTS's structural foundation that the ultrahazardous and abnormally dangerous pile driving activity on the Eighty-Seven Park project caused was foreseeable and within the scope of risk that pile driving presents.

548.    The ultrahazardous and abnormally dangerous pile driving activities carried out by Defendants on the Eighty-Seven Park project caused significant structural damage to CTS were a substantial factor in, a factual cause of, and/or resulted in an increased risk of harm to the Association and its members and the structural damage to CTS, which ultimately led to one of the deadliest and costliest building collapses in United States history.

549.    As a result of Defendants' ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to CTS's structure, Stantec is strictly liable for the injuries and damages suffered by the Association and its members as alleged herein.

WHEREFORE, the Association demands judgment against Stantec for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

62820710;1

**COUNT XIV**
**NEGLIGENCE**
**(Against Geosonics)**

550.    The Association adopts and realleges paragraphs 1 to 296 as though fully set forth herein.

551.    Geosonics was retained by NV5 to perform onsite vibration monitoring during construction activities at Eighty-Seven Park.

552.    Geosonics had a duty to ensure that the vibrations caused by construction activities at Eighty-Seven Park, especially those caused by vibratory sheet pile driving, remained at safe levels and did not exceed the threshold established for the project.

553.    Geosonics' field personnel, Gary Rider and Katie Daniel-Mayer, were obligated to vigilantly monitor vibrations and immediately stop the work anytime vibrations exceeded the allowable safe threshold of 0.5 in/sec.

554.    Although various vibration-producing construction activities occurred for years at the Eighty-Seven Park project, Geosonics only performed vibration monitoring for 7 total days during the period of March 3, 2016, through March 14, 2016, when vibratory sheet pile driving occurred along the northern property line of the project, directly abutting the CTS south foundation wall.

555.    During the seven days Geosonics monitored vibrations on the Eighty-Seven Park project, the vibrations exceeded the allowable safe threshold of 0.5 in/sec every single day, multiple times per day. Despite this, Geosonics allowed the unsafe sheet pile driving activities to continue.

556.    Geosonics knew, or should have known, that a failure to immediately stop the vibration-producing construction work the moment vibrations exceeded the threshold and allowing

176

the work to continue despite the excessive vibrations would cause structural damage to the immediately adjacent CTS and expose the Association and its members to a grave risk of harm.

557.    In addition to allowing the unsafe vibratory sheet pile driving to continue in the face of the safe threshold being exceeded, Geosonics failed to monitor vibrations for all of the sheet pile driving activities along the northern property line of the Eighty-Seven Park project.

558.    Geosonics packed up and left the Eighty-Seven Park project site at the end of the day on March 14, 2016, but vibratory sheet pile driving and pile grading work along the northern property line of the project continued for at least two additional days, until March 16, 2016.

559.    Geosonics failed to monitor any vibrations caused by the sheet pile driving and grading work performed on March 15 and 16, 2016.

560.    Geosonics did not monitor any vibrations during the vibratory sheet pile driving along the south, east, and west project property lines, or during the interior sheet pile driving.

561.    Geosonics did not monitor any vibrations during removal of the sheet piles which utilized the same vibratory hammer and similarly emitted dangerous and damaging vibrations.

562.    Geosonics did not monitor any vibrations during vibratory site compaction activities.

563.    Geosonics did not monitor any vibrations during the excavation of 87th Terrace immediately adjacent to the CTS south foundation wall, or any other excavation activities on the Eighty-Seven Park project.

564.    Geosonics did not monitor any vibrations during the jackhammering and destruction of the sidewalk running along and connecting to the CTS south foundation wall.

565.    Geosonics failed to advise or warn others on the Eighty-Seven Park project that all of the above vibration-producing foundation construction activities must be closely monitored to ensure damaging vibrations were not transmitted to the immediately adjacent CTS.

566.    Geosonics knew, or should have known, that a failure to monitor vibrations during the vast majority of vibration-producing foundation construction activities at the Eighty-Seven Park project would cause structural damage to the immediately adjacent CTS and expose CTS's residents to a grave risk of harm.

567.    Geosonics was hired to perform vibration monitoring on the Eighty-Seven Park project and ensure that vibrations caused by certain construction activities did not exceed a safe threshold and cause damage to the immediately adjacent CTS.

568.    Geosonics owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to ensure that the construction activities on the Eighty-Seven Park project did not produce dangerous and damaging vibrations that would negatively impact or harm adjacent structures or in any way compromise the stability of adjacent structures, primarily CTS.

569.    Geosonics owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to ensure that vibration-producing foundation construction activities did not produce vibrations that exceeded safe levels.

570.    Geosonics owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to diligently monitor vibration-producing foundation construction activities.

571.    Geosonics owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to immediately stop the work if the vibrations exceeded

safe levels and not allow the work to continue if vibrations could not be brought down to safe levels.

572.    Geosonics owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to ensure that all vibration-producing foundation construction activities on the Eighty-Seven Park project, including all vibratory sheet pile driving, excavation, jackhammering, and vibratory site compaction were closely monitored to ensure the vibrations did not exceed safe limits.

573.    Geosonics failed to perform these aforementioned duties when it allowed the vibratory sheet pile driving along the north property line of the Eighty-Seven Park project to continue unimpeded despite the vibrations overwhelmingly exceeding safe limits.

574.    Geosonics failed to perform these aforementioned duties when it failed to monitor all vibratory sheet pile driving and grading work along the north property line of the Eighty- Seven Park project.

575.    Geosonics failed these aforementioned duties when it completely neglected to monitor any vibrations produced by vibratory sheet pile driving along the south, west, and east property lines of the project, vibratory sheet pile driving in the interior section of the project, vibratory sheet pile removal, excavation, and jackhammering of 87th Terrace and the sidewalk adjoining the CTS south foundation wall, and vibratory site compaction.

576.    Geosonics should have, but did not, recommend and advise that all of the aforementioned vibration-producing foundation construction activities must be closely monitored.

577.    Geosonics, acting by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to the Association and its members by:

62820710;1

a.      Placing the residents and occupants of CTS at grave and immediate risk of harm to persons and property;

b.      Permitting construction site activities at the Eighty-Seven Park project to impact CTS by damaging its structural condition and stability and causing economic damages;

c.      Permitting activities on the Eighty-Seven Park construction site to produce dangerous and damaging vibrations, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

d.      Failing to monitor all vibration-producing foundation construction activities on the Eighty-Seven Park project to ensure vibrations did not exceed safe levels, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

e.      Failing to monitor all of the vibratory sheet pile driving and grading work along the north property line of the Eighty-Seven Park project, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

f.      Failing to diligently monitor the vibratory sheet pile driving and grading work along the north property line of the Eighty-Seven Park project, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

g.      Failing to immediately stop the work the moment vibrations produced by the sheet pile driving and grading work exceeded safe levels;

h.      Allowing the vibratory sheet pile driving and grading work to continue despite the vibrations overwhelmingly exceeding safe levels, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

i.       Failing to monitor vibrations during vibratory sheet pile driving along the south, west, and east property lines of the Eighty-Seven Park project, despite knowing that such vibrations would foreseeably cause damage to adjacent structures, including CTS;

j.       Failing to monitor vibrations during vibratory sheet pile driving in the interior of the Eighty-Seven Park property;

k.       Failing to monitor vibratory sheet pile removal;

l.       Failing to monitor vibrations during excavation activities on the Eighty-Seven Park project, including excavation of 87th Terrace immediately adjacent to the CTS south foundation wall;

m.       Failing to monitor vibrations during jackhammering and demolition of the 87th Terrace sidewalk immediately adjacent to and adjoining the CTS south foundation wall;

n.       Failing to monitor vibrations during vibratory site compaction activities;

o.       Failing to recommend, advise, and/or insist that vibration monitoring be performed for all vibration-producing foundation construction activities on the Eighty-Seven Park project;

p.       Continuing to allow the use of a vibratory hammer to drive sheet piles after learning that vibrations were exceeding safe and allowable limits;

q.       Failing to stop the vibratory sheet pile driving work after learning that vibrations were exceeding safe and allowable limits;

r.       Selectively monitoring vibration levels during sheet pile driving activities;

s.       Failing to appropriately and vigilantly monitor vibration levels for all pile driving activities performed on the Eighty-Seven Park project;

181

t.      Failing to take or insist on appropriate corrective action after learning that vibrations were exceeding safe and allowable limits;

u.      Failing to take or insist on appropriate corrective action after learning that vibrations were exceeding safe and allowable limits, despite knowing that said vibrations could and would foreseeably damage adjacent structures, primarily CTS, and despite knowing that allowing the emission of vibrations at dangerous levels would expose CTS residents and occupants to an unreasonable and unacceptable risk of severe injury and/or death;

v.      Failing to warn the Association and CTS residents and/or occupants that the Eighty-Seven Park project site was emitting vibrations in excess of safe;

w.      Ignoring the vibration monitoring results confirming that vibrations emitted during vibratory sheet pile driving work was exceeding safe and allowable limits.

578.     Geosonics' conduct and failures, as described herein, demonstrated a disregard for the property of the Association, and the property, safety, and health of its members.

579.     Geosonics' negligence contributed to one of the most devastating and deadly building collapses in United States history, and the Association and its members suffered the damages set forth herein.

580.     By conducting itself as set forth herein, Geosonics' acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to the Association and its members.

WHEREFORE, the Association demands judgment against Geosonics for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

**COUNT XV**
**STRICT LIABILITY**
**(Against Geosonics)**

581.    The Association adopts and realleges paragraphs 1 to 296 as though fully set forth herein.

582.    As discussed, sheet pile driving was extensively performed on the Eighty-Seven Park project, and it was done under the supervision of Geosonics.

583.    Geosonics was intimately involved in the performance and progress of the pile driving activities along the north property line of the Eighty-Seven Park project and was responsible for closely monitoring the vibration levels during portions of the pile driving work.

584.    The following factors are pertinent to determine whether an activity is abnormally dangerous: (a) whether the activity involves a high degree of risk of some harm to the person, land, or chattels of others; (b) whether the harm which may result is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate the place where it is carried on; and (f) the value of the activity to the community. *Great Lakes Dredging, supra*, 460 So. 2d at 512-13.

585.    Pile driving, including sheet pile driving, is an ultrahazardous and abnormally dangerous construction activity that meets all the factors set forth in *Great Lakes Dredging*. Pile driving, including sheet pile driving, necessarily involves an extreme risk of serious harm to persons and property that cannot be eliminated by the exercise of the utmost care. Pile driving also is not a matter of common usage, especially in a setting and location like the Eighty-Seven Park project site.

586.    The ultrahazardous and abnormally dangerous construction activity of pile driving poses a physical danger to persons and property in the area and adjacent to the pile driving that is of a significant magnitude and nature.

62820710;1

587.    Pile driving on the Eighty-Seven Park project, carried out under the supervision of Geosonics, was inappropriate given the project's proximity to CTS, a highly populated condominium building.

588.    Pile driving at the Eighty-Seven Park project was of no value to the community, given that available and suitable alternative methods of basement excavation support could have been utilized.

589.    The NV5 Report warned of the danger that the ultrahazardous and abnormally dangerous pile driving activities carried out on the Eighty-Seven Park project posed to properties adjacent to the site, including CTS, the Association and its members. The NV5 Report specifically cautioned that vibrations caused by the ultrahazardous and abnormally dangerous pile driving activities could damage adjacent structures, including CTS, if not properly monitored and controlled.

590.    The pile driving that the Eighty-Seven Park project performed damaged CTS and negatively impacted its structural stability.

591.    Damage to CTS's structural foundation that the ultrahazardous and abnormally dangerous pile driving activities on the Eighty-Seven Park project caused was foreseeable and within the scope of risk that pile driving presents.

592.    The ultrahazardous and abnormally dangerous pile driving activities carried out by Defendants on the Eighty-Seven Park project, and partially monitored and supervised by Geosonics, caused significant structural damage to CTS are substantial factors in, a factual cause of, and/or resulted in an increased risk of harm to the Association and its members and the structural damage to CTS, which ultimately led to one of the deadliest and costliest building collapses in United States history.

593.    As a result of Defendants' ultrahazardous and abnormally dangerous pile driving activities and the damage that the pile driving did to CTS's structure, Geosonics is strictly liable for the injuries and damages the Association and its members suffered, as alleged herein.

WHEREFORE, the Association demands judgment against Geosonics for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## COUNT XVI
## NEGLIGENCE
### (Against Florida Civil)

594.    The Association adopts and realleges paragraphs 1 to 296 as though fully set forth herein.

595.    Florida Civil was retained to develop the plans and procedures for dewatering the Eighty-Seven Park project site and to obtain the necessary dewatering permits for the project.

596.    The dewatering plan developed by Florida Civil was signed and sealed by Florida Civil's professional engineer, Matthew Milinski.

597.    A fundamental duty and obligation of Florida Civil and Mr. Milinksi, as professional engineers, is to hold paramount the safety, health, and welfare of the public, which includes the Association and its members.

598.    Upon information and belief, Florida Civil received a copy of the April 17, 2015, NV5 Report, which explicitly required that dewatering procedures "the adjacent properties must be monitored for adverse impacts from dewatering drawdown."

599.    Despite Florida Civil's duty and obligation to hold paramount the safety, health, and welfare of the public, including the Association and its members, and the explicit warnings provided by NV5 that adjacent properties must be monitored for adverse impacts caused by the dewatering activities at Eighty-Seven Park, the dewatering plan developed by Florida Civil did not

include any means of monitoring dewatering drawdown or its potentially catastrophic impact on the neighboring CTS building.

600.    When a substantial amount of water is extracted from the water table and pumped out of deep excavations, like those that occurred at the Eighty-Seven Park project, significant dewatering drawdown occurs and it is imperative that the water table is "recharged," which requires the removed water being pumped back into the system.

601.    Upon information and belief, the volume of water pumped out of the site was massive, with a total project pumpage of over 100 million gallons. Despite this, Florida Civil's dewatering plan included no means or procedure to recharge the water table. Florida Civil knew, or should have known, that failing to provide a means or procedure to monitor dewatering drawdown and potential impact of dewatering on adjacent properties, including CTS, would lead to structural damage caused to CTS and would foreseeably place the Association and its members in grave and immediate danger.

602.    Florida Civil knew, or should have known, that failing to provide a means or procedure to recharge the water table would lead to dangerous drawdown and cause structural damage to CTS and foreseeably place the Association and its members in grave and immediate danger.

603.    Despite Florida Civil's duty and obligation to hold paramount the safety, health, and welfare of the public, including the Association and its members, and the explicit warnings provided by NV5 that adjacent properties must be monitored for adverse impacts caused by the dewatering activities at Eighty-Seven Park, Florida Civil failed to perform the calculations required to determine the radius of influence of the Eighty-Seven Park dewatering activities, an

analysis critical to understanding the risk adjacent properties, including CTS, would be subjected to during dewatering.

604.    As a result of Florida Civil's failure to incorporate means and procedures for monitoring CTS for negative impacts caused by dewatering, recharging the water table, and determining the radius of influence of the Eighty-Seven Park dewatering activities into the dewatering plan, the dewatering that occurred at the Eighty-Seven Park project site resulted in a dangerous drawdown of the water table underlying CTS and compromised its structural stability, ultimately contributing to the catastrophic collapse.

605.    As professional engineers, Florida Civil had a fundamental and nondelegable duty to hold paramount the safety, health, and welfare of the public, which includes the Association and its members.

606.    Florida Civil owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to develop dewatering plans and procedures that considered and protected their health and safety.

607.    Florida Civil owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to develop dewatering plans and procedures that appropriately and adequately monitored the dewatering drawdown.

608.    Florida Civil owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to develop dewatering plans and procedures that appropriately and adequately monitored CTS for adverse impacts from dewatering drawdown.

609.    Florida Civil owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to develop dewatering plans and procedures that provided means and procedures to recharge the water table.

610.     Florida Civil owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to appropriately consider and calculate the radius of influence of the dewatering activities at Eighty-Seven Park.

611.     Florida Civil owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to advise or insist that CTS be monitored for adverse impacts caused by dewatering drawdown.

612.     Florida Civil owed a duty to persons present in and occupying adjacent structures, including the Association and its members, to develop dewatering plans and procedures that established appropriate and adequate means to determine the extent to which dewatering drawdown was occurring.

613.     The National Society of Professional Engineers Code of Ethics for Engineers establishes the fundamental canon and rule of practice that professional engineers must "Hold paramount the safety, health, and welfare of the public."

614.     Florida Civil failed to abide by the fundamental canon of the Code of Ethics for Engineers to hold the safety, health, and welfare of the public, and specifically of CTS residents and occupants (including members of the Association), of paramount importance by engaging in the acts and omissions discussed herein.

615.     Florida Civil, acting by and through its agents, servants, workmen, employees, ostensible agents, joint venturers, and/or alter egos, both generally and in the following particular respects, breached the duties owed to the Association and its members by:

a.      Placing the Association and its members at grave and immediate danger;

b.      Permitting dewatering activities at the Eighty-Seven Park project to impact CTS by damaging its structural condition and stability and causing economic damages;

c.      Developing inadequate dewatering plans and procedures for the Eighty-Seven Park project;

d.      Developing dewatering plans and procedures that did not include means to monitor CTS for adverse impacts caused by dewatering drawdown;

e.      Developing dewatering plans and procedures that did not include means to monitor CTS for adverse impacts caused by dewatering drawdown, despite knowing that dewatering drawdown must be monitored for adverse impacts to adjacent properties;

f.      Failing to incorporate means and procedures to monitor CTS for adverse impacts caused by dewatering drawdown into the dewatering plans;

g.      Developing dewatering plans and procedures that did not include means to measure, monitor, or observe the extent to which dewatering drawdown was occurring;

h.      Developing dewatering plans and procedures that did not include means to measure, monitor, or observe the extent to which dewatering drawdown was occurring, despite knowing that dewatering drawdown could cause adverse impacts to adjacent properties, including CTS;

i.      Failing to incorporate means and procedures to measure, monitor, or observe the extent to which dewatering drawdown was occurring into the dewatering plans;

j.      Developing dewatering plans and procedures that did not include means to recharge the water table;

k.      Developing dewatering plans and procedures that did not include means to recharge the water table, despite knowing that dewatering drawdown could adversely impact the structural stability and condition of CTS;

l.      Failing to incorporate means and procedures to recharge the water table into the dewatering plans;

m.      Failing to incorporate means and procedures to recharge the water table into the dewatering plan despite knowing that over 100 million gallons of water would be pumped out of the water table during dewatering activities at the Eighty-Seven Park project;

n.      Failing to consider, analyze, or calculate the radius of influence of the dewatering activities at Eighty-Seven Park;

o.      Failing to consider, analyze, or calculate the radius of influence of the dewatering activities at Eighty-Seven Park, despite knowing that CTS was at risk of being adversely impacted by dewatering activities and dewatering drawdown;

p.      Failing to advise or insist that CTS must be monitored for adverse impacts caused by dewatering drawdown, despite knowing CTS was at risk of same;

q.      Failing to develop proper and adequate dewatering plans and procedures;

r.      Failing to warn the Association and its Members that the Eighty-Seven Park project dewatering plans did not include means and procedures to monitor CTS for adverse impacts caused by dewatering drawdown.

s.      Failing to warn the Association and its members that the Eighty-Seven Park project dewatering plans did not include means and procedures to measure, monitor, or observe the extent of dewatering drawdown;

t.      Failing to warn the Association and its members that the Eighty-Seven Park project dewatering plans did not include means and procedures to recharge the water table;

u.      Violating the Code of Ethics for Engineers;

v.      Knowing or having reason to know its conduct violated the Code of Ethics for Engineers.

616.    Florida Civil's conduct and failures, as described herein, demonstrated a disregard for the property of the Association and the property, safety and health of its members.

617.    Florida Civil's negligence contributed to one of the most devastating and deadly building collapses in United States history, and the Association and its members suffered the damages set forth herein.

618.    By conducting itself as set forth herein, Florida Civil's acts and/or omissions were a substantial factor in, a factual cause of, and/or increased the risk of harm to the Association and its members.

WHEREFORE, the Association demands judgment against Florida Civil for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

### COUNT XVII
### NEGLIGENCE
### (Against the 8701 Association)

619.    The Association adopts and realleges paragraphs 1 to 296 as though fully set forth herein.

620.    The 8701 Association is the association which controls the Eighty-Seven Park building adjacent to where CTS stood.

621.    The 8701 Association was incorporated in November 2018.

622.    From the time of the 8701 Association's incorporation in November 2018 until May 2021, Michael Piazza served as its president. During this time, Michael Piazza was employed as Senior Vice President Design and Construction for the Terra Group and continued to be involved with the management of construction activities for Eighty-Seven Park.

62820710;1

623.    Mr. Piazza knew or had reason to know of aforementioned harmful construction activities involving sheet pile driving and soil compaction using vibratory machinery that had previously negatively impacted, compromised, and weakened CTS's foundational structure. Mr. Piazza also knew or had reason to know of complaints by residents of CTS about the harmful consequences of these construction activities on CTS's structure.

624.    In November 2019, the Terra Defendants, through 8701 Collins Development, LLC recorded a Declaration of Condominium for Eighty-Seven Park.

625.    The 8701 Association is bound by the rights and obligations contained in its governing documents, including its Articles of Incorporation, Declaration of Condominium, By-Laws, and any subsequent amendments.

626.    Paragraph 1.2 of the Declaration submitted the land located at the 8701 Collins Property, including 87th Terrace, all easements, and rights appurtenant thereto, including the beach access walkway, to condominium form of ownership.

627.    Paragraph 2.25 of the Declaration defines "Development Covenants" as the development agreement with the City of Miami Beach that provide for among other things "(a) the vacation of the public right-of-way known as 87th Terrace; (b) a ten foot (10') wide perpetual access easement for the purpose of providing public pedestrian access through and over a portion of former 87th Terrace for ingress to and egress from Collins Avenue public beach; ... (e) the obligation of the Association to maintain and insure the 87th Terrace easement area and the 87th Street pedestrian access area, and (f) the maintenance and repair of certain improvements, including without limitation, pavers, sidewalks, bicycle racks, landscaping and other improvements, within the County-owned rights of way adjacent, or in close proximity to the Condominium Property."

628.   The Development Covenant also set forth the design, construction, and installation details of the beach access walkway, including the "resurfacing, drainage, hardscaping, paving" and "landscaping and related irrigation" related to the walkway.

629.   Paragraph 11.1 of the Declaration states "[T]he Association shall be the entity responsible for operation of the Condominium and Association Property. The powers and duties of the Association shall include those set forth in the By-Laws and Articles of Incorporation.... The Association shall have all of the powers and duties set forth in the Act, as well as all powers and duties granted or imposed upon it by this Declaration, including without limitation: . . . (e) **The Association shall assume all Developer's and/or Developer's Affiliates' responsibilities (i) under the Development Covenants**. . . ." (Emphasis added.)

630.   Accordingly, the 8701 Association assumed all the responsibilities, including the ongoing liability, of the Terra Defendants, acting through 8701 Collins Development, LLC, under the Development Covenants for the design, construction, installation, and maintenance of the 87th Terrace easement improvements, including the beach access walkway.

631.   According to 8701 Association's governing documents, the 8701 Association likewise has and had a duty to control, manage, maintain, repair, reconstruct, and operate condominium property, and/or association property, including the 87th Terrace easement area, including the beach access walkway.

632.   The 8701 Association owed the Association and its members a duty, including a non-delegable duty under its governing documents, the Miami-Dade County Code of Ordinances, and the common law, to maintain Eighty-Seven Park's common elements, including the 87th Terrace easement area and beach access walkway, in a safe condition and to warn of unreasonable risks of harm.

633.   This duty included ensuring that conditions on its premises, including the beach access walkway on the 87th Terrace easement area, did not create a danger to the public or owners, residents, and inhabitants of CTS.

634.   After its incorporation, and especially throughout the time that Mr. Piazza was its president, the 8701 Association had a duty, including a non-delegable duty to ensure the design, construction, and installation of the beach access walkway was performed in a reasonably safe manner.

635.   This duty further includes the responsibility to the Association and its members to redress any harms caused by the design, construction, or installation methods used in developing the beach access walkway.

636.   The 8701 Association breached its duty by:

a.     Improperly maintaining and operating the 87th Terrace easement area, including the beach access walkway;

b.     Allowing excavation dangerously close to the south foundational wall of CTS;

c.     Failing to comply with applicable rules, code, regulations, and safety measures governing excavation abutting adjacent structures, including but not limited to, those pertaining to excavation support and protective systems;

d.     Failing to take proper and necessary precautions for excavations performed immediately adjacent to the CTS south foundation wall;

e.     Failing to prevent the excavation work from damaging the CTS foundation wall and/or failing to recognize that such damage had occurred;

f.      Constructing the beach access walkway on 87th Terrace so it was pitched and angled toward the CTS south foundation wall causing an unreasonable and burdensome increase in water runoff;

g.      Failing to prevent the construction work for the beach access walkway from damaging the CTS south foundation wall and/or failing to recognize that such damage had occurred;

h.      Allowing water runoff to infiltrate the CTS foundation wall and damage its structural foundation;

i.      Damaging the CTS south foundation wall so that water runoff was able to infiltrate the CTS foundation;

j.      Failing to maintain, repair, and remediate dangerous conditions, including, but not limited to, repairing the CTS structural instability and foundation wall, repairing the beach access walkway on 87th Terrace, and/or warning the Association and its members of dangers posed by the forgoing actions, inactions, and omissions; and

k.      Failing to redress any harms caused by the design, construction, or installation methods used in developing the beach access walkway.

637.    The 8701 Association knew, or should have known, that the foregoing actions, inactions, and omissions posed significant and foreseeable risks of unreasonable harm to the Association and its members.

638.    The 8701 Association's knowledge of the foreseeable risks of unreasonable harm to the Association and its members was further heightened by Mr. Piazza's actual knowledge of the damage which had been caused to CTS throughout the development of Eighty-Seven Park.

Indeed, while he was president of the 8701 Association, Mr. Piazza was given a copy of the Morabito 2020 inspection report showing CTS's structural damage.

639.    Despite knowledge of these foreseeable risks, the 8701 Association failed to take reasonable steps to avoid damage to the Association and its members and breached its duty of reasonable care in its control, construction, maintenance, and operation of Eighty-Seven Park's common elements and 87th Terrace easement area, contributing to the collapse of CTS.

640.    By conducting itself as set forth herein, the acts and omissions of the 8701 Association, were a substantial factor in, a factual cause of, and/or increased the risk of harm to the Association and its members, proximately causing the Association and its members to suffer the damages set forth herein.

WHEREFORE, the Association demands judgment against the 8701 Association for compensatory damages (including attorneys' fees expended in defending third party claims), interest, costs, and such relief as the Court deem just and proper.

## DEMAND FOR JURY TRIAL

The Association demands a trial by jury on all issues so triable as a matter of right.

Dated: March 29, 2022             Respectfully submitted,

                                  **AKERMAN LLP**
                                  201 East Las Olas Boulevard, Suite 1800
                                  Fort Lauderdale, Florida 33301-2229
                                  Telephone: (954) 463-2700
                                  Facsimile: (954) 463-2224
                                  By: /s/ *Andrew P. Gold*
                                      Andrew P. Gold, Esq.
                                      Florida Bar No. 612367
                                      Primary email: andrew.gold@akerman.com
                                      Secondary email: jill.parnes@akerman.com
                                      Christopher Carver, Esq.
                                      Florida Bar No. 993580
                                      Primary email: christopher.carver@akerman.com
                                      Secondary e-mail: cary.gonzalez@akerman.com

                                      *and*

                                      Brenda Radmacher, Esq.
                                      California Bar No. 185265
                                      *Admitted Pro Hac Vice*
                                      brenda.radmacher@akerman.com
                                      **AKERMAN LLP**
                                      601 West Fifth Street, Suite 300
                                      Los Angeles, California 90071

                                      *Attorneys for Receiver/Association*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of March, 2022, a true and correct copy of Defendant Champlain Towers South Condominium Association, Inc.'s Answer and Affirmative Defenses to Plaintiffs' Consolidated Third Amended Class Action Complaint and Crossclaims was filed electronically through the Florida Court's E-Filing Portal, which will provide electronic service of the filing to all counsel of record.

By: *Andrew P. Gold*
    Attorney

198

# Exhibit A



July 20, 2018

Champlain Towers South
8777 Collins Avenue
Surfside, FL  33154

Attention:     Ms. Maggie Manrara
               Treasurer

Re:     *Champlain Towers South Condominium*
        *40 Year Recertification and Cost Estimate – Phase 1 Services Proposal*
        *Revised Fee Proposal*
        *MC Job# 18217*

Dear Ms. Manrara:

Morabito Consultants, Inc. (MC) is pleased to submit this proposal for professional consulting structural engineering services for the recertification of the existing Champlain Towers South Condominium Complex (CTS) in Surfside, FL. The scope of this project includes a review of the existing 12 story plus penthouse 136-unit residential building, below-grade parking garage and at-grade exterior pool and recreation area.

MC met with Ms. Mara Chouela and Ms. Alexandria Santamaria on 5/3/2018 to review our original proposal dated 11/30/2018. It was decided after an extended discussion that it is important to the Board of Directors of the Champlain Towers South Condominium to have a preliminary estimate of the probable construction cost to address the structural and electrical maintenance items that exist at this condominium complex. As such, MC is revising our firm's initial proposal to provide this information in the Phase I report outlined below. MC also had an extended conversation w/Ms. Maggie Manrara, and has incorporated her requests into this revised proposal.

***Phase I – Preparation of Recertification Report and Preliminary Cost Estimate:***
The scope of this initial phase is to prepare the recertification report required by Miami-Dade County and to provide to CTS a preliminary estimate of the probable construction cost to address the structural and electrical maintenance items that exist at this condominium complex. To complete these professional services, MC and Thomas E. Henz, PE, Inc. (TEH – mechanical, electrical, and plumbing engineers) will visit the site and complete a visual examination of the building structures sufficiently to certify that the buildings and surrounding recreation deck is safe for continued occupancy as a residential condominium. Structural testing and manual procedures are not deemed to be necessary to complete this certification and as such these services are not included in this proposal.

In order to provide this certification, MC & TEH will review the available architectural, structural, and mechanical, electrical, and plumbing drawings and complete a visual review of the parking garage, common areas, recreational deck, roof and numerous condominium units to prepare the structural and electrical engineering recertification "Form Checklist" as required by the "Minimum Inspection Procedural Guidelines for Buildings" as prepared by Miami-Dade

Structural Engineers | Parking Consultants
131 Isle Verde Way | Palm Beach Gardens, FL 33418-1710
561-316-7660 | www.morabitoconsultants.com

July 20, 2018
Champlain Towers South
**Re: Champlain Towers South Condominium**
   *40 Year Recertification and Cost Estimate – Phase 1 Services Proposal*
   *Revised Fee Proposal*
   *Mc Job# 18217*
Page 2

---

County Department of Regulatory and Economic Resources.

➢ MC Scope of Structural Engineering Services:
  - MC will visit the site and complete a visual review which will include the structural elements, ~50% (68 units) of the unit balconies, windows, doors, caulking, paint, walls, parking garage, pool deck, planters and roof of the building.
  - MC will note the identified/observed deficient areas on prints of AutoCAD base plans that MC will prepare prior to commencement of the Phase 1 field investigation.
  - MC will perform invasive inspection of damaged concrete/masonry building elements as required to develop approximate quantities and costs to repair the identified damage.
  - A structural engineering recertification report will be prepared by MC for issuing to Miami-Dade County that will note the following:
    o Location of the structure.
    o Describe the type of construction.
    o General magnitude of the structure.
    o The existence of drawings.
    o The history of the structure to the extent reasonably known.
    o A description of the type and manner of the inspection completed.
    o Note (if required) problem areas and recommended repairs required to maintain structural integrity.
    o Include a statement to the effect that the building or structure is structurally safe, safe with qualifications, or unsafe.
  - A preliminary estimate of the probable construction cost to address the structural maintenance items that exist at this condominium complex will be prepared. This estimate will include a detail breakdowns of repair items, estimated quantities, and unit prices based on MC experience with similar Miami condominium projects. A contingency will be included to address unknown items that are not discovered during this initial project phase.

➢ TEH Scope of Electrical Engineering Services:
  - TEH will visit the site to field verify all existing conditions.
  - TEH will check all items listed in the Miami-Dade County inspection guidelines for building electrical recertification. Includes electrical service, meter and electrical rooms, electrical gutters, panels, branch circuits, grounding, service conduits, service conductors, wiring methods, feeders, emergency lighting, building egress illumination, fire alarm system, smoke detectors, exit lights, emergency generator, wiring in parking, parking illumination, swimming pool wiring, and wiring to mechanical equipment.
  - TEH will check outdoor lighting levels will be measured after dark for compliance with local ordinances.
  - TEH scope will include inspecting ~10 % (13) residential units for the electrical wiring inside the condominium units.
  - The electrical 40 yr. inspection will include common area electrical and fire alarm systems.
  - TEH will provide all necessary coordination with all state and local agencies having jurisdiction over the project.
  - All work completed by TEH will comply with all current codes of agencies having jurisdiction.
  - It shall be the responsibility of TEH to make corrections and/or revisions that may be required Miami-Dade County.
  - To prepare a preliminary estimate of the probable construction cost to address the electrical maintenance items, TEH will complete an in-depth inspection of the existing condominium complex,

MCI_00039503

July 20, 2018
Champlain Towers South
*Re: Champlain Towers South Condominium*
   *40 Year Recertification and Cost Estimate – Phase 1 Services Proposal*
   *Revised Fee Proposal*
   *Mc Job# 18217*
Page 3

develop solutions to each problem noted and
then put a price tag on each item. This process will include:
- o   Estimate quantities,
- o   Size equipment and panels
- o   Layout system to determine wire and conduit lengths.
- o   Get prices from equipment suppliers
- o   Do night photometric measurements
- o   Design new lighting.
- o   Price out all components.
- o   Estimate manhours for each item.
- o   Estimate permit costs.

MC & TEH lump sum fee for Phase 1 services shall be as follows:

|  | 40 Yr Recertification | Preliminary Cost Estimate | Firm Total |
|---|---|---|---|
| MC | $8,000 | $25,500 | $33,500 |
| TEH | $9,500 | $18,000 | $27,500 |
| Subtotal | $17,500 | $43,500 | $61,000 |
|  |  | **Total Phase I Lump Sum Fee** | **$61,000** |

### Phase II: Preparation of Repair Documents

Once the Board of Directors of CTS has approved and elects to proceed with the recommendations in the Phase I report, it will be necessary for an experienced structural engineer to prepare repair documents which will describe, in detail, the repair and maintenance work that needs to be completed to this building structure.  These documents will include concrete, stucco, waterproofing, and plaza repair details and project specifications which will establish the quality of the work necessary to complete a lasting repair.  The specifications will include warrantee periods for the various work items that require specialty contractors experienced in concrete restoration work. These specifications will also outline a basis of contract under which the work will be completed, including unit prices for work items which do not have established quantities of repair.  These contract documents & specifications will be sealed by MC, submitted for permit and used to obtain competitive pricing from qualified restoration contractors.

MC will prepare a lump sum fee for Phase II services after the Phase I report is completed and the condition of the existing CTS Complex is known. The Phase II scope of services will not be completed until the CTS Board of Directors has authorized MC to proceed with same.

### Phase III: Bid/Permit Phase Services

Once CTS has approved the Phase 2 Bid Documents, MC will submit the approved plans for permit and solicits competitive bids from qualified concrete restoration contractors. The Bid/Permit Phase Services will include (but not limited to) the following items.
1. Soliciting bids from qualified contractors.
2. Submission of contract documents to obtain a building permit.
3. Preparation of responses to questions/issues raised by permit department.
4. Assistance during the contract bid phase to clarify any questions that may arise.
5. Attendance at the pre-bid meeting on site.
6. Preparation/issuing of any addendum/clarifications.
7. Receiving of bids, the review of the bid proposals, and preparation of bid comparison spreadsheet.
8. Attendance at a post-bid meeting to discuss job with the low bidder (s).
9. Recommendations to finalize the scope of work with the selected contractor on which a construction contract will be written / awarded.
10. Attendance at pre-construction meeting.

MCI_00039504

July 20, 2018
Champlain Towers South
*Re:  Champlain Towers South Condominium*
    *40 Year Recertification and Cost Estimate – Phase 1 Services Proposal*
    *Revised Fee Proposal*
    *Mc Job# 18217*
Page 4

---

11. Attendance at a meeting with the CTS Board of Directors to review the bid process and to approve the award of this restoration project to the successful bidder.

MC & TEH lump sum fee for the Phase III scope of services shall be negotiated after the Phase II services has been completed.

## *Phase IV: Construction Phase Services*
The Construction Phase Services will include (but not limited to) the following items.
1. Attendance at progress meetings on site.
2. Review of shop drawings and product submittals.
3. Periodic site visits to review the actual work in progress and address any questions and to assure conformance with the project specifications and details. These site visits will include inspection (and measuring) of all repair areas after demolition is complete.
4. MC will prepare monthly reports that will include photographs that will be distributed to the Building Official, Client and Contractor.
5. MC will attend bi-weekly job progress meetings with the Client and Contractor to update the Client on the progress of work, schedule, budget, and other critical issues related to the work.
6. Review of RFIs and proposed change orders.
7. Monitor the contractor's schedule and project costs for adherence to executed contract.
8. Attendance in ARC, BOD, and other owner meetings as deemed necessary.
9. Review of as-built drawings prepared by the contractor.
10. MC will review the contractor's monthly requisitions to assure that the invoiced work has been completed per the contract documents and specifications prior to authorizing payments.
11. Provide final project certification.

MC lump sum fee for the Phase IV scope of services shall be negotiated after the Phase III services has been completed.

MC is available to work with the CTS to complete this project at a schedule that meets the needs of CTS Board of Directors. Based on our office's present understanding of the project scope, MC suggests the following schedule for the Phase I services:

1. MC Professional Services shall commence when the Contract between the Owner's and MC has been signed/executed and payment of *$12,200* (20.0% of Phase 1 fee) has been received.
2. MC will mobilize the project within 2 weeks after the CTS on-site management personnel makes arrangements for MC to gain access into all of the desired condominium units.
3. In order to complete the Phase I scope of services for the lump sum fee price quoted in this proposal, MC must complete all of the field investigation as efficiently as possible during daytime hours on Monday thru Friday. As such, it is mandatory that the CTS provide onsite personal with keys to allow the inspection of the condominium units, building roof, and common areas to be completed efficiently within the pre-arranged inspection day.
4. After the completion of the field survey work, MC & TEH will prepare the Recertification Report for submission to Miami-Dade County, which will be submitted within 3-weeks of completion of the field investigation. Payment of *$24,400* shall be due within 30 days of the submission of the Recertification Report to CTS.
5. After the completion of the Recertification Report, MC & TEH will prepare the preliminary estimate of the probable construction cost to address the structural and electrical maintenance items that exist at this condominium complex. This report will be completed within 4-weeks of completion of the Recertification Report. Payment of *$24,400* shall be due within 30 days of the submission of the preliminary cost estimate.

The Owner acknowledges the inherent risks associated with construction.  In performing professional services, the standard of care applicable to the A/E's services will be the degree of skill and diligence normally employed by

July 20, 2018
Champlain Towers South
*Re: Champlain Towers South Condominium*
    *40 Year Recertification and Cost Estimate – Phase 1 Services Proposal*
    *Revised Fee Proposal*
    *Mc Job# 18217*
Page 5

professional engineers or consultants performing the same or similar services.

As a matter of routine and in order to avoid any possible misunderstanding, it is important to note that the 40-Year Recertification site review and follow-up report completed and prepared by MC will not provide a guarantee for any portion of the existing building structures. To the best of MC knowledge and ability, the reports that will be prepared for this project will represent an accurate appraisal of the present conditions of the buildings based upon the careful evaluation of observed conditions, to the extent reasonable possible.

It is also agreed that this contract along with the attached Morabito Consultants, Inc.'s Terms and Conditions of Agreement for professional services dated July 20, 2018 in its entirety will become the basis of our consulting services once MC receives this proposal signed by the Champlain Towers South along with the required initial payment.

Thank you for the opportunity of submitting this proposal; and we trust it meets with your approval.  If you have any questions concerning its content, please do not hesitate in contacting our office.  We look forward to working with you on this project.

Very truly yours,

MORABITO CONSULTANTS, INC.

Frank Morabito, PE SECB
President

Enclosure
*fpm/18217/MC-CTS40YrRecertPh1Proposal_180720.pdf*

Proposal as stated is accepted.  Authorization to proceed is granted.

NAME: _MARGARITA    BRITO_
                    (Printed or Typed)

SIGNATURE: _____    TITLE: _PRESIDENT_

COMPANY: _CHAMPLAINTOWERS_ DATE: _7-24-2018_
                    _SOUTH_

MCI_00039506



**TERMS AND CONDITIONS OF AGREEMENT**
**For Professional Services**
*Project:  Champlain Towers South*
   *40 Year Recertification and Cost*
   *Estimate – Phase 1 Services Proposal*
   *MC Job# 18217*
Page 1

**Scope of Project and Services**
See attached letter.

**Fixed Fee Projects**
Billings are based upon the percentage of completion of each phase of services.

**Hourly Rate Schedule**
Compensation for hourly services:

| | |
|---|---|
| Principal I | $250.00/hr |
| Principal II | $215.00/hr |
| Sr. Project Manager | $185.00/hr |
| Project Manager | $155.00/hr |
| Professional Engineer | $130.00/hr |
| Field Engineer | $115.00/hr |
| Design Engineer | $110.00/hr |
| Clerk/Typist | $ 75.00/hr |

Any consultants required and authorized by the Architect/Owner will be billed at cost plus ten percent.

**Estimated Fees**
Fee estimates are valid for 60 days. Where an estimated total is given for hourly work, it shall not constitute an upset figure but is provided to assist in project budgeting only.

**Initial Payment**
Services commence when the Owner's authorization is received along with payment of **$12,200.**

**Invoices**
Invoices are sent per the payment schedule spelled out in the based proposal. All subsequent invoices will be sent monthly for services performed during the previous month.  Payment is due upon receipt.  A late charge will be added 30 days after the invoice date at 1.0% per month.

**Reimbursable Expenses**
Reimbursable expenses shall be in addition to all lump sum and hourly fees. Travel expenses that are more than 100 miles one-way from the project site that

are specifically requested and approved by *Champlain Towers South* will be billed monthly at cost plus ten percent.

**Additional Services**
Services beyond those outlined in the attached Scope of Work, for revisions due to adjustments in the scope, budget or quality of the project, will be billed at hourly rates above.

**Change of Scope**
All fees are subject to renegotiation if the original scope of service is changed or if services are not completed within 18 months.

**Design without Construction Review**
It is agreed that if the professional services of the A/E do not extend to or include any part of the review of shop drawings and the review or site observation of the Contractor's work or performance, the Owner will defend, indemnify and hold harmless the A/E from any claim or suit whatsoever.  Such claims shall include, but are not limited to payments, expenses or costs involved, arising from or alleged to have arisen from the Contractor's performance or the failure of the Contractor's work to conform to the design intent and the contract documents.  The A/E agrees to be responsible for his own or his employees' negligent acts, errors or omissions, as limited below.

**Ownership of Documents**
All documents (drawings, sketches, reports, etc.) prepared as instruments of service shall remain the copyrighted property of the A/E.  Work, which is furnished, but not paid for, will be returned to the A/E and will not be used for any purpose until payment is rendered.

**Insurance**
Morabito Consultants, Inc. shall maintain the following insurance for the duration of this Agreement: General Liability $1,000,000; Automobile Liability $1,000,000; Workers Compensation $500,000; Professional Liability $1,000,000.  The A/E will not be responsible for any loss, damage or liability arising from Contractor's negligent acts, errors or omissions or those by Contractor's consultants, contractors, and agents or from those of any person whose conduct is not within the A/E's contractual responsibility.

**Risk Allocation**

To the fullest extent permitted by law, the Owner and its agents, employees and consultants (hereinafter referred to as Owner) agrees that the total liability of Morabito Consultants, Inc.'s to the Owner and to all other consultants, construction contractors and subcontractors with regard to this project, for any loss or damage, including but not limited to special and consequential damages arising from the design professional's negligent acts, errors or omissions, under any and all theories of liability shall be limited to the Morabito Consultants, Inc. lump sum fee for this project.  The Owner agrees to require of the other consultants and contractors an indemnification of the design professional by the other consultants, contractors, and his subcontractors due to the other consultants', contractors' and/or subcontractors' defective work or any other breach of contract.

**Termination of Agreement**
This Agreement may be terminated by either party upon seven days' written notice should the other party fail substantially to perform in accordance with its terms through no fault of the party initiating the termination.  This Agreement may be terminated by the Owner upon at least seven days' written notice to the A/E in the event that the Project is permanently abandoned.  In the event of termination not the fault of the A/E, the A/E shall be compensated for all services performed to termination date, together with Reimbursable Expenses then due.

**Nonpayment/Work Stoppage**
Morabito Consultants reserves the right to stop work on the project upon 10 days' written notice to Owner for non-payment. Morabito Consultants stoppage of work shall be without liability for consequential or other damages resulting from the stoppage.

**Collection**
If it is necessary to enforce collection on any amount past due under this agreement, Morabito Consultants shall be reimbursed for all legal and other reasonable costs related thereto, including attorney's fees, court costs, administrative time and other collection costs.

TERMS AND CONDITIONS OF
AGREEMENT
For Professional Services
*Project:  Champlain Towers South*
*40 Year Recertification and Cost*
*Estimate – Phase 1 Services Proposal*
*MC Job# 18217*
Page 2

## Standard of Care
The Owner acknowledges the inherent
risks associated with construction.  In
performing professional services, the
standard of care applicable to the A/E's
services will be the degree of skill and
diligence normally employed by
professional engineers or consultants
performing the same or similar services.

## Indemnification
The A/E shall indemnify and hold the
Owner and the Owner's officers and
employees harmless from and against
damages, losses and judgments arising
from claims by third parties, including
reasonable attorneys' fees and expenses
recoverable under applicable law, but only
to the extent they are caused *solely* by the
negligent acts or omissions of the A/E, its
employees and its consultants in the
performance of professional services
under this Agreement

The Owner will, where permitted by law,
defend, indemnify and hold harmless
Morabito Consultants, Inc. from any claim
or suit whatsoever, including but not
limited to all payments, expenses or costs
involved, arising from all alleged to have
arisen from:
(a) Contractor's performance or the
failure of the contractor's work to
conform to the design intent and the
contract documents.
(b) Third party claims related to
Contractor's performance and/or the
design professional's negligent acts,
errors or omissions.
(c) Claims related to existing conditions
that were designed and constructed
by others or otherwise created by use,
operation, and maintenance, or lack
thereof.
(d) Claims which are the result
assumptions made regarding hidden
conditions when these assumptions
could not be verified without
expending additional money, or
destroying otherwise adequate or
serviceable portions of the structure.
(e) Claims from any other party, which
are a result of Morabito Consultants,
Inc. exercising its right to suspend

services if payment of any invoice is
past due.

## Successors & Assigns
The A/E and the Owner bind themselves,
their partners, successors, assigns and
legal representatives to the other party to
this Agreement and to the partners,
successors, assigns and legal
representatives of such other party with
respect to all covenants of this
Agreement. Neither party shall assign,
sublet or transfer any interest in this
Agreement without the written consent of
the other.

## Affidavits/Certifications
Any affidavits or certifications required by
local municipalities, lenders, or others
shall be written to include language
acceptable to the A/E Liability Insurance
Carrier-Architects & Engineers Insurance
Co.  The Owner shall not require
certification that would require
knowledge beyond the scope of this
agreement.

## Miscellaneous Provisions
Unless otherwise specified, this
Agreement shall be governed by Florida
Law.  Terms in this Agreement shall have
the same meaning as those in AIA
Document A201, General Conditions of
the Contract for Construction, current as
of the date of this Agreement.  Causes of
action between the parties to this
Agreement pertaining to acts or failures to
act shall be deemed to have accrued and
the applicable statues of limitations shall
commence to run no later than either the
date of Substantial Completion for acts or
failures to act occurring prior to
Substantial Completion, the Date of
Termination of Agreement, or the date of
issuance of the final Certificate for
Payment for acts or failures to act
occurring after Substantial completion.  In
no event shall such statutes of limitations
commence to run any later than the date
when the A/E services are substantially
completed.

## Publicity
All publicity developed for this project will
credit Morabito Consultants, Inc. as the
Structural Engineer / Parking Consultant.

## Certificate of Merit
The Owner shall make no claim for
professional negligence, either directly or
in a third-party claim, against the A/E
unless the Owner has first provided the
A/E with a written certification executed
by an independent design professional
currently practicing in the disciple of the

alleged defective design and licensed in
the jurisdiction of the Project.  This
certification shall: (a) contain the name
and license number of the certifier; (b)
specify each and every act or omission
that the certifier contends is a violation of
the standard of care expected of a design
professional performing the allegedly
defection professional services under
similar circumstances; and (c) state in
complete detail the basis for the certifier's
opinion that each such act or omission
constitutes such a violation.

## Waiver of Subrogation
To the extent damages are covered by
property insurance, the A/E and the
Owner waive all rights against each other
and against the consultants, agents and
employees of the other for damages,
except such rights as they may have to the
proceeds of such insurance.  The nature of
the conduct that causes the damages shall
not violate this waiver.  A waiver of
subrogation shall be effective as to a
person or entity even though that person
or entity would otherwise have a duty of
indemnification, contractual or otherwise,
did not pay the insurance premium
directly or indirectly, and whether or not
the person or entity had an insurable
interest in the property damaged.

## No Third-Party Beneficiary
Nothing contained in this Agreement shall
create a contractual relationship with or a
cause of action in favor of a third party
against either the A/E or the Owner.  The
Owner shall include a copy of this
provision in its other contracts relating to
the Project.

## Frivolous Suit
In the event the Owner makes a claim or
brings an action against the A/E for any
act arising out of the performance of the
services hereunder, and the Owner fails to
prove such a claim or action, then the
Owner shall pay all legal and other costs
incurred by the A/E in defense of such
claim or action.

July 20, 2018 - Morabito Consultants, Inc.

# Exhibit B



**BUILDING DEPARTMENT**

**MINIMUM INSPECTION PROCEDURAL GUIDELINES FOR BUILDING'S STRUCTURAL RECERTIFICATION**

**PERMIT NUMBER:**

_____

**INSPECTION COMMENCED:**

DATE 08/01/2018_____

**INSPECTION COMPLETED:**

DATE 09/06/2018_____

**INSPECTION MADE BY:**

_____
SIGNATURE
**Frank P. Morabito, PE SI**
_____
PRINT NAME

**President**_____
TITLE
206 Via Condado Way
Palm Beach Gardens, FL 33418
_____
ADDRESS

## 1.  DESCRIPTION OF STRUCTURE

**a. Name on Title:** Champlain Towers South Condominium

**b. Street Address:** 8777 Collins Avenue, Surfside, FL 33154 (Only Bldg on Site)

**c. Legal Description:** Champlain Towers South Condominium

**d. Owner's Name:** Champlain Towers South Condominium Association, Inc.

**e. Owner's Mailing Address:** 8777 Collins Avenue, Surfside, FL 33154

**f. Folio Number of Property on which Building is Located:** 14-2235-025-0001

**g. Building Code Occupancy Classification:** R-2

**h. Present Use:** Residential

**i. General Description:** 12-story plus Penthouse concrete framed condominium towers with 136 residential units.

**Addition Comments:** MC inspected a total of 68 units which is approximately 50% of the total number of units plus commons areas, pool deck, and parking garage structure.

**j. Additions to original structure:** N/A

| 2. PRESENT CONDITION OF STRUCTURE |
|---|
| **a. General alignment (Note:  good, fair, poor, explain if significant)** |
|     1.   Bulging: Good – no bulging observed. |
|     2.   Settlement: Good – no building settlement observed. |
|     3.   Deflections: Good – deflections observed were minor in nature and within accepted industry standards |
|     4.   Expansion: Good – Existing slabs appear to be adequate to accommodate building and plaza thermal and moisture/volume effects |
|     5.   Contraction: Good – Existing slabs appear to be adequate to accommodate building and plaza thermal and moisture/volume effects |
| **b. Portion showing distress (Note, beams, columns, structural walls, floor, roofs,  other)** |
| Concrete columns: ~2% of exterior columns have experienced concrete spalling |
| Exterior walls: ~1% of exterior masonry walls have experienced masonry cracking spalling |
| Balcony floor slabs: ~5% of the balcony structural floor slabs showed hairline cracking at underside of the slab. The balcony edges have experienced concrete spalling in ~25% of their length. |
| Roof: approximately 2% of perimeter masonry parapet walls have experienced concrete spalling |
| Garage/Plaza slab: ~8% of the soffit of these slabs have experienced concrete deterioration |
| Structural steel beams/connections: isolated rusting identified at existing mechanical unit support steel |
| **c. Surface conditions – describe general conditions of finishes, noting cracking, spalling, peeling, signs of moisture penetration and stains.** |
| Concrete columns: ~2% of exterior columns have experienced concrete spalling measuring 3 sf or less in each location. |
| Exterior walls: ~5% of exterior masonry walls have experienced stucco spalling (mostly aligning with the floor elevation) and 2% of the stucco wall has experienced some minor stucco cracking. |
| Balconies: 90% of the balconies are covered with tile. Only 2% of the balconies have cracked tile and/or cracked mortar joints between the tile units. |
| Garage/Plaza slab: ~8% of the soffit of these slabs have experienced concrete deterioration with the majority of areas being adjacent to or under the pool and planters. There is also some isolated slab cracks in the soffit of these slabs. |
| Residential units: ~3% of the units exhibit drywall cracking at partitions, bulkheads, or ceilings and/or cracking in crown molding which are purely cosmetic in nature and are not a structural concern. |
| **d. Cracks – note location in significant members. Identify crack size as HAIRLINE if barely discernible; FINE if less than 1 mm in width; MEDIUM if between 1 and 2 mm width; WIDE if over 2 mm.** |
| Slabs: the majority of cracking found in the underside of the balcony and plaza/pool concrete slabs was classified as hairline cracks with several instances of fine and medium cracks. Appendix A shows examples of each case. |
| Columns: The majority of cracking found in the exterior concrete columns was classified as fine or medium cracks with one instance of a wide crack. Appendix A shows examples of each case. |
| Exterior walls: The majority of stucco wall cracking can be classified as fine. |

| |
|---|
| **e. General extent of deterioration – cracking or spalling of concrete or masonry, oxidation of metals; rot or borer attack in wood.** |
| The extent of deterioration / distress is described in item 2.b. |
| The plaza and planter waterproofing membranes are beyond their useful life and need to be removed and replaced with new waterproofing, protection board, drainage board. The planters also need root mat installed. |
| The pool and jacuzzi are leaking and need to have the plaster removed, all discovered concrete spalling/cracking repaired, and a new plaster finish installed. |
| **f. Previous patching or repairs** |
| It appears that the concrete framed slab that supports the plaza/pool above the garage slab-on-grade parking has undergone some previous concrete patching and epoxy injection of cracks. This work has performed less than satisfactorily and needs to be completed again |
| **g. Nature of present loading indicate residential, commercial, other estimate magnitude:** Residential |

| |
|---|
| **3. INSPECTIONS** |
| **a.   Date of notice of required inspection:** No notice has been received as of this writing. |
| **b.   Date(s) of actual inspection:** 08/01/2018 – 09/06/2018 |
| **c.   Name and qualifications of individual submitting report:** Frank Morabito, PE SI; Steven J. Troxel. |
| **d.   Description of laboratory or other formal testing, if required, rather than manual or visual procedures:** N/A |
| **e.   Structural repair-note appropriate line:** |
| **1.   None required** |
| **2.   Required (describe and indicate acceptance):** ☐   Items to be repaired and standard of acceptance listed below: |
| Balconies: Repair of cracked/spalled exterior concrete columns, soffits, edge slab, loose top rails/pickets. |
| Exterior Walls: Repair of cracked/spalled masonry stucco wall at floor line and other isolated areas. |
| Garage/Plaza slab: Repair of cracked/spalled concrete slabs, columns, and walls. |
| Structural Steel: Exposed structural steel at rooftop cooling towers to be recoated with a galvanizing finish. |
| Waterproofing: Remove/replace all plaza and planter waterproofing. |

| |
|---|
| **4. SUPPORTING DATA** |
| a.                Cover Sheet                    sheet written data |
| b.                Appendix A                    photographs |
| c.                     N/A                     drawings or sketches |

| 5. MASONRY BEARING WALL = Indicate good, fair, poor on appropriate lines: |
|---|
| **a. Concrete masonry units:** Good |
| **b. Clay tile or terra cota units:** N/A |
| **c. Reinforced concrete tie columns:** Good |
| **d. Reinforced concrete tie beams:** Good |
| **e. Lintel:** Good |
| **f. Other type bond beams:** N/A |
| **g. Masonry finishes - exterior:** Satisfactory |
| **1.   Stucco:** Satisfactory |
| **2.   Veneer:** N/A |
| **3.   Paint only:** Satisfactory |
| **4.   Other (describe):** N/A |
| **h. Masonry finishes - interior** |
| **1.   Vapor barrier:** N/A |
| **2.   Furring and plaster:** N/A |
| **3.   Paneling:** N/A |
| **4.   Paint only:** Satisfactory |
| **5.   Other (describe):** Stucco Finish - Satisfactory |
|  |
| **i. Cracks** |
| **1.   Location – note beams, columns, other:** Isolated cracking in stucco wall finish |
| **2.   Description:** Portions of stucco finish on the exterior masonry wall and slab edges are showing spalling/cracking at the floor elevation that is leading to isolated moisture penetration at the interior faces of the wall. It is recommended that the spalled/cracked stucco be repaired; all spalled masonry shall be patched with repair mortars; all cracks be routed out and repointed with type N mortar; and all affected areas painted. |
| **j. Spalling** |
| **1.   Location – note beams, columns, other:** Very isolated. |
| **2.   Description:** Difficult to determine location of spalled masonry due to stucco finish. |
|  |
| **k. Rebar corrosion-check appropriate line** |
| **1.   None visible**  ☐ |
| **2.   Minor-patching will suffice** |
| **3.   Significant-but patching will suffice** |

| |
|---|
| **4.  Significant-structural repairs required** |
| **l. Samples chipped out for examination in spall areas** |
| **1.  No** ☐ |
| **2.  Yes – describe color, texture, aggregate, general quality** |
| |

## 6. FLOOR AND ROOF SYSTEM

**a. Roof**

**1.  Describe (flat, slope, type roofing, type roof deck, condition)**

Flat, concrete roof with waterproof membrane top coating. Membrane appears to be in good condition with no immediate repairs noted or required.

**2. Note water tanks, cooling towers, air conditioning equipment, signs, other heavy equipment and condition of support:**

For information on the condition of the structural steel supporting rooftop mechanical equipment– see Section 7b.

**3.  Note types of drains and scuppers and condition:**

Flat roof drains showing moderate corrosion but generally in good condition. No scuppers were noted on the structure.

**b. Floor system(s)**

**1.  Describe (type of system framing, material, spans, condition)**

The building is a concrete framed structure with flat-plate floor slabs, concrete columns spaced at ~22' o/c and 2 concrete shearwalls located at stair towers and elevator/stair cores. The typical floors are 8" thick and the lobby floor is 9.5" thick.

**c. Inspection – note exposed areas available for inspection, and where it was found necessary to open ceilings, etc. for inspection of typical framing members.**

Underside of structural floor slabs are visible from floor below. Condition of roof membrane was surveyed from above.

## 7. STEEL FRAMING SYSTEM

**a. Description**

Steel framing only noted at the rooftop mechanical equipment units for equipment support.

**b. Exposed Steel- describe condition of paint and degree of corrosion**

Majority of exposed structural steel members and connections are in satisfactory condition with some members experiencing corrosion. It is recommended that the entirety of the steel be recoated with a galvanizing finish.

**c. Concrete or other fireproofing – note any cracking or spalling and note where any covering was removed for inspection:** N/A

**d. Elevator sheave beams and connections, and machine floor beams – note condition:** N/A

---

## 8. CONCRETE FRAMING SYSTEM

**a. Full description of structural system**

Reinforced concrete flat-plate floor slabs supported by reinforced concrete columns on a driven pile foundation.

**b. Cracking**

　　1.　**Not significant**

　　2.　**Location and description of members affected and type cracking:** ☐ Please see section 2.b, 2.c, 2.d, 2.e, 2.f

**c. General condition:** Overall, concrete framing is in good condition, with the aforementioned items requiring attention.

**d. Rebar corrosion – check appropriate line**

　　1.　**None visible**

　　2.　**Location and description of members affected and type cracking:**

Signs of rebar corrosion was noted in the underside of the 9.5" thick plaza/lobby concrete flat in the area under the pool and planters.

　　3.　**Significant but patching will suffice** ☐

　　4.　**Significant – structural repairs required (describe)**

**e. Samples chipped out in spall areas:**

　　1.　**No** ☐

　　2.　**Yes, describe color, texture, aggregate, general quality**

**f. Additional Comments:** N/A

| 9. WINDOWS |
| --- |
| **a. Type (Wood, steel, aluminum, jalousie, single hung, double hung, casement,  awning, pivoted, fixed, other)** |
| Aluminum-framed windows and aluminum-framed sliding doors for balcony access. |
| **b. Anchorage- type and condition of fasteners and latches:** Approximately 2% of sliding door latches were difficult to operate, but were secure once in position. |
| **c. Sealant – type of condition of perimeter sealant and at mullions:** Sealant at perimeter or windows and doors are beyond their useful life and need to be replaced. |
| **d. Interiors seals – type and condition at operable vents:** Good – Few locations showing water damage, possibly from condensation. |
| **e. General condition:** Windows and sliding doors are in good condition. |
| **f.  Additional Comments:** |

| 10.  WOOD FRAMING |
| --- |
| **a. Type – fully describe if mill construction, light construction, major spans, trusses:** N/A |
| **b. Note metal fitting i.e., angles, plates, bolts, split pintles, other, and note condition:** N/A |
| **c. Joints – note if well fitted and still closed:** N/A |
| **d. Drainage – note accumulations of moisture:** N/A |
| **e. Ventilation – note any concealed spaces not ventilated:** N/A |
| **f. Note any concealed spaces opened for inspection:** N/A |
| |

js:lm:jg:rtc:10/13/2015:40yearrecertificationsystem

BORA Approved – Revised September 17, 2015/RER-10/13/2015

# **APPENDIX A**

 

**Figure 1:** Cracking at balcony floor slab at sliding door threshold

 

**Figure 2:** Hairline cracking at underside of floor slabs in garage



**Figure 3:** Column damage at ground floor





**Figure 4:** Delaminated concrete garage entrance

 

**Figure 5**: Delaminated stucco



**Figure 6**: Water intrusion at rail posts





**Figure 7:** Balcony soffit deterioration



**Figure 8:** Rusted steel beam on roof 1





**Figure 9:** Repaired roof area

# Exhibit C



October 8, 2018

Champlain Towers South
8777 Collins Avenue
Surfside, FL  33154

Attention:      Ms. Maggie Manrara
                Treasurer

*Re:      Champlain Towers South Condominium*
         *Structural Field Survey Report*
         *MC Job# 18217*

Dear Ms. Manrara:

Morabito Consultants, Inc. (MC) is pleased to submit this structural engineering report of the Field Survey completed at the existing Champlain Towers South Condominium Complex (CTS) in Surfside, FL. The scope of this project includes a review of the existing 12 story plus penthouse 136-unit residential building, below-grade parking garage and at-grade exterior entrance drive, pool and recreation area. MC reviewed a representative sample of ~68 condominium units (half of the total units found in the building) along with the roof, exterior façade (observed from the balconies surveyed), parking garage, pool deck, and general common areas.  The goal of our study was to understand and document the extent of structural issues that require repair and/or remediation in the immediate and near future.  As a part of this report, MC has prepared an estimate (that is attached to this report) of the probable construction cost to construct the required structural repairs & maintenance that MC recommends being completed.  These documents will enable the Condominium Board to adequately assess the overall condition of the building, notify tenants on how they may be affected, and provide a safe and functional infrastructure for the future.

To assist our office in the review of this project, MC has reviewed the following documents:
- Architectural contract drawings A1-A30 prepared by William M. Friedman & Associates Architects, Inc. last revised 11/27/1979.
- Structural contract drawings S1-S14 prepared by Breiterman Jurado & Associates, Consulting Engineers dated 08/22/1979.
- Various HVAC, Plumbing, Electrical, Plumbing and Landscape drawings.

The following conditions that require future repairs and maintenance were observed.

October 8, 2018

Re:   *Champlain Towers South Condominium*
      *Structural Field Survey Report*
      *MC Job# 18217*

Page 2

---

A.   MC understands some unit owners have complained of flooding into the interior space of their
     unit during a hurricane event. MC has concluded that this infiltration is occurring through the
     balcony sliding glass doors & windows due to the lack of proper flashing at the sill of these
     doors & windows and deteriorated exterior perimeter sealant between the window/door
     frames and masonry/concrete walls. MC recommends that the exterior sealant be removed /
     replaced at the sliding glass door & window perimeter to assist in providing a water-tight
     condition. Unfortunately, the new sliding doors in unit 209 and above were not installed
     properly and were fabricated too tall to allow the base flashing to be properly installed, so
     these unit owners have no choice but to discard the newly purchased doors and have them
     completely refabricated.

 

Figure A1: Exterior sealant past its serviceable lifespan at sealant between the window/door
frames and masonry/concrete walls & balcony floors



Figure A2: Newly installed sliding door at unit 209 that was not properly flashed

October 8, 2018
Re:     *Champlain Towers South Condominium*
        *Structural Field Survey Report*
        *MC Job# 18217*
Page 3

B.  MC observed that the majority of the balconies were furnished with tile or some other floor
    covering by choice of the tenant, making it impossible to observe the condition of the topside
    of the balcony slabs. Several instances were noted where balcony tile was damaged, such as in
    Unit 1008. Based on MC experience, cracked tile usually means structural damage exists to the
    balcony slab that must be repaired per the requirements of the International Concrete Repair
    Institute (ICRI) prior to the installation of a pedestrian waterproofing membrane.



Figure B: Damaged balcony tile that must be removed to fix structural damage

C.  MC found it fairly typical that the concrete slab edges of the balconies are experiencing
    concrete spalling or cracking. MC sees this as a common source of water infiltration and a main
    cause of the commonly found, sub-surface deterioration at the exterior soffits under the
    railings. MC requires that the balcony slab edges be further investigated and repaired in
    accordance with the recommendations of the ICRI to prevent future water penetration.



Figure C: Concrete spall at balcony slab edge in units 1008 & 211

October 8, 2018
Re:     ***Champlain Towers South Condominium***
         ***Structural Field Survey Report***
         ***MC Job# 18217***
Page 4

D.  Approximately half of the balcony soffits reviewed by MC show evidence of deterioration under the painted finished surface. These areas were identified by sounding the concrete with a golf club, checking for solidarity. In some cases, the paint finish had formed a bubble or pocket that was retaining water, while in other areas the painted soffit was peeled away leaving the concrete surface exposed. The extensive soffit damage is a systemic issue that can only be repaired by removing all of the balcony tile, repairing the damaged concrete surfaces at the top and bottom of the slab and protecting the slab by installing a pedestrian waterproofing membrane on all top-side balcony surfaces. Partial/full depth concrete repairs in these areas shall be performed in accordance with the recommendations of ICRI. It is important to note that installing tile on top of the concrete balcony surfaces results in the railing having inadequate height to meet the minimum guardrail height of 42" required by the Florida Building Code.



Figure D: Balcony Soffit paint spalling in units 208, 703, & 1301.

E.  Several areas of the entrance drive soffits under the second floor were observed by MC to have deteriorated black plywood. This condition was also observed at several light fixtures in the entrance soffit. MC could not get access into the soffit areas to observe the extent of the deteriorated soffits and support framing as CTS maintenance was too busy to assist us. MC is concerned that mold exists above these soffit areas and the soffit support framing is deteriorated which will require the complete removal and replacement of the entrance suspended soffit. Further investigation into this area is warranted.



Figure E: Deteriorated plywood soffit above entrance drive.

October 8, 2018
Re:    *Champlain Towers South Condominium*
       *Structural Field Survey Report*
       *MC Job# 18217*
Page 5

F.   It was brought to MC's attention that several units are experiencing water infiltration through the window frames and glazing as the windows are near the end of their functional lifespan. It is recommended that the window frame glazing (metal to glass), and perimeter sealant (metal to metal or metal to masonry/concrete) be removed and replaced for the entirety of the building to reduce future water penetration and minimize damage during hurricane events. MC recommends that the BOD strongly consider the replacement of all exterior windows and doors with impact resistant units.

  

Figure F: Exterior sealant at window frame that has aged past its serviceable lifespan

G.   Significant cracking in the stucco exterior façade often occurs at the mortar bed joint between the top of the concrete floor slab and first block masonry course. Although MC does not see this crack as a source of water infiltration into the condominium units, such cracks need to be routed and repointed to prevent future water permeation. All significant façade stucco cracking is to be repaired in accordance with the recommendations of ICRI.

 

Figure G: Typical cracking in the stucco exterior facade.

October 8, 2018
Re:     *Champlain Towers South Condominium*
        *Structural Field Survey Report*
        *MC Job# 18217*
Page 6

H.  MC observed the non-existence of window washing / suspension hooks that should have been installed face-mounted to the underside of the top-level balconies and spread throughout the roof of this building structure. This failure to have suspension hooks is a violation of the present-day **Occupational Safety and Health Administration (OSHA) Rules and Regulations 29 CFR Part 1910 "Walking-Working Surfaces and Personal Protective Equipment (Fall Protection systems)"** requirements and **ANSI/IWCA I-14.1-2001 "Window Cleaning Safety Standard"**. MC recommends that new hooks be installed and waterproofed on the roof structural slab and underside of the top-level balcony slabs that meet the requirements of **OSHA 29 CFR Part 1926.502 "Fall Protection Systems Criteria and Practices"** and **ANSI/IWCA 1-14.1** prior to the commencement of façade and balcony restoration. Furthermore, MC recommends that our office meet with the contractor who is to perform the façade restoration work and the present window washing contractor so that the new fall protection system anchor quantity and location can be agreed upon to assure adequate anchor coverage for all future contractors who will be suspended on the exterior of the Champlain Towers South Condominium.

 

Figure H: No suspension hooks at the underside of the balconies and on the roof.

I.  MC understands that the BOD plans to pressure wash and paint the entire building façade to improve the building's aesthetics. MC recommends this work be performed following the conclusion of the aforementioned structural façade repairs.

MC was able to briefly survey the roof of the building at the 13th/14th level. The roof levels appear to be in satisfactory condition, and MC was told by maintenance personal that no present roof leaks are known to exist. The only damage noted was minor cracking at the parapet walls and some minor spalling at the stair tower walls. All identified cracking shall be routed and sealed with a urethane sealant, and all spalls repaired per the recommendations of ICRI. In addition, all mechanical equipment support steel shall be cleaned and coated with a zinc-rich galvanizing paint.

The Pool Deck and Entrance Drive areas were reviewed to observe the condition of the concrete knee walls, planters, pavers, decorative stamped concrete and railings. Minor cracking in the knee walls was found around the pool deck, which shall be routed and sealed with a urethane sealant. The handrails and rail post connections at the pool deck knee walls did not appear to be damaged and are not in need of repair at this time. Many of the existing pavers on the pool deck are cracked and showing moderate wear and tear from years of being exposed to the elements. The pavers do not appear to pose any hazard to the building occupants and are currently not in need of replacement. The joint sealant was

observed to be beyond its useful life and are in need of complete replacement. However, the waterproofing below the Pool Deck & Entrance Drive as well as all of the planter waterproofing is beyond it useful life and therefore must all be completely removed and replaced. The failed waterproofing is causing major structural damage to the concrete structural slab below these areas. Failure to replace the waterproofing in the near future will cause the extent of the concrete deterioration to expand exponentially. MC approach to the repair of this structure is different from what is specified in contract documents in numerous aspects, which are briefly described below.

   a.   The main issue within this building structure is that the entrance drive/pool deck / planter waterproofing is laid on a flat structure. Since the reinforced concrete slab is not sloped to drain, the water sits on the waterproofing until it evaporates. This is a major error in the development of the original contract documents prepared by William M. Friedman & Associates Architects, Inc. and Breiterman Jurado & Associates, Consulting Engineers.

   b.   It is also important to note that the replacement of the existing deck waterproofing will be extremely expensive as removal of the concrete topping slab to gain access to the waterproofing membrane will take time, be disruptive and create a major disturbance to the occupants of this condominium building. Please note that the installation of deck waterproofing on a flat structure is a systemic issue for this building structure.

MC correct repair approach includes removing all pavers, decorative concrete paving, setting beds, concrete topping slab and waterproofing down to the reinforced concrete structure; repairing the concrete structure as deemed necessary; pouring a sloped bonded concrete overlay that will be sloped to drain; installing a new waterproofing membrane, protection board and drainage panels on the new sloped surface; and placing new pavers/decorative concrete slabs over a sand setting bed. New stainless-steel dual-level drains will be installed at all existing drain locations that will collect rain water at the surface of the pavers and at the waterproofing level. This system will assure that all water that penetrates to the waterproofing layer will be able to flow freely to the deck drains, resulting in an extended life for the replacement waterproofing membrane. This system also provides extra protection for the existing reinforced concrete structure and allows future membrane repair/replacement to be completed more economically. The repairs to all planters will be completed in a similar manner.

The condition of the Parking Garage levels was reviewed specifically noting any cracked or spalled concrete members, condition of the concrete slabs and joint sealant conditions. MC was able to identify the presence of previous epoxy injections and patch repairs which were evaluated for their long-term effectiveness.  MC's review of the Parking Garage revealed signs of distress/fatigue as described below:

   J.   Abundant cracking and spalling of varying degrees was observed in the concrete columns, beams, and walls. Several sizeable spalls were noted in both the topside of the entrance drive ramp and underside of the pool/entrance drive/planter slabs, which included instances with exposed, deteriorating rebar. Though some of this damage is minor, most of the concrete deterioration needs to be repaired in a timely fashion. All cracking and spalling located in the parking garage shall be repaired in accordance with the recommendations of ICRI.

October 8, 2018

**Re:**    *Champlain Towers South Condominium*
           *Structural Field Survey Report*
           *MC Job# 18217*

Page 8

 

Figure J1: Typical cracking and spalling at parking garage columns

 

Figure J2: Spalling with exposed steel reinforcement at topside of garage deck.

K.   MC visual observations revealed that many of the previous garage concrete repairs are failing resulting in additional concrete cracking, spalling and leaching of calcium carbonate deposits. At the underside of Entrance/Pool deck where the slab had been epoxy-injected, new cracks were radiating from the originally repaired cracks. The installed epoxy is not continuous as observed from the bottom of the slab, which is evidence of poor workmanship performed by the previous contractor.  The injection ports were not removed, and the surfaces were not ground smooth at the completion of the injection. Leaching of calcium carbonate deposits in numerous areas has surely caused CTS to pay to repaint numerous cars. This leaching will continue to increase until proper repairs are completed. MC is convinced that the previously installed epoxy injection repairs were ineffective in properly repairing the existing cracked and spalled concrete

October 8, 2018
*Re:*   ***Champlain Towers South Condominium***
        ***Structural Field Survey Report***
        ***MC Job# 18217***
Page 9

slabs. MC recommends that the Entrance/Pool deck concrete slabs that are showing distress be removed and replaced in their entirely. Unfortunately, all of these failed slab areas are under brick pavers, decorative stamped concrete and planters which require completed waterproofing replacement. All repaired concrete slabs located in the parking garage are to be repaired in accordance with the recommendations of ICRI.

 

Figure K1: Previously installed failed injection repairs with leaching forming

 

Figure K2: More previously installed failed injection repairs with leaching forming

MC trusts this initial report will assist the Champlain Towers South Condominium in understanding the required maintenance that is needed to properly maintain this existing residential property. MC is available to further discuss the recommended repair work and how it coincides with the owner's desires and constraints.  We look forward to working with you in maintaining the structural integrity of the Champlain Towers South Condominium.

Very truly yours,

MORABITO CONSULTANTS, INC.

Frank Morabito, PE, SECB
President
*FPM/18217/Documents/MC/MC-CTS-SurveyReport_181008.pdf*

# Exhibit D

## ENGINEERING SERVICES AGREEMENT

**CHAMPLAIN TOWERS SOUTH CONDOMINIUM ASSOCIATION INC.** ("Association") enters into this Agreement dated this 10th day of June, 2020 ("Effective Date") with **MORABITO CONSULTANTS INC.** ("Engineer") relating to professional engineering services for the structural engineering along with architectural design and landscape-hardscape design services and other related engineering services for the 40 year certification of the buildings and improvements at the Champlain Towers South Condominium ("Project"). "Construction Contract" refers to the future Contract to be entered into between the Association and Contractor ("Contractor") to perform the specified remediation and other associated work at the Project. "Days" as referenced in this Agreement means "consecutive calendar days" unless otherwise specified. All references to "Contractor" means the general contractor(s) selected by the Association to render the labor and furnish the materials for the work to be performed at the Project in accordance with the plans and specifications prepared by Engineer. The Exhibits contemplated by this Agreement consist of the following:

| Exhibit "1" | Phase Description and Milestone Schedule |
|-------------|------------------------------------------|
| Exhibit "2" | Scope of Services |
| Exhibit "3" | Key Personnel |
| Exhibit "4" | Fee Breakdown and Compensation |
| Exhibit "5" | Certificate of Insurance |

**NOW THEREFORE**, in exchange for the mutual covenants and promises and agreements set forth in this Agreement, the parties hereto agree as follows:

1.   **Compliance with Codes, Standards and Time for Completion**:   All services rendered by Engineer and its consultants pursuant to this Agreement ("Services") will be performed in accordance with the standard of care for professional engineers involved in performing the Services described in the Proposal in Miami-Dade County, Florida. The Engineer will perform its Services in compliance with the requirements of the applicable edition of the Florida Building Code, and other local jurisdictional codes, laws, regulations, and ordinances. Nothing in this Agreement shall be deemed to permit the Engineer to perform its Services in accordance with a lower standard of care or require such performance in accordance with a higher standard of care or shall be deemed to constitute a warranty. The Services for each Phase will be completed in accordance with the "Phase Description and Milestone Schedule" labeled and attached to this Agreement as Exhibit "1".

2.   **Services**: Upon full execution of this Agreement by the Association and Engineer, the Engineer will perform only those Services outlined in this Agreement as well as in the "Scope of Services" labeled and attached to this Agreement as Exhibit "2".  All additional Services will only be authorized by written authorization to this Agreement signed by the Association and Engineer. Once the Engineer has been paid for the Services associated with the preparation of

" = "1" "" "" 13656347v.1



Instruments of Services in accordance with this Agreement the Engineer and its consultants and sub-consultants grant to the Association a non-exclusive license to use and copy all Instruments of Service prepared by Engineer for the purpose of performing repairs, alterations or improvements to this Project only.

At the time of completion, or upon an earlier termination of this Agreement, Engineer shall promptly on demand turn over to Association the originals of all such documents. Engineer may retain one (1) set of reproducible copies thereof for information and reference purposes only. Engineer agrees to complete the Services and provide all deliverables to the Association for the Phases of Services outlined in Exhibit "2", time being of the essence. The Phase of Services as outlined in Exhibit "2" will only commence upon receiving written authorization to proceed with a Phase of Services, time being of the essence. At all times, Engineer will allocate enough professional staff and other resources as required to perform the Services in accordance with the specified time periods as described in the Agreement, time being of the essence. Engineer's failure to timely complete its Services in accordance with the dates specified in the Agreement, except for reasonable cause, shall be a material breach of this Agreement. All Services will be performed expeditiously to avoid and/or minimize delay to achieving the objectives of the Association.

3.      **Engineers:** Engineer's consultants and sub-consultants shall be properly licensed to perform all Services relative to this Agreement. The Engineer shall be responsible to the Association for the acts and omissions of its employees, consultants, sub-consultants, and their respective employees performing any of the Services under this Agreement. The Engineer and its consultant(s) shall perform without expense to the Association, such professional Services as may be required to correct or remedy any negligent act, error or omission of the Engineer or its Engineers. The Engineer and its consultants and sub-consultants grant to the Association a non-exclusive license to use and copy all Instruments of Service prepared by Engineer for the purpose of performing repairs, alterations, or improvements to this Project only. A list of "Key Personnel" to be utilized by Engineer on the Project is labeled and attached to this Agreement as Exhibit "3". Key Personnel cannot be changed absent the express written approval of the Association.

4.      **Payments to Engineer:** The Engineer shall be paid for the Services as outlined in the document entitled "Fee Breakdown and Compensation labeled and attached to this Agreement as Exhibit "4". As to each payment, the Engineer shall provide Association with appropriate lien releases and other satisfactory documentation from Engineer and its Engineers to ensure against the filing of liens against the Project by the Engineer or its consultants. The Engineer agrees to defend, indemnify, and hold the Association harmless, including reasonable attorney's fees for any claims made by any sub-consultant with respect to Services performed on behalf of Engineer pursuant to this Agreement. For Phase IV Services, Engineer will submit billing invoices to the Association at thirty (30) day intervals setting forth the number of hours worked, along with  a description of the Services performed and will provide any additional documentation that the Association may reasonably request.



" = "1" "" "" 13656347v.1

5. **Indemnification**: To the fullest extent permitted by law, Engineer shall indemnify, and hold harmless the Association, its directors, officers, members, and their respective employees (hereafter collectively referred to as "Related Parties"), from and against all liability, claims, damages, losses and expenses, including, but not limited to, attorneys' fees, expert witness fees and other engineering fees, but only if such claims, damages, loss or expense result from the failure of the Engineer and/or its Engineers to exercise due care in the performance of its Services relating to this Project. The parties hereto specifically acknowledge and agree the foregoing indemnity shall be construed in accordance with Section 725.06, Florida Statutes in force as of the date of this Agreement. This Agreement does not require the Engineer to provide indemnification for the negligence of the Association. However, should Section 725.06, Florida Statutes, be held applicable to this provision then and only then will the indemnification obligation of the Engineer will have a monetary limitation of One Million Dollars ($1,000,000.00). The foregoing amount bears a reasonable commercial relationship to the risks undertaken by each party in accordance with this Agreement and is incorporated by reference into the Agreement. This Indemnification obligation of Engineer to the Association shall survive termination or expiration of this Agreement.

6. **Insurance**: The Engineer shall carry Professional Liability Insurance for errors or omissions in a minimum amount of $1,000,000.00 declining limits as well as Commercial General Liability and Worker's Compensation Insurance (these insurance requirements shall, unless otherwise stated, hereinafter be collectively referred to as "Insurance"). These policies shall remain in effect to provide coverage to the Association during performance of the Engineer's Services for the Project. The Engineer will not begin any Services at the Project until it has obtained all insurance required. The Certificate of Insurance for the Engineer is labeled and attached to this Agreement as Exhibit "5". The Association shall be named as an additional insured by a separate written endorsement to the policy with respect to its Commercial General Liability Insurance to be delivered to the Association prior to commencement of the Services (not applicable to Professional Liability Insurance). Copies of the pertinent insurance policies maintained by Engineer shall be made available for inspection and copying by the Association. This insurance shall be primary and other insurance of Association shall not be contributory. Engineer shall not cause any insurance policies to be cancelled or permit them to lapse during the period of performance of this Contract. All policies must provide that Association shall receive not less than thirty (30) days' notice of any cancellation. Certificates of Insurance shall be authenticated by the proper office of the insurer. Engineer shall be responsible for verifying that all consultants and sub-consultants maintain Worker's Compensation Insurance. All consultants to the Engineer will be required to maintain the levels of insurance specified for the Engineer and name the Association as an additional insured.

7. **Records**: The Engineer shall keep such full and detailed accounts as may be necessary for proper financial management under this Agreement and to document the Services rendered to the Association. The Association shall be afforded access to all Engineer's records related to this Project, including, but not limited to billing invoice records, documents supporting reimbursable expenses claimed by the Engineer, and other supporting documentation regarding

" = "1" "" "" 13656347v.1



Services rendered to Association, as well as all books, correspondence, instructions, drawings, reports, receipts, vouchers, memoranda and similar data relating to this Agreement, as kept by Engineer in the normal course of business, and the Engineer shall preserve all such records for a period of five (5) years after the final payment.

8. **Termination/Termination for Convenience**: This Agreement may be terminated by either party, for materially failing to perform its respective obligations as outlined in this Agreement upon not less than seven (7) days written notice. The Engineer shall be paid for Services rendered and accepted by Association up to the date of termination and shall be paid for all reasonable expenses resulting from such termination and for any unpaid reimbursable expenses subject to any set-off for damages incurred or to be incurred by the Association due to the acts and conduct of the Engineer. The Association retains the exclusive right to terminate this Agreement for convenience. The Association and Engineer acknowledge and agree that a termination for convenience under this paragraph will only require the Association to pay Engineer for Services performed and approved by the Association and no other compensation. The Association will provide Engineer with ten (10) days written notice before the termination for convenience becomes effective. Once notice of a termination for convenience is delivered to Engineer, the Engineer will initiate all steps not to incur any further fees, costs, and expenses absent the express written consent of the Association. In the event of termination for cause or convenience Engineer and its Engineers and sub-consultants grant to the Association a non-exclusive license to use and copy all Instruments of Service prepared by Engineer for the purpose of performing repairs, alterations or improvements to this Project only.

9. **No Waiver of Rights**: Neither the Association's review, approval or payment for any of the Services required under this Agreement shall be construed to operate as a waiver of any rights under this Agreement or of any cause of action arising out of the performance of this Agreement, and the Engineer shall be and remain liable to the Association in accordance with the applicable law for all damages to the Association caused by the Engineer's negligent performance of any of the Services furnished under the Agreement. The rights and remedies of the Association provided for under this Agreement are in addition to other rights and remedies provided by law

10. **Jurisdiction and Venue**: The venue for any litigation from the Agreement shall be in a Court of competent jurisdiction in Miami-Dade County, Florida.

11. **Alternative Dispute Resolution**: If any dispute arises in connection with the performance of any obligation under this Agreement, the parties agree to consult with each other and consider the use of mediation or other form of alternative dispute resolution prior to resolving to litigation. Pending resolution of any dispute, the Engineer shall continue to perform its obligations under the Agreement and be compensated for any amounts not in dispute to minimize interruptions in construction of the Project. Mediation will be conducted in Miami-Dade County using the services of a mediator certified by the Florida Supreme Court.



12.    **No Assignment**:  This Agreement is personal to Association and cannot be assigned by the Engineer without written approval of Association which consent shall not be unreasonably withheld.

13.    **Gender**:  Wherever the context shall so require, all words herein in the masculine gender shall be deemed to include the feminine or neuter gender, all singular words shall include the plural, and all plural words shall include the singular.

14.    **Time is of the Essence:**  Time is of the essence of this Agreement. Where necessary to effectuate the intent of the parties, the terms of this Agreement shall survive completion of the Project.  This Agreement shall be construed under the laws of the State of Florida regardless of where executed by either party.

15.    **Written Agreement**:  This Agreement is binding upon the parties hereto, their successors and assigns and replaces any and all prior agreements or understanding between the parties hereto (whether written or oral) and cannot be modified except in a written document signed by Association and Engineer.  This Agreement is the joint product of the parties and shall not be more strictly construed against any party to this Agreement.

16.    **Waiver of Chapter 558, Florida Statutes:   The Association and Engineer waive any requirement of Chapter 558, Florida Statutes relative to any matter arising from this Agreement.**

17.    **Severability**: If any provision of this Contract is held to be or becomes invalid, illegal or unenforceable or has been breached by any party to this Contract, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired.

18.    **Construction Phase Services**. The Engineer's field personnel will observe the progress that has been made and the quality of the various aspects of the Contractor's executed work.  Based on information obtained during these observations, the Engineer's field personnel will endeavor for the benefit of the Owner to determine in general if the work is proceeding in accordance with the contract documents.  The Engineer's field personnel efforts will be directed towards providing for the Owner a greater degree of confidence that the completed work will conform to the Contract Documents and requirements of this Agreement.  The Engineer's field personnel will keep the Owner informed of the progress of the work and will endeavor to guard the Owner against defective work.  The Engineer's field personnel will not supervise, direct, control, or have authority over or be responsible for the Contractor's means, methods, techniques, sequences, or procedures of construction, or the safety precautions and programs incident thereto, or for any failure of the Contractor to comply with the laws and regulations applicable to the furnishing or performance of the work. Engineer is obligated to reports any concerns to the Association in writing.



The Engineer shall advise and consult with the Association during the Construction Phase Services. The Engineer shall have authority to act on behalf of the Association only to the extent provided in this Agreement. The Engineer shall not have control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the work, nor shall the Engineer be responsible for the Contractors' failure to perform the Work in accordance with the requirements of the Contract Documents. The Engineer shall be responsible for  its negligent acts or omissions, but shall not have control over or charge of, and shall not be responsible for, acts or omissions of the Contractor or of any other persons or entities performing portions of the Work. Engineer is obligated to reports any concerns to the Association in writing.

19.    **Estimates:** Any cost estimates made or reviewed by Engineer shall be on the basis of Engineer's experience and professional judgment as design professionals.  The Engineer shall work with the Association in the constructability and value engineering reviews and in identifying proper design solutions that will result in alignment with the Project budget.

20.    **Hazardous Materials:** Unless otherwise required by this Agreement, the Engineer shall have no responsibility for the discovery, presence, handling, removal or disposal of, or exposure of persons to, hazardous materials or toxic substances (including lead or asbestos) in any form at the Project site except that Engineer shall exercise reasonable due care when handling hazardous or toxic substances at the Project.  Subject to the requirement to exercise reasonable due care, to the fullest extent permitted by law, the Association shall waive all claims, damages, losses, and expenses including reasonable attorney's fees to the extent caused by any existing hazardous waste conditions on site at the time of the Engineer's performance of Services and for which the Engineer, its employees, and agents, are, in no part, responsible.

21.    **Flood Resiliency:**  Engineer's scope of services does not include flood mitigation or protection against sea level rise.  The parties acknowledge that the Project is located within a flood hazard area, as designated by the Federal Emergency Management Agency, and it is agreed that the Association shall retain responsibility for any flood mitigation measures.

22.    **Notices**: Notices to the parties as provided herein shall be by certified mail, return receipt requested, to the following addresses:

| As to Association: | Champlain Towers South Condominium Association Inc.<br>Attn: Board of Directors<br>8777 Collins Avenue<br>Surfside, Florida 33154 |
|---|---|
| Additional Notice to: | Steven B. Lesser, Esq.<br>Becker & Poliakoff PA<br>1 East Broward Boulevard, Suite 1800<br>Fort Lauderdale, FL 33301 |



" = "1" "" "" 13656347v.1

| As to Engineer: | Morabito Consultants Inc.<br>206 Via Condado Way<br>Palm Beach Gardens, FL 33418-1701 |

IN WITNESS WHEREOF, the parties have executed this Agreement on the Effective Date.

| CHAMPLAIN TOWERS SOUTH CONDOMINIUM ASSOCIATION INC. ("ASSOCIATION") | MORABITO CONSULTANTS INC. ("ENGINEER") |
|---|---|
| By: _____<br>Jean Wodnicki as President, Champlain Tower South Condominium Association, Inc. | By: _____<br><br>Frank P. Morabito, PE SI, President<br>Printed Name and Title |
| _____<br>Witness Signature<br><br>SCOTT F. STEWART<br>Printed Name Witness | _____<br>Witness Signature<br><br>Maria M. Boller<br>Printed Name Witness |



" = "1" "" "" 13656347v.1

**EXHIBIT "1"**
**PHASE DESCRIPTION AND MILESTONE SCHEDULE**

The following is a list of Phases for Service to be furnished under this Agreement. The Services for each Phase will be completed as follows and time is of the essence.

- Phase IB: Hiring of Sub-Consultants
- Phase IIA: Building Roof Replacement, Selective Demolition & Initial Structural Repairs
- Phase IIB: OSHA Fall Protection Systems
- Phase IIC: Preparation of Building, Plaza & Garage Repair Documents
- Phase III: Bid/Permit Services
- Phase IV: Construction Phase and Threshold Inspection (Special Inspections ["SI Services"])

### *MILESTONE SCHEDULE*

- Phase IB will be completed in 30 days from the Effective Date, time being of the essence.
- Phase IIA Services will be completed in 90 days from the date the Association approves the Phase IB Services, time being of the essence.
- Phase IIB Services will be completed in 30 days from the date the Phase IIA Services have been approved by the Association, time being of the essence.
- Phase IIC Services will be completed in 180 days from the date the Phase IIB Services have been approved by the Association, time being of the essence.
- Phase III Services will be completed in 120 days from the date the Phase IIC Services have been approved by the Association, time being of the essence.
- Phase IV Services will be expeditiously performed to meet the Association's objectives, time being of the essence.



" = "1" "" "" 13656347v.1

**EXHIBIT "2"**
**SCOPE OF SERVICES**

**Phase IB: The Engineer shall hire the following Sub-Consultants:**

A. The Engineer's scope of services for this phase includes developing the scope of work for each Sub-Consultant, reviewing this scope with Association , contacting Sub-Consultants to describe the scope of services, reviewing the Sub-Consultant's scope of services and fee for accuracy, completeness and competitiveness. Then preparing the Master Contract and each Sub-Consultant's contract to include all fees, terms, and conditions.

B. **Architect – Scott D. Dyer Architect, P.A.**
Layout/Aesthetic design of the replacement soffit over the entrance drive.

Assistance in the design of the new entrance handicap ramp including material finish selection.

Develop exterior building elevations with color scheme options for review/approval of the Board and Association community. Work includes preparation of presentation documents and meetings with Association as required.

Three Architectural designs will be prepared for the new painting color scheme that includes 2 two-dimensional elevations for each painting scheme that needs to be approved by the Association Board and submitted to the community for vote.

The scope will include attendance at Association meetings (preliminary and final meetings). Up to three (3) full color renderings on boards will be provided by the Architect along with PDF format copies for the Association's future use.

Association requested revisions to the color schemes after the original design and meetings are completed are not included in the fee and will be invoiced at the standard hourly rates.

Specify and detail the window and sliding glass door removal/replacement for the common area on Level 1. Develop design guidelines for the replacement of all unit owner windows and doors in sufficient detail to obtain unit prices from qualified contractors. Work to include site visits as deemed necessary to understand the existing site conditions.

C. **Landscape Architect – Rhett Roy Landscape Architecture-Planning, P.A.**



" = "1" "" "" 13656347v.1

Renovate the existing amenity deck and structured planters for a condominium tower that will include the re-design of deck planters. Additional deck amenities shall be proposed.

Develop schematic and presentation drawings for further review and comment that will include (2) meetings with the Board to achieve approval for schematic design including hardscape, landscape, lighting, and furniture.

1   Prepare a Tree Disposition Plan - Provided a CAD survey file, a site visit will be performed to identify all existing trees and palms on the deck.

2   Prepare a Hardscape Plan - Prepare plans for the amenity deck including pavers (or other system), planters and related site features.  Identify colors, finishes and materials for all remediation. Working drawings will be coordinated with engineering plans.

3   Prepare a Planting Design - Prepare contract documents for planting specifying name, size, location, and arrangement of various species of trees, shrubs and ground covers and lawn.

4   Prepare Site Lighting – Selection of upgraded landscape lighting fixtures will be recommended and coordinated with the MEP engineer for specifications, photometrics and electrical. All recommended lighting must be turtle compliant

The scope of this Agreement does not include electrical, irrigation, drainage or civil engineering related to landscape design. Engineer will work with MEP Engineer on location of Electrical, irrigation, drainage related to final landscape design.

Work with MEP for future electrical needs (Outlets, Car charging stations, etc.), new irrigation plan for all landscaped areas, and drainage plan for all planter areas.

Review as-built drawings prepared by Contractor and provide in both CAD and PDF format final plans, layouts, and inventory of all plantings.

D.   **Permit Expeditor – East of Collins Expediting**
Process Master Building Permit for Exterior Rehabilitation and Renovation:
Building - Town of Surfside
Fire / DERM / WASD / Impact Fee - Miami Dade County
NOC - Miami Dade Recorders
Scope does not include DEP approval, any sub-permits, and separate permits.

E.   **Surveyor – J. Bonfill & Associates**
A boundary & topographic Survey shall be completed for this property.
The entire site at the plaza/entrance level will be surveyed including the area east of the building footprint, the deck to the south property line, the street curbs to the north and west with everything in between. The surveyor shall install permanent property line markers for future reference



Work product will include plans with spot elevations and grade contours. Elevations of the deck, curbs, top of planter walls, pool perimeter, elevated structures, etc... will be provided to prepare site drainage and final planter/parking configuration.
CAD/PDF plans will be provided that will be used to prepare the contract documents.

F.   The Engineer shall work with the Association to hire:

Geotechnical & Material Testing Firm: For earthwork and concrete slump/cylinder testing during construction.

Welding Inspection Firm: For on-site steel repair inspection completed during construction.

Specialty Roof Contractor: For design and installation of main building waterproofing roof repairs/replacement

Concrete Restoration Contractor: For construction of initial /final repairs to the tower, plaza, and garage remediation work specified by the Engineer and its Sub-Consultants.

**Phase IIA:  Building Roof Replacement, Selective Demolition, & Initial Structural Repairs**
A.   The initial phase of the 40-Year remediation project shall include the repair/replacement of the building roof waterproofing system. Association shall hire a roof contractor to evaluate the roof systems and recommended a repair program on which a contract will be signed directly with Association. The accepted repairs shall be totally described in a submittal that will be reviewed and approved by the Engineer. Once the submittal has been approved, the roof contractor shall obtain all required permits and execute the approved repairs.

B.   Engineer will prepare initial documents to complete the following scope of services:
1.   Selective demolition of the plaza driving surface and pool deck pavers to understand the existing waterproofing systems, details, and building's structural infrastructure.
2.   Selective demolition of the soffit of the entry drive are to understand the construction of the soffit and evaluate the condition of the plywood sheathing and suspended structural framing.
3.   Repair concrete spalling/damage to the pool concrete walls and gutter that are exposed inside of the garage.
4.   Repair the rusted steel tube column at the lower level of the tower egress stair.

**Phase IIB:  OSHA Fall Protection Systems**
A.   The staging of the building to complete all required present and future repairs and maintenance will require the installation of permanent safety anchors (for stage and



personal safety anchorages) on the roof and underside of the top floors cantilevered balcony slabs.  These new permanent safety anchors must meet the requirements of **OSHA 29 CFR Part 1926.502 "Fall Protection Systems Criteria and Practices"** which went into effect on 1/17/2017 and was required to be implemented by 10/26/2017. The Engineer shall prepare contract documents and specifications that outline the location, details, and waterproofing for the permanent safety anchors.

**Phase IIC: Preparation of Building, Plaza & Garage Repair Documents**

   A. The scope of the Building, Plaza & Garage Repair Documents includes the following:

      1. All of the repair/remediation recommendations outlined in the ***Phase I – Recertification Report and Preliminary Cost Estimate*** dated 10/08/2018 prepared by the Engineer, which includes the Building Façade, Garage, Entrance & Pool Deck Remediation.

      2. The Engineer and its Sub-Consultants shall design a handicap ramp at the main entrance to the building lobby.

      3. The Engineer and its Sub-consultants shall incorporate all approved layout/design changes prepared by the Landscape Architect and approved by ASSOCIATION.

   B. The Engineer and its Sub-Consultants shall prepare contract documents which will describe, in detail, the repair, revisions and maintenance work that needs to be completed to this building structure.  These documents will include concrete, stucco, waterproofing, paving, plaza, and landscaping repair details and project specifications which will establish the quality of the work necessary to complete a lasting repair.  The specifications will include warrantee periods for the various work items that require specialty contractors experienced in concrete restoration work. These specifications will also outline a basis of contract under which the work will be completed, including unit prices for work items which do not have established quantities of repair.  These contract documents & specifications will be sealed, submitted for permit, and used to obtain competitive pricing from qualified restoration contractors.

   C. The landscaping layout/configuration shall be updated, designed and approved by Association  to include the remediation/repair of the existing planters along with the design of new planters, paving surfaces, expanded entrance parking and a new handicap entrance ramp with like-kind landscaping. This work will be completed in conjunction with a licensed Landscape Architect a Surveyor (hired by the Engineer) and a MEP engineer that will hired by Association.

**Phase III: Bid/Permit Phase Services**

   A. The Engineer and its Sub-Consultants shall sign and seal the contract documents and send them to a Permit Expeditor for submission to the Building Official to obtain the necessary construction permits. The Engineer shall also solicit competitive bids from qualified concrete restoration contractors. The Bid/Permit Phase Services will include (but not limited to) the following items.



" = "1" "" "" 13656347v.1

1. Soliciting bids from qualified contractors. ASSOCIATION shall have final approval of the contractor bid list and shall have the right to add qualified contractors to the bid list.
2. Signing/Sealing of contract documents for building permit.
3. Preparation of responses to questions/issues raised by permit department.
4. Assistance during the contract bid phase to clarify any questions that may arise.
5. Attendance at the pre-bid meeting on site.
6. Preparation/issuing of any addendum/clarifications.
7. Receiving of bids, the review of the bid proposals, and preparation of bid comparison spreadsheet.
8. Attendance at a post-bid meeting to discuss job with the low bidder(s).
9. Recommendations to finalize the scope of work with the selected contractor on which a construction contract will be written / awarded.
10. Attendance at pre-construction meeting.
11. Attendance at a meeting with the Association Board of Directors to review the bid process and to approve the award of this restoration project to the successful bidder.

These professional services do not include Value-Engineering services that may be requested by Association to reduce the cost of the proposed project remediation after the bids are received.

**Phase IV: Construction Phase + Threshold Inspection (Special Inspections – SI) Services**
A. The Engineer and its Sub-Consultants shall complete the Construction Phase Services which will commence upon Notice to Proceed to the Contractor performing the work. These Phase IV services will include (but not be limited to) the following items.
1. Attendance at pre-construction meeting on site.
2. Management of relevant construction related correspondence.
3. Review of shop drawings and product submittals.
4. Periodic site visits to review the actual work in progress and address any questions to assure that all work is in conformance with the project specifications and details. These site visits will include inspection (and measuring) of all repair areas after demolition is complete.
5. Attend bi-weekly job progress meetings with the Association and Contractor to update the Association on the progress of work, schedule, budget, and other critical issues related to the work.
6. Prepare weekly reports that will include photographs that will be distributed to the Association, Engineer and Contractor. These weekly reports will be complied on a monthly basis and submitted to the building official. These monthly reports will contain MC registered Florida Special Inspector's professional seal.
7. Review and response to Contractor RFIs.
8. Review, oversight, discovery, and approval recommendation for proposed change orders.

" = "1" "" "" 13656347v.1



9. Monitor Contractor's schedule and project costs for adherence to executed contract.
10. Review Contractor's monthly requisitions to assure that the invoiced work has been completed per the contract documents and specifications prior to authorizing payments.
11. Review of as-built drawings prepared by the contractor that must be submitted with the monthly requisitions.
12. Punch list management including final payment coordination, Contractor closeout package review, and project closeout support
13. Provide final project certification.

**EXHIBIT "3"**
**KEY PERSONNEL**

Engineer shall make available the Services of the following Key Personnel of its Firm and the following Sub-Consultants. No substitution of any of the Key Personnel shall be permitted without the prior written notification to, and approval of, the Association. If the Engineer or a Sub-Consultant desires to change any of the Key Personnel, it shall specify in writing to the Association the reason(s) for substitution and submit the qualifications of personnel proposed as a substitute(s) for the prior approval of the Association.

The Engineer shall specifically require the Sub-Consultants to periodically visit the Project site and inspect the Work in the manner set forth in this Agreement, to endeavor to guard against defects and deficiencies in the Work for which such Sub-Consultant is consulting, and to determine in general that such Work is being performed substantially in accordance with the Drawings and Specifications, other Construction Documents, and the Applicable Laws. To the extent that Work is discovered to be performed contrary to design documents and /or the standards of this Agreement, written notice must promptly be provided to the Association to allow for the mitigation of any damages to the Association.

**Structural Engineer of Record:  Morabito Consultants, Inc.:**
Principal-in-Charge/President: Frank P. Morabito, PE SI
Senior Project Manager: Robert J. Miller, PE
Structural Engineer: Henry Rand, PE
Structural Designer: Timothy J. Sabatino, EI
Project Engineer: Jonathan M. Bain, EI

**Architect:  Scott D. Dyer Architect, P.A.**
Principal-in-Charge/President: Architect: Scott D. Dyer, AIA
Design Architect: Chris Dyer

**Landscape Architect:  Rhett Roy Landscape Architecture-Planning, P.A.**
Principal-in-Charge/President: Rhett G. Roy, LA
Landscape Architect: Herb Hodgeman



" = "1" "" "" 13656347v.1

**Engineers: (Mechanical/Electrical/Plumbing Engineers):**
Thomas E. Henz PE, Inc. (to be hired directly by CTS)

**Geotechnical Engineer:** To Be Identified

**Material Testing Consultant:** To Be Identified

**Surveyor: J. Bonfill & Associates**
Principal-in-Charge/President: Cathy        th

**Permit Expeditor:  East of Collins Expediting**
Principal-in-Charge/President: Jeevan B. Tillit

**Other Consultants:** To Be Identified

" = "1" "" "" 13656347v.1

<u>EXHIBIT "4"</u>
**FEE BREAKDOWN AND COMPENSATION**

In consideration of the Services to be provided, Engineer shall be compensated a Lump Sum Fee as described in the following Phase breakdown. The Compensation for each Phase will be paid based upon the progress of Services performed as approved by the Association. The Engineer will be paid at thirty (30) day intervals by written invoice with a description of the Services furnished with reasonable detail supported by documentation that the Association may reasonably require. The Association will pay Engineer within 14 days for submitting the invoice subject to the provisions of this Agreement.

The ENGINEER'S Professional Services shall commence when the Contract between the ASSOCIATION Owner's and ENGINEER has been signed/executed and an initial payment of **$15,000**.00 has been received, which shall be applied to the final invoice. Invoices will be prepared thereafter on a monthly basis and will reflect a payment due amount based on percentage complete for each phase of work being perform during any given month.

In consideration of the Services to be provided, Engineer shall be compensated based on a Lump Sum/ Hourly Fee as described in the following Phase breakdown.



" = "1" "" "" 13656347v.1

**STRUCTURAL REMEDIATION OF CHAMPLAIN TOWERS CONDOMINIUM**  — 4/15/2020
**BREAKDOWN BY PHASE OF ENGINEER'S PROFESSIONAL FEE** — CTS_MC-FeeBreakdown.xlsx
**REVISED TO INCORPORATE OPTIONAL SCOPE OF SERVICES** — Page 1 of 1

| # | PHASE | MORABITO CONSULTANTS (Structural Engineer) | SCOTT D. DYER ARCHITECT, PA (Architect) | RHEET ROY LANDSCAPE ARCHITECTURE-PLANNING PA (Landscape Architect) | EAST OF COLLINS EXPEDITING (Permit Expediting) | J. BONFILL & ASSOCIATES (Surveyor) | TOTAL FEE PER PHASE |
|---|---|---|---|---|---|---|---|
| 1 | BASE FEE REQUIRED TO MEET 40-YEAR RECERTIFICATION | | | | | | |
| 2 | | | | | | | |
| 3 | Phase IB — Hiring of Sub-Consultants | | | | | | |
| 4 | | $4,500.00 | | | | | $4,500.00 |
| 5 | | | | | | | |
| 6 | Phase IIA — Building Roof Replacement, Selective Demolition, & Initial Structural Repairs | | | | | | |
| 7 | Part A | $4,000.00 | | | | | |
| 8 | Part B | $3,800.00 | | | | | $7,800.00 |
| 9 | | | | | | | |
| 10 | Phase IIB — OSHA Fall Protection Systems | | | | | | |
| 11 | | $12,500.00 | | | | | $12,500.00 |
| 12 | | | | | | | |
| 13 | Phase IIC — Preparation of Building, Plaza, Level 1 Windows & Garage Repair Documents | | | | | | |
| 14 | Windows | $4,000.00 | $12,650.00 | | | | |
| 15 | Balance | $68,000.00 | $22,000.00 | $40,700.00 | | $11,000.00 | $158,350.00 |
| 16 | | | | | | | |
| 17 | Phase III — Bid/Permit Phase Services | | | | | | |
| 18 | IIA, Part B | $2,500.00 | | | | | |
| 19 | IIB | $4,000.00 | | | | | |
| 20 | IIC | $9,500.00 | $2,000.00 | $1,500.00 | $13,750.00 | | $33,250.00 |
| 21 | | | | | | | |
| 22 | Phase IV — Construction Phase + Threshold Inspection (Special Inspections – SI) Services | | | | | | |
| 23 | These services will be invoiced on an hourly basis for actual time spent | | | | | | |
| 24 | IIA + IIB — Based on a construction schedule of 3 months | | | | | | |
| 25 | | $37,500.00 | | | | | |
| 26 | IIC — Based on a construction schedule of 12 months for the Tower and 9 months for the Garage | | | | | | |
| 27 | | $262,500.00 | $11,000.00 | $4,500.00 | | | $315,500.00 |
| 28 | | | | | | | |
| 29 | Expenses — Reimbursable Expenses (Estimate) | | | | | | |
| 30 | | $15,000.00 | | | | | $15,000.00 |
| 31 | | | | | | | |
| 32 | 40-YEAR RECERTIFICATION TOTAL PER CONSULTANT | | | | | | |
| 33 | | $427,800.00 | $47,650.00 | $46,700.00 | $13,750.00 | $11,000.00 | |
| 34 | | | | | | | |
| 35 | | | | | Total Estimated Fee | | $546,900.00 |
| 36 | | | | | | | |



" = "1" "" "" 13656347v.1

**Hourly Rates**

    A.  All Compensation for the Engineer's hourly services shall be invoiced at the following rates:

| | |
|---|---|
| • Principal I | $250.00/hour |
| • Principal II | $215.00/hour |
| • Senior Project Manager | $185.00/hour |
| • Project Manager | $155.00/hour |
| • Professional Engineer | $140.00/hour |
| • Special Inspector | $135.00/hour |
| • Design Engineer | $115.00/hour |

    B.  All Sub-Consultants required and authorized by the Association will be billed at the Sub-Consultant's quoted rates below plus ten percent.

| | |
|---|---|
| • Principal Architect | $200.00 per hour |
| • Associate Architect/Draftsperson | $125.00 per hour |
| • Architectural Illustrator / Renderer | $100.00 per hour |
| • Principal Landscape Architect | $200.00 per hour |
| • Senior Landscape Architect | $125.00 per hour |

## ADDITIONAL SERVICES & REIMBURSABLE EXPENSES

**I.**    **Compensation for Additional Services:** To the extent approved in advance and in writing by the Association, payment for Additional Services shall be computed on either: (a) a "time and expense" basis measured by the *Hourly Rates* as listed in the Agreement, without mark-ups, plus Reimbursable Expenses directly related to the Additional Services, without mark-ups; or (b) a "lump sum" basis as may be mutually agreed upon by the parties in advance and in writing. Lump-sum amounts for Additional Services shall be inclusive of all Reimbursable Expenses, except for the cost of travel.

**II. Reimbursable Expenses:** Reimbursable Expenses shall be invoiced at actual cost (without mark-ups) and limited to those costs incurred by the Engineer in the direct performance of Services and Additional Services performed on a "time and expense" basis as follows:

    **.1**    Actual and reasonable costs for travel and subsistence expenses in connection, in the discharge of duties in connection with the Services, but only for travel more than 50 miles from the Project.  All travel shall only be authorized in writing by the Association before any expense is incurred.



.2      Costs of long- distance telephone communications including facsimile transmissions directly required by the Services.

.3      Fees approved by the Association and paid for securing approval of authorities having jurisdiction over Engineer's Services provided.

.4      Costs of postage including the cost of air express mail and delivery services directly required by the Services.

.5      Expense of overtime hours requiring higher than regular rates, when authorized in advance and in writing by the Association.

Reimbursable Expenses relating to Engineer's Services shall be subject to the express written approval of the Association except for those set forth in .2-.5 above which will not exceed the sum of $15,000.00.

**III. Non-Reimbursable Expenses:** Non-Reimbursable expenses are included within the fees as outlined in the Agreement and shall include expenses incurred by the Engineer and its Sub-Consultants of any tier as follows:

.1      All local postage and telephone communications.

.2      All drawing reproduction and photocopying required either in support of the Services or to communicate with its Sub-Consultants, Association, and all consultants and Agreement or to the Association, up to one copy or as otherwise specified in the Agreement, or necessary for permit applications. The Engineer shall be entitled to charge for document production that were requested as additional copies, re-submittal of documents that were lost through no fault of the Engineer, as well as the cost to provide copies of documents by third parties.

.3      Processing charges for sending and receiving facsimile transmissions.

.4      Costs of all materials, photographic production, computer timer, data processing and similar expenses incurred in support of the Services, for fixed price portions of the Agreement. All reasonable costs required for field report production inclusive of data processing and photograph production, under hourly/not to exceed/allowance part of the Agreement may be billed*.

.5      Costs of Internet and e-mail access fees and charges.

.6      Any other costs in excess of the Fee unless approved in advance and in writing by the Association.

\* In-house expenses incurred for the Project will be billed as follows:

| | |
|---|---|
| Drawings | $0.15 / sq. ft. |
| B&W Copies | $0.12 / ea. |
| Color Copies | $0.50 / ea. |
| Mileage | IRS Business Rate + 10% |



" = "1" "" "" 13656347v.1

**EXHIBIT "5"**
**CERTIFICATE OF INSURANCE**

## CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 4/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

PRODUCER: Mason & Carter, 23 South Street, Baltimore MD 21202-3296

CONTACT NAME: William Codd
PHONE (A/C, No, Ext): (410)539-6767   FAX (A/C, No):
E-MAIL ADDRESS: bcodd@masoncarter.com

INSURED: Morabito Consultants Inc, 952 Ridgebrook Road #1700, Sparks MD 21152

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Continental Casualty Company - A | 20443 |
| INSURER B: National Fire Ins Co of Hart - A | 20478 |
| INSURER C: Sentinel Insurance - A+ | 11000 |
| INSURER D: Ace American Insurance Co - A++ | 22667 |
| INSURER E: | |
| INSURER F: (REVISED 05/01/2020) | |

COVERAGES   CERTIFICATE NUMBER: CL19102830472   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY CLAIMS-MADE X OCCUR | | X | Y | 6011704867 | 11/1/2019 | 11/1/2020 | EACH OCCURRENCE | $ 2,000,000 |
| | | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PRO-JECT LOC OTHER | | | | | | | GENERAL AGGREGATE | $ 4,000,000 |
| | | | | | | | | PRODUCTS - COMP/OP AGG | $ 4,000,000 |
| | | | | | | | | | $ |
| B | AUTOMOBILE LIABILITY X ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS HIRED AUTOS NON-OWNED AUTOS | | X | Y | 6021296111 | 11/1/2019 | 11/1/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| A | X UMBRELLA LIAB OCCUR EXCESS LIAB CLAIMS-MADE DED X RETENTION $ | | X | Y | 6011705633 | 11/1/2019 | 11/1/2020 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N | N/A | Y | 30WBCELL277 | 11/1/2019 | 11/1/2020 | X PER STATUTE OTH-ER | |
| | | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| D | CYBER LIA COV | X | X | | D05358766 | 04/05/2020 | 04/05/2021 | LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: CHAMPLAIN TOWERS SOUTH

CERTIFICATE HOLDER:
CHAMPLAIN TOWERS SOUTH CONDOMINIUM ASSOCIATION
8777 COLLINS AVE
SURFSIDE, FL 33154

CANCELLATION:
SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE
William Codd/SB

© 1988-2014 ACORD CORPORATION. All rights reserved.
ACORD 25 (2014/01)   The ACORD name and logo are registered marks of ACORD

"=" "1" "" "" 13656347v.1

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
4/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: certs@fenner-esler.com | | |
|---|---|---|---|
| Fenner & Esler | PHONE (A/C, No, Ext): (201) 262-1200 | FAX (A/C, No): 1001-555-5555 | |
| 467 Kinderkamack Road | E-MAIL ADDRESS: | | |
| P. O. Box 60 | | | |
| Oradell                NJ   07649-0060 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A: Architects & Engineers Ins. | | 44148 |
| INSURED | INSURER B : | | |
| Morabito Consultants, Inc. | INSURER C : | | |
| 952 Ridgebrook Road | INSURER D : | | |
| Suite 1700 | INSURER E : | | |
| Sparks                MD   21152-9390 | INSURER F : | | |

**COVERAGES** | **CERTIFICATE NUMBER:** Master 19-21 | **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | POLICY ☐ PRO-JECT ☐ LOC ☐ | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS ☐ SCHEDULED AUTOS ☐ | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ☐ NON-OWNED AUTOS ☐ | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ☐ ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N/A (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | PER STATUTE ☐  OTH-ER ☐ | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liability | | Y | 8EXC90-18 | 11/5/2020 | 11/5/2021 | Per Claim Limit | $3,000,000 |
| | | | | | | | Aggregate Limit | $5,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: Champlain Towers South

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Champlain Towers South Condominium Association 8777 Collins Ave. Surfside, FL 33154 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.  AUTHORIZED REPRESENTATIVE  Timothy Esler/JEAN |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)
INS025 (201401)

The ACORD name and logo are registered marks of ACORD



" = "1" "" "" 13656347v.1

**Engineers: (Mechanical/Electrical/Plumbing Engineers):**
Thomas E. Henz PE, Inc. (to be hired directly by CTS)

**Geotechnical Engineer:** To Be Identified

**Material Testing Consultant:** To Be Identified

**Surveyor: J. Bonfill & Associates**
Principal-in-Charge/President: Cathy ___th

**Permit Expeditor:  East of Collins Expediting**
Principal-in-Charge/President: Jeevan B. Tillit

**Other Consultants:** To Be Identified

" = "1" "" "" 13656347v.1

<u>**EXHIBIT "4"**</u>
**FEE BREAKDOWN AND COMPENSATION**

In consideration of the Services to be provided, Engineer shall be compensated a Lump Sum Fee as described in the following Phase breakdown. The Compensation for each Phase will be paid based upon the progress of Services performed as approved by the Association. The Engineer will be paid at thirty (30) day intervals by written invoice with a description of the Services furnished with reasonable detail supported by documentation that the Association may reasonably require. The Association will pay Engineer within 14 days for submitting the invoice subject to the provisions of this Agreement.

The ENGINEER'S Professional Services shall commence when the Contract between the ASSOCIATION Owner's and ENGINEER has been signed/executed and an initial payment of **$15,000**.00 has been received, which shall be applied to the final invoice. Invoices will be prepared thereafter on a monthly basis and will reflect a payment due amount based on percentage complete for each phase of work being perform during any given month.

In consideration of the Services to be provided, Engineer shall be compensated based on a Lump Sum/ Hourly Fee as described in the following Phase breakdown.



" = "1" "" "" 13656347v.1

| # | PHASE | MORABITO CONSULTANTS Structural Engineer | SCOTT D. DYER ARCHITECT, PA Architect | RHEET ROY LANDSCAPE ARCHITECTURE-PLANNING PA Landscape Architect | EAST OF COLLINS EXPEDITING Permit Expediting | J. BONFILL & ASSOCIATES Surveyor | TOTAL FEE PER PHASE |
|---|---|---|---|---|---|---|---|
| 1 | BASE FEE REQUIRED TO MEET 40-YEAR RECERTIFICATION | | | | | | |
| 2 | | | | | | | |
| 3 | Phase IB | Hiring of Sub-Consultants | | | | | |
| 4 | | $4,500.00 | | | | | $4,500.00 |
| 5 | | | | | | | |
| 6 | Phase IIA | Building Roof Replacement, Selective Demolition, & Initial Structural Repairs | | | | | |
| 7 | Part A | $4,000.00 | | | | | |
| 8 | Part B | $3,800.00 | | | | | $7,800.00 |
| 9 | | | | | | | |
| 10 | Phase IIB | OSHA Fall Protection Systems | | | | | |
| 11 | | $12,500.00 | | | | | $12,500.00 |
| 12 | | | | | | | |
| 13 | Phase IIC | Preparation of Building, Plaza, Level 1 Windows & Garage Repair Documents | | | | | |
| 14 | Windows | $4,000.00 | $12,650.00 | | | | |
| 15 | Balance | $68,000.00 | $22,000.00 | $40,700.00 | | $11,000.00 | $158,350.00 |
| 16 | | | | | | | |
| 17 | Phase III | Bid/Permit Phase Services | | | | | |
| 18 | IIA, Part B | $2,500.00 | | | | | |
| 19 | IIB | $4,000.00 | | | | | |
| 20 | IIC | $9,500.00 | $2,000.00 | $1,500.00 | $13,750.00 | | $33,250.00 |
| 21 | | | | | | | |
| 22 | Phase IV | Construction Phase + Threshold Inspection (Special Inspections – SI) Services | | | | | |
| 23 | | These services will be invoiced on an hourly basis for actual time spent | | | | | |
| 24 | IIA + IIB | Based on a construction schedule of 3 months | | | | | |
| 25 | | $37,500.00 | | | | | |
| 26 | IIC | Based on a construction schedule of 12 months for the Tower and 9 months for the Garage | | | | | |
| 27 | | $262,500.00 | $11,000.00 | $4,500.00 | | | $315,500.00 |
| 28 | | | | | | | |
| 29 | Expenses | Reimbursable Expenses (Estimate) | | | | | |
| 30 | | $15,000.00 | | | | | $15,000.00 |
| 31 | | | | | | | |
| 32 | 40-YEAR RECERTIFICATION TOTAL PER CONSULTANT | | | | | | |
| 33 | | $427,800.00 | $47,650.00 | $46,700.00 | $13,750.00 | $11,000.00 | |
| 34 | | | | | | | |
| 35 | | | | | | Total Estimated Fee | $546,900.00 |
| 36 | | | | | | | |

**STRUCTURAL REMEDIATION OF CHAMPLAIN TOWERS CONDOMINIUM** 4/15/2020
**BREAKDOWN BY PHASE OF ENGINEER'S PROFESSIONAL FEE** CTS_MC-FeeBreakdown.xlsx
**REVISED TO INCORPORATE OPTIONAL SCOPE OF SERVICES** Page 1 of 1

Engineering Services Agreement Page 17 of 21



" = "1" "" "" 13656347v.1

**Hourly Rates**

    A.  All Compensation for the Engineer's hourly services shall be invoiced at the following rates:

- Principal I                               $250.00/hour
- Principal II                             $215.00/hour
- Senior Project Manager        $185.00/hour
- Project Manager                    $155.00/hour
- Professional Engineer          $140.00/hour
- Special Inspector                 $135.00/hour
- Design Engineer                   $115.00/hour

    B.  All Sub-Consultants required and authorized by the Association will be billed at the Sub-Consultant's quoted rates below plus ten percent.

- Principal Architect              $200.00 per hour
- Associate Architect/Draftsperson    $125.00 per hour
- Architectural Illustrator / Renderer   $100.00 per hour
- Principal Landscape Architect       $200.00 per hour
- Senior Landscape Architect         $125.00 per hour

## ADDITIONAL SERVICES & REIMBURSABLE EXPENSES

**I.**    **Compensation for Additional Services:** To the extent approved in advance and in writing by the Association, payment for Additional Services shall be computed on either: (a) a "time and expense" basis measured by the *Hourly Rates* as listed in the Agreement, without mark-ups, plus Reimbursable Expenses directly related to the Additional Services, without mark-ups; or (b) a "lump sum" basis as may be mutually agreed upon by the parties in advance and in writing. Lump-sum amounts for Additional Services shall be inclusive of all Reimbursable Expenses, except for the cost of travel.

**II. Reimbursable Expenses:** Reimbursable Expenses shall be invoiced at actual cost (without mark-ups) and limited to those costs incurred by the Engineer in the direct performance of Services and Additional Services performed on a "time and expense" basis as follows:

    **.1**    Actual and reasonable costs for travel and subsistence expenses in connection, in the discharge of duties in connection with the Services, but only for travel more than 50 miles from the Project. All travel shall only be authorized in writing by the Association before any expense is incurred.



.2    Costs of long- distance telephone communications including facsimile transmissions directly required by the Services.

.3    Fees approved by the Association and paid for securing approval of authorities having jurisdiction over Engineer's Services provided.

.4    Costs of postage including the cost of air express mail and delivery services directly required by the Services.

.5    Expense of overtime hours requiring higher than regular rates, when authorized in advance and in writing by the Association.

Reimbursable Expenses relating to Engineer's Services shall be subject to the express written approval of the Association except for those set forth in .2-.5 above which will not exceed the sum of $15,000.00.

**III. Non-Reimbursable Expenses:** Non-Reimbursable expenses are included within the fees as outlined in the Agreement and shall include expenses incurred by the Engineer and its Sub-Consultants of any tier as follows:

.1    All local postage and telephone communications.

.2    All drawing reproduction and photocopying required either in support of the Services or to communicate with its Sub-Consultants, Association, and all consultants and Agreement or to the Association, up to one copy or as otherwise specified in the Agreement, or necessary for permit applications. The Engineer shall be entitled to charge for document production that were requested as additional copies, re-submittal of documents that were lost through no fault of the Engineer, as well as the cost to provide copies of documents by third parties.

.3    Processing charges for sending and receiving facsimile transmissions.

.4    Costs of all materials, photographic production, computer timer, data processing and similar expenses incurred in support of the Services, for fixed price portions of the Agreement. All reasonable costs required for field report production inclusive of data processing and photograph production, under hourly/not to exceed/allowance part of the Agreement may be billed*.

.5    Costs of Internet and e-mail access fees and charges.

.6    Any other costs in excess of the Fee unless approved in advance and in writing by the Association.

\* In-house expenses incurred for the Project will be billed as follows:

| | |
|---|---|
| Drawings | $0.15 / sq. ft. |
| B&W Copies | $0.12 / ea. |
| Color Copies | $0.50 / ea. |
| Mileage | IRS Business Rate + 10% |



" = "1" "" "" 13656347v.1

## EXHIBIT "5"
## CERTIFICATE OF INSURANCE

**ACORD**    **CERTIFICATE OF LIABILITY INSURANCE**    DATE (MM/DD/YYYY) 4/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: William Codd | | |
|---|---|---|---|
| Mason & Carter | PHONE (A/C, No, Ext): (410)539-6767 | FAX (A/C, No): (410) 521-7000 | |
| 23 South Street | E-MAIL ADDRESS: bcodd@masoncarter.com | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| Baltimore MD 21202-3296 | INSURER A : Continental Casualty Company - A | | 20443 |
| INSURED | INSURER B : National Fire Ins Co of Hart - A | | 20478 |
| Morabito Consultants Inc | INSURER C : Sentinel Insurance - A+ | | 11000 |
| 952 Ridgebrook Road #1700 | INSURER D : Ace American Insurance Co - A++ | | 22667 |
| | INSURER E : | | |
| Sparks MD 21152 | INSURER F : (REVISED 05/01/2020) | | |

| COVERAGES | CERTIFICATE NUMBER:CL19102830472 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | X | | 6011794807 | 11/1/2019 | 11/1/2020 | EACH OCCURRENCE | $ 2,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 4,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 4,000,000 |
| | OTHER | | | | | | | $ |
| B | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X ANY AUTO | X | Y | 6021296111 | 11/1/2019 | 11/1/2020 | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB OCCUR | | | | | | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED X RETENTION $ | X | Y | 6011795622 | 11/1/2019 | 11/1/2020 | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | | | | | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | Y | 3088C01277 | 11/1/2019 | 11/1/2020 | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| D | CYBER LIA COV | X | Y | D05208766 | 04/09/2020 | 04/09/2021 | LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: CHAMPLAIN TOWERS SOUTH

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CHAMPLAIN TOWERS SOUTH CONDOMINIUM ASSOCIATION 8777 COLLINS AVE SURFSIDE, FL 33154 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE William Codd/SB |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)
008825 (2014/01)

The ACORD name and logo are registered marks of ACORD

" = "1" "" "" 13656347v.1

**ACORD** | **CERTIFICATE OF LIABILITY INSURANCE** | DATE (MM/DD/YYYY) 4/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | certs@fenner-esler.com | | |
|---|---|---|---|---|
| Fenner & Esler | PHONE (A/C, No, Ext): (201) 262-1200 | | FAX (A/C, No): 000-000-0000 | |
| 467 Kinderkamack Road | E-MAIL ADDRESS: | | | |
| P. O. Box 60 | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| Oradell            NJ   07649-0060 | INSURER A: Architects & Engineers Ins. | | | 44148 |
| INSURED | INSURER B: | | | |
| Morabito Consultants, Inc. | INSURER C: | | | |
| 952 Ridgebrook Road | INSURER D: | | | |
| Suite 1700 | INSURER E: | | | |
| Sparks              MD   21152-9390 | INSURER F: | | | |

**COVERAGES** | **CERTIFICATE NUMBER:** Master 19-21 | **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS  ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB  ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED  ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y / N | | | | | | ☐ PER STATUTE  ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liability | | Y | EE3CN0-18 | 11/5/2018 | 11/5/2021 | Per Claim Limit | $3,000,000 |
| | | | | | | | Aggregate Limit | $5,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: Champlain Towers South

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Champlain Towers South Condominium Association  8777 Collins Ave.  Surfside, FL 33154 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE  Timothy Esler/JEAN |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)
INS025 (201401)     The ACORD name and logo are registered marks of ACORD



" = "1" "" "" 13656347v.1



14 July 2020

Champlain Towers South
8777 Collins Avenue
Surfside, FL 33154

Attention:        Mr. Scott Stewart
                  Project Management

*Re:        Champlain Towers South – Phase IIA Scope of Work*

Dear Scott:

As requested, Morabito Consultants has developed this document to detail the scope of work
included under Phase IIA of the restoration to Champlain Towers South. Please refer to the list
below for the scope of work:

1) **Pool Corbel/Wall Repairs** – The contractor shall conduct a full survey of the area
surrounding the visibly damaged and deteriorated concrete corbel, soffit, and pool wall.
All areas noted to be deficient (including spalls, delamination, cracks, etc..) shall be
repaired per the details provided in the Phase IIA contract documents.
2) **Deteriorated Stair Column Base** – The base of the continuous center column in Stair 1 is
severely deteriorated. The stairs shall be shored as required and the deteriorated
bottom portion of the column will be removed and a new HSS steel section will be
spliced to the existing column.
3) **First Floor Exploratory Demolition** – The contractor shall review the exploratory
demolition locations indicated on the Phase IIA contract documents. They shall demolish
the paver system at the pool deck, stamped concrete at the parking/drive aisle, and
landscaping within a planter down to the existing waterproofing. Morabito Consultants
shall be notified of the completion of the demolition and will conduct a site visit to
document the full system at each location. Upon completion of the review and
documentation, the contractor shall restore each area back to its original condition or as
directed by the Association.
4) **Hung Soffit Exploratory Demolition** – The contractor shall review the exploratory
demolition locations indicated on the Phase IIA contract documents. They shall open
areas in the framed soffit large enough to access the space to review and document the
existing framing conditions. Morabito Consultants shall be notified of the completion of
the demolition and will conduct a site visit to document the existing framing, overall

Structural Engineers | Remediation & Parking Consultants
206 Via Condado Way | Palm Beach Gardens, FL 33418-1701
561-316-7660 | www.morabitoconsultants.com

14 July 2020
Champlain Towers South
*Re: Phase IIA Scope of Work*
Page 2

condition of the soffit, and the general locations of immovable MEP piping and ductwork. Upon completion of the review and documentation, the contractor shall restore each area back to its original condition or as directed by the Association.

5) **Balcony Soffit Remedial Demolition** – Morabito Consultants has provided a preliminary schedule of observed deficiencies of the balcony soffit concrete and stucco. Morabito Consultants did not complete an exhaustive survey, therefore the contractor shall conduct their own hands-on review of the noted balcony soffits and address all areas of debonded stucco and concrete damage. No repairs are to be completed at this time, the contractor is responsible for removing all loose, spalled, deteriorated, and delaminated concrete and all deteriorated, debonded, or failing stucco. The contractor is required to supply all overhead and fall protection to complete the work as well as disposal of all removed material. The Association shall facilitate the contractor's access to the units noted on the contract documents.

Morabito Consultants appreciates the opportunity of being of service to you in this project and trusts that breakdown of the Phase IIA scope of work addresses your present needs.  We look forward to working with you in order to implement this phase of the project.  In the meantime, if we can answer any further questions concerning this scope of work, please do not hesitate to contact our office.

Very truly yours,

MORABITO CONSULTANTS

Evan Campbell, PE
Project Engineer

Frank Morabito, PE
President

g:\2018\18217 - Champlain Towers South\Phase IIA\Archive\MC - CTS Phase IIA_Scope of Work.docx

Structural Engineers | Remediation & Parking Consultants
206 Via Condado Way | Palm Beach Gardens, FL 33418-1701
561-316-7660 | www.morabitoconsultants.com